IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TIMOTHY CHARLES DAVIS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:99cv416-ID |
| | ) | (WO) |
| CHARLIE JONES, et al., | ) | |
| | ) | |
| Respondents. | ) | |

**MEMORANDUM OPINION AND ORDER**

## I.  INTRODUCTION

This cause is before the court on Petitioner Timothy Charles Davis' ("Davis")

petition for writ of habeas corpus, brought pursuant to 28 U.S.C. § 2254, for a decision

on the merits.[1]  Davis, who was seventeen years old at the time of the offense, was

convicted of murder by a jury in an Alabama state court and sentenced to death.  The

judgment of conviction and sentence of death were affirmed on direct review, and Davis'

petition was rejected by state collateral proceedings.

In the present proceeding, timely brought pursuant to 28 U.S.C. § 2254, Davis

challenges the constitutional validity of his judgment of conviction and sentence of death.

---

[1] Previously, the court adopted the recommendations of the magistrate judge that
certain of Davis' claims are procedurally defaulted.  (See Doc. Nos. 49, 60, 81, 87, 88.)
As a result, in this opinion, the court does not address the merits of those claims which
are procedurally defaulted.  As to the issues which have been preserved for merit review
and are not moot, the parties agree that an evidentiary hearing is not necessary.  (See Doc.
Nos. 72, 85.)

In light of the Supreme Court of the United States' decision in Roper v. Simmons, which held that the execution of individuals who were under the age of eighteen at the time of their capital crimes is prohibited by the Eighth and Fourteenth amendments, Davis is no longer eligible for the death penalty.  See 543 U.S. 551 (2005).  Because Davis' sentence of death is unconstitutional under Roper, as discussed herein, Davis is due habeas corpus relief with respect to his sentence of death to the extent that the court must grant Davis' petition, unless the State of Alabama vacates or sets aside Davis' death sentence and sentences Davis to life imprisonment without the possibility of parole.

In his petition, Davis also raises guilt-phase claims challenging the validity of his judgment of conviction.  After careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that, as to Davis' guilt-phase claims, Davis' writ is due to be denied pursuant to 28 U.S.C. § 2254(d) because the decisions of the Alabama courts were not contrary to or an unreasonable application of clearly established, controlling Supreme Court precedent, and were not based on an unreasonable determination of the facts.

## II.  BACKGROUND

### A.  Procedural History

The following presents a synopsis of the procedural history of this case.  Davis was tried before a jury in the Circuit Court of Coosa County, Alabama, on a charge of capital murder, namely, the intentional killing during a robbery of Mrs. Avis F. Alford

("Mrs. Alford").  On June 13, 1980, the jury returned a verdict of guilty against Davis for

capital murder, and, pursuant to § 13-11-2(a) of the Alabama Code, the predecessor to

§ 13A-5-40(a)), fixed his punishment at death by electrocution.  Pursuant to former

Alabama Code §§ 13-11-3 and -4 (repealed and replaced by § 13A-5-45 and -47), after a

separate sentencing hearing held on July 14, 1980, the Honorable Kenneth F. Ingram,

who presided as the trial and sentencing judge, imposed a sentence of death consistent

with the jury's determination.  See Davis v. State, 554 So.2d 1094, 1103 (Ala. Crim. App.

1984).

Davis' judgment of conviction originally was reversed on appeal and remanded for

a new trial on the authority of Beck v. Alabama, 447 U.S. 625 (1980).  See Davis v. State,

408 So.2d 532 (Ala. Crim. App. 1981) (per curiam), cert. denied, 408 So.2d 533 (Ala.

1982).  The Supreme Court of the United States, however, granted the State's petition for

certiorari, vacated the judgment of the Alabama Court of Criminal Appeals, above, and

remanded the case for further consideration in light of Hopper v. Evans, 456 U.S. 605

(1982).  See Alabama v. Davis, 457 U.S. 1114 (1982).

Upon remand, the Alabama Court of Criminal Appeals affirmed Davis' judgment

of conviction and the sentence of death.  See Davis v. State, 554 So.2d 1094 (Ala. Crim.

App. 1984), op. extended and reh'rg denied, 554 So.2d 1109 (Ala. Crim. App. 1986).

The judgment of the Alabama Court of Criminal Appeals was affirmed by the Supreme

Court of Alabama.  Ex parte Davis, 554 So.2d 1111 (Ala. 1989).  Davis' application for

rehearing was overruled on September 28, 1990.  Davis v. State, 569 So.2d 738 (Ala.

1990).  The Supreme Court of the United States denied certiorari on February 25, 1991.

Davis v. Alabama, 498 U.S. 1127 (1991).

On February 12, 1992, Davis, through counsel, filed a petition for relief from the

judgment of conviction and sentence of death pursuant to Rule 32 of the Alabama Rules

of Criminal Procedure.  An amended petition was filed on November 18, 1994, and an

evidentiary hearing was conducted by the Circuit Court of Coosa County on September 1,

1995.  On September 29, 1995, Davis filed a motion to amend the Rule 32 petition, to

which the State filed a written objection on October 28, 1995.  The Rule 32 trial court did

not rule on whether the motion to amend was accepted or rejected.  On February 3, 1997,

the Rule 32 trial court denied Davis' petition.  The Alabama Court of Criminal Appeals

affirmed the judgment of the Rule 32 trial court, denying Davis' Rule 32 petition, Davis

v. State, 720 So.2d 1006 (Ala. Crim. App. 1998), and the Supreme Court of Alabama

denied certiorari.  Thereafter, on February 22, 1999, the Supreme Court of the United

States denied certiorari.  Davis v. Alabama, 525 U.S. 1149 (1999).

Davis' extensive post-trial proceedings culminated in the filing of his timely

habeas petition in this court on April 28, 1999, pursuant to 28 U.S.C. § 2254.  During

stage I of the proceedings, the court determined which of Davis' claims could be heard on

the merits.  (See Doc. No. 68.[2])  During these stage II proceedings, the court now decides

the merits of the claims which are not procedurally barred.

_____

[2] Herein, all cites to document numbers refer to the docket in this federal habeas
action.

4

B.  The Crime

The crime of which Davis was convicted involves horrific instances of brutality,

sodomy and murder.  In Davis v. State, the Alabama Court of Criminal Appeals, in its

decision affirming Davis' judgment of conviction on direct appeal, succinctly

summarized the facts which were adduced at trial.  See 554 So.2d 1094, 1097-98 (Ala.

Crim. App. 1984).  The court quotes from the Davis opinion:

> On July 20, 1978, between 4:30 p.m. and 5:30 p.m., at Alford's Grocery in
> Coosa County, Alabama, 68-year-old Avis F. Alford was robbed,
> sodomized, and brutally murdered with a common steak knife.  Her nude
> body was discovered at approximately 5:30 p.m. inside her store next to the
> cash drawer counter, where she had been assaulted and stabbed in the back
> 17 times.  The cash drawer was found open.  The drawer contained no
> paper currency, but it did contain a few coins.  Other coins were "scattered
> about" on the floor behind the counter.
>
> An autopsy revealed that Mrs. Alford had, indeed, died from the
> combination of knife wounds in her back, wounds which punctured her
> lungs and lacerated her aorta.  She had lost a large volume of type "A
> positive" blood.  Further analysis of samples taken during the autopsy
> revealed the presence of human sperm in the victim's rectum.
>
> Shortly after the murder, the appellant, accompanied by his wife and his
> mother, appeared at the murder scene and told the authorities that he had
> discovered Mrs. Alford's body inside the store.  He explained that when he
> realized she was dead, he "got scared and ran."  He later explained that in
> lifting the body he had "gotten blood all over" himself and that he had
> changed clothes at home before returning to report what he had seen.  He
> also told the officers that on his way home after discovering the body he
> had seen two black men walking down the highway away from Alford's
> store.  However, when asked for a description of the two black men, the
> appellant "hemmed and hawed," and could only state that one was tall and
> one was short.
>
> Mrs. Alford was last seen alive inside the store at 4:30 p.m.  A young white
> male on a motorcycle was seen riding into the parking lot at Alford's

Grocery at 5:05 p.m.  The description of the motorcycle rider and the motorcycle generally matched the appearance of the appellant and his motorcycle on the day of the murder.

Curtis Smith identified the appellant in court.  He testified that on the day of the murder, at approximately 5:30 p.m., he saw the appellant riding his motorcycle at the Covered Bridge a few miles from Alford's store.  He saw the appellant ride past the bridge, and he heard the motorcycle stop and "quiet down" for several minutes before the appellant returned to the bridge.  The appellant stopped and told Smith that he, the appellant, had "taken a spill" on his motorcycle.  The appellant was wearing a brown T-shirt and blue jeans and had blood on his right hand and arm and on his jogging shoes.  He was bleeding from underneath one of his fingernails.  He "pulled down to the rocks" beside the creek, washed off the blood, and rode away.

During the investigation immediately following the murder, Mrs. Alford's wallet, which had been taken during the robbery-murder, was found in the woods a short distance past the Covered Bridge where Smith had seen the appellant.  The investigating officers testified that, after talking with Smith, they drove slowly down the road and found, at the entrance to an old logging road, a disturbance in the dirt of the type a motorcycle would make "spinning out."  They searched the area and found the wallet.

Using metal detectors, the investigating officers also found, in the field across the highway from Alford's Grocery, the murder weapon, a steak knife covered with type "A" human blood.  Similar knives were seen in the kitchen of appellant's residence.

The results of physical examinations and chemical analyses of the clothes the appellant was wearing at the time Mrs. Alford was murdered, including his motorcycle helmet, were particularly incriminating.  Splattered blood was found on his motorcycle helmet and smeared and splattered blood was found on his blue jeans and shoes.  Blood was smeared on and around the button and the button hole used to fasten the jeans at the waist.  Blood stains were found on the outside and on the inside of the jeans in the waist area.  Bloodstains were also found in the area of the right knee and the lower leg.  All of the stains of sufficient size to permit typing were type "A" human blood, whereas appellant's blood type is type "O."

A small bloodstain was found on the inside of appellant's undershorts.  On the outside of his undershorts in the area of the crotch there was a large yellowish-brown stain.  This stain was a combination of human sperm mixed with fecal matter and human tissue of the type found inside the rectum.

In addition to this overwhelming circumstantial evidence against the appellant, the state presented evidence of an alleged confession by the appellant to Tracy Bignault, a fellow inmate of the appellant during appellant's incarceration prior to trial.  Bignault testified that the appellant admitted robbing and killing Mrs. Alford.  Bignault related to the jury a detailed account of the crime as it was, allegedly, confessed to him by the appellant.  Bignault's testimony was consistent with the state's circumstantial evidence.  On cross-examination, however, Bignault admitted that in his original statement to the authorities he had left out many of the details.  He explained that he did not tell the authorities the whole truth at that time because he was scared.

Appellant's apparent motive for the crime was presented through the testimony of Steve Colvin.  Colvin had sold the appellant the motorcycle the appellant was riding on the day of the murder, but the appellant had not made timely payments for it.  At work on the morning of the murder, Colvin told the appellant that he, Colvin, needed some of the money the next day.

The appellant presented a defense in the nature of an alibi.  On the day of the murder he was living in his grandmother's home with his wife, his mother, and his grandmother.  He had been living there for approximately five weeks.  His mother testified that the appellant came home from work at 4:00 p.m. and ate supper with the family as usual.  James Richardson, a young black boy in the neighborhood, borrowed appellant's motorcycle shortly after the appellant came home from work and did not return it until 5:15 p.m.  The appellant, then, took Richardson home and returned at 5:17 p.m.  The appellant left again and returned at 5:40 p.m.  He told his mother to call the police because he had found a dead woman inside Alford's Grocery.  After she had changed clothes, she immediately drove the appellant back to the store, where the appellant told the authorities what he had seen.  On cross-examination appellant's mother admitted that she had never told the authorities about James Richardson, and she could not remember the appellant saying anything about going down to the Covered Bridge before returning home from Alford's Grocery.  She also admitted

7

that the family had some knives similar in appearance to the murder
weapon, but stated that their knives were not the same size.  Some were
larger and some were smaller than the murder weapon.

Appellant's theory in defense was that someone else robbed and killed Mrs.
Alford, that he got blood on himself when he found her body, and that
Bignault was lying and had fabricated appellant's alleged confession in
order to "make a deal" with the authorities.

Id.

## III.  FEDERAL HABEAS CORPUS STANDARD OF REVIEW

Because Davis is in state custody, his application for habeas review is controlled

by 28 U.S.C. § 2254.  The amendments to 28 U.S.C. § 2254(d), which were enacted in

1996 as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), govern

the court's review of the claims in Davis' petition for writ of habeas corpus.  See Nelson

v. Alabama, 292 F.3d 1291, 1294 (11th Cir. 2002) (a petition for habeas corpus filed after

the effective date of the AEDPA is governed by 28 U.S.C. § 2254(d)).  The AEDPA sets

forth a "'highly deferential standard for reviewing state court judgments.'"  Jamerson v.

Sec'y for Dep't of Corrs., 410 F.3d 682, 687 (11th Cir. 2005) (quoting Parker v. Sec'y for

Dep't of Corrs., 331 F.3d 764, 768 (11th Cir. 2003)).

Pursuant to 28 U.S.C. § 2254(d), the court may grant habeas relief to a person in

state custody, such as Davis, only if that person demonstrates that a claim "adjudicated on

the merits" by the state court

(1) resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the
Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination
of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The purposes behind § 2254(d)'s limited parameters of review of

state court judgments are twofold, the first being "to prevent 'retrials' on federal habeas,"

and the second being "to give effect to state convictions to the extent possible under law."

Williams v. Taylor, 529 U.S. 362, 386 & 404 (2000); see also Bell v. Cone, 535 U.S.

685, 693 (2002).  The deferential review, recited in § 2254(d), applies even where the

state court summarily rejects a federal claim.  See Herring v. Sec'y for Dep't of Corrs.,

397 F.3d 1338, 1347 (11th Cir. 2005) ("even a summary, unexplicated rejection of a

federal claim qualifies as an adjudication entitled to deference under § 2254(d)").

By its express terms, § 2254(d)(1) confines the source of "clearly established

Federal law" to decisions of the Supreme Court of the United States.  See Williams, 529

U.S. at 381-82 & 412.  In Williams, the Supreme Court interpreted § 2254(d)(1)'s

limitation as to the source of authority as encompassing "the holdings, as opposed to the

dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court

decision."  Id. at 412; see also Wiggins v. Smith, 539 U.S. 510, 542 (2003).

Section 2254(d)(1), however, does not "'limit the federal courts' independent interpretive

authority with respect to federal questions.'"  Williams, 542 U.S. at 412 (quoting Lindh v.

Murphy, 96 F.3d 856, 869 (7th Cir. 1996)), and "rules of law may be sufficiently clear for

habeas purposes even when they are expressed in terms of a generalized standard rather

than as a bright-line rule."  Id. at 382.

Decisions emanating from claims adjudicated by state courts are deemed in aberration of "clearly established Federal law" only if one of two conditions is satisfied: The decision is (1) "contrary to" or (2) "involved an unreasonable application of" the "clearly established Federal law."  28 U.S.C. § 2254(d)(1); <u>Williams</u>, 529 U.S. at 404. These two phrases – "contrary to" and "unreasonable application" –  have "independent meaning."  <u>Williams</u>, 529 U.S. at 404.  A state court decision is contrary to "clearly established federal law" when the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme Court]," but nonetheless reaches a different result.  <u>Id.</u> at 405-06.

With respect to the "unreasonable application" scenario, the standard is one of objective unreasonableness.  <u>See id.</u> at 409.  "[W]hen a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's 'unreasonable application' clause."  <u>Id.</u>  Additionally, a state court decision involves an unreasonable application of controlling law where, "under clearly established federal law, the State court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled."  <u>Ramdass v. Angelone</u>, 530 U.S. 156, 164 (2000); <u>see also</u> <u>Williams</u>, 529 U.S. at 408

At the same time, the <u>Williams</u> Court recognized that "[t]he term 'unreasonable' is no doubt difficult to define."  529 U.S. at 410.  "[T]he most important point," for

purposes of the ruling in Williams, is that "unreasonable" differs from an incorrect or erroneous application of Supreme Court jurisprudence.  Id.  Under the unreasonable application prong, the "habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) ("The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous.  The state court's application of clearly established law must be objectively unreasonable.") (citation omitted).

As stated, the AEDPA also permits a court to grant a writ if the court concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."  28 U.S.C. § 2254(d)(2).  Relevant to § 2254(d)(2)'s analysis is the restriction delineated in 28 U.S.C. § 2254(e):  "A state court's determinations of fact shall be 'presumed to be correct,' and the habeas petitioner 'shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'"  Parker v. Head, 244 F.3d 831, 835-36 (11th Cir. 2001) (quoting 28 U.S.C. § 2254(e)(1)).  As pronounced in Miller-El v. Cockrell,

> [f]actual determinations by state courts are presumed correct absent clear
> and convincing evidence to the contrary, § 2254(e)(1), and a decision
> adjudicated on the merits in a state court and based on a factual
> determination will not be overturned on factual grounds unless objectively

> unreasonable in light of the evidence presented in the state-court
> proceeding, § 2254(d)(2).

537 U.S. 322, 340 (2003); see also Lenz v. Washington, 444 F.3d 295, 300 (4th Cir. 2006)

(discussing interrelatedness between 28 U.S.C. § 2254(d)(2) and 28 U.S.C. § 2254(e)(1)

as "indicated" by Supreme Court precedent).  The presumption "applies equally to factual

determinations made by the state trial and appellate courts."  Bui v. Haley, 321 F.3d

1304, 1312 (11th Cir. 2003).  On the other hand, "the statutory presumption of correctness

applies only to findings of fact made by the state court, not to mixed determinations of

law and fact."  Parker, 244 F.3d at 836.

In addition to the foregoing law governing the standard of review, one other legal

premise is noteworthy.  The federal habeas writ is not available to correct violations of

state law:  "[A] habeas petition grounded on issues of state law provides no basis for

habeas relief" pursuant to 28 U.S.C. § 2254(d).  Branan v. Booth, 861 F.2d 1507, 1508

(11th Cir. 1988).  The federal writ is available only if the violation of state law "raises

federal constitutional problems."  Wilcox v. Ford, 813 F.2d 1140, 1145 n.7 (11th Cir.

1987).  Thus, whether or not the state court erred under Alabama law in its rulings at

Davis' trial is "largely beside the point" in the court's analysis.  Jammal v. Van de Kamp,

926 F.2d 918, 920 (9th Cir. 1991).

## IV.  DISCUSSION

Davis seeks habeas corpus relief as to his sentence of death based upon the Supreme Court's recent decision in Roper, *supra*, and the court addresses this claim first. Davis also has raised and briefed six constitutional guilt-phase claims attacking the validity of his judgment of conviction which the court will address in the order in which the claims are asserted by Davis.  See Clisby v. Jones, 960 F.2d 925, 936 (11th Cir. 1992) (holding that district court must resolve all claims for relief premised on alleged constitutional violations which are raised in a petition for writ of habeas corpus whether habeas relief is granted or denied).

### A.  Davis' Sentence of Death

This case no longer involves implication of the death penalty.  During the pendency of the present action, the Supreme Court of the United States granted certiorari to consider "whether it is permissible under the Eighth and Fourteenth Amendments to the Constitution of the United States to execute a juvenile offender who was older than 15 but younger than 18 when he committed a capital crime."  Roper v. Simmons, 543 U.S. 551, 555-56 (2005); Roper v. Simmons, 540 U.S. 1160 (2004) (granting petition for writ of certiorari to the Supreme Court of Missouri)  Based on the Supreme Court's decision to decide this issue and the fact that the Court's ultimate decision would likely inform the merits of the issues pertaining to Davis' sentence of death, the court stayed

consideration of the instant petition pending the Supreme Court's ruling.  (See Doc. No. 89.)

On March 1, 2005, the Supreme Court issued its opinion, holding that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."  Roper, 543 U.S. at 579.  The bright-line holding in Roper abrogated the Supreme Court's earlier decision in Stanford v. Kentucky, 492 U.S. 361 (1989), wherein the Court held that the Constitution did not bar the imposition of the death penalty for offenders who were older than the age of sixteen.

By order filed on March 4, 2005, this court directed the parties to file briefs addressing all issues remaining for review on the merits and discussing the effect of the Supreme Court's decision in Roper on Davis' death penalty claims, including his claim that the execution of offenders who were under the age of eighteen at the time their crimes were committed is unconstitutional.  (Doc. No. 90 at 16-17.)  On June 2, 2005, the State filed a supplemental brief conceding, *albeit* reluctantly, that the death penalty could not be imposed against Davis because he was under the age of eighteen when Mrs. Alford was robbed, murdered and sexually assaulted, crimes for which Davis has been convicted.  (Id. at 17.)

The parties do not dispute that Davis was seventeen years old when Mrs. Alford was murdered, and the record amply supports this uncontested fact.  Davis' certificate of birth shows that Davis was born on March 18, 1961.  (See Doc. No. 92, Ex. 1.)  Mrs.

14

Alford was murdered seventeen years later on July 20, 1978.  The decisions of the state courts also contain references to Davis' age at the time of the offense.  See, e.g., *Ex parte Davis*, 554 So.2d 1111, 1113-14 (Ala. 1989) (acknowledging Davis' age in context of considering his claim that Eighth Amendment barred his execution); id. at 1110 ("In its finding of facts, the trial court found as mitigating circumstances the fact that the appellant had no significant history of any prior criminal activity and was 17 years old at the time of the offense."); Davis v. State, 554 So.2d 1094, 1107 (Ala. Cr. App. 1984) (accepting "stipulations of the State and defendant that the defendant was 17 years of age . . . at the time the offense was committed").

Applying the Supreme Court's decision in Roper to the undisputed fact that Davis was seventeen years old at the time the murder was committed, the court finds that Davis' sentence of death is unconstitutional.  Pursuant to an Alabama statute, an individual convicted of a capital offense must be sentenced to death or life imprisonment without the possibility of parole.  See Ala. Code § 13A-5-39(1) (defining "capital offense" as "[a]n offense for which a[] defendant shall be punished by a sentence of death or life imprisonment without parole according to the provisions of this article"); id. § 13A-5-40(a) (listing and defining Alabama's capital offenses).  Because the sentence of death is no longer constitutionally valid, the only sentencing alternative is life without parole.  See Adams v. State, ___ So.2d ___, 2006 WL 1216740, *1 (Ala. Cr. App. April 28, 2006) (holding unconstitutional defendant's sentence of death based upon the holding in Roper, *supra*, and "remand[ing] for the Montgomery Circuit Court to set aside [the

15

defendant's] death sentence and to sentence him to the only other sentence available--life in the penitentiary without the possibility of parole").

Davis' petition, therefore, is due to be granted as to his sentence of death to the extent that the court must grant the petition, unless the State of Alabama sets aside Davis' death sentence and imposes a sentence of life imprisonment without the possibility of parole.  Consequently, the court finds, and Davis concedes (see Doc. No. 92 at 2, 7), that the remaining claims regarding the penalty phase of Davis' trial now are moot.  See LeCroy v. Secretary, Florida D.O.C., 421 F.3d 1237, 1239-40 (11th Cir. 2005) (dismissing as moot defendant's § 2254 petition, challenging his death sentence, where his death sentence was vacated pursuant to Roper v. Simmons because the defendant was seventeen years old at the time of his offenses).  The court, thus, need only address Davis' claims pertaining to his guilt and the validity of the judgment of conviction.

### B.  Claims B and C:  Davis' Claims that He Was Denied His Fourth Amendment Right to a Fair and an Impartial Judge

#### 1.  Arguments of Counsel

In Claims B and C, Davis contends that, in the proceedings in his case in juvenile court, including the hearings governing detention, probable cause and juvenile transfer, he was denied due process, as guaranteed by the Fourteenth Amendment to the United States Constitution, because the presiding judge, Robert Teel, Jr. ("Judge Teel"), and the prosecutor, Frank Teel, are brothers.  (Doc. No. 92 at 7.)  Frank Teel was the assistant

district attorney who participated in all stages of Davis' prosecution.  Because Davis was a juvenile when arrested, the initial proceedings were held in juvenile court.  Judge Teel presided over the hearings in juvenile court, including two detention hearings held on July 25, 1978, and September 26, 1978, and a juvenile transfer hearing held on November 17, 1978, after which Davis' case was transferred by Judge Teel to adult court.

Davis asserts that the state court "upheld the participation of the Teel brothers in this case" based solely on the application of Alabama law, but that the decision is "contrary to and an unreasonable application of" Davis' clearly established federal rights to "due process," "a fair and impartial judge," and "proceedings free from the appearance of impartiality."  (Doc. No. 95 at 7); (see also Doc. No. 92 at 8-9 (same).)  In support of his argument, Davis relies on four United States Supreme Court opinions which he says clearly establish that the "appearance of impartiality" violates due process rights under the United States Constitution.  (Doc. No. 29 at 9, citing Tumey v. Ohio, 273 U.S. 510 (1927); Offutt v. U.S., 348 U.S. 11 (1954); In re Murchison, 349 U.S. 133 (1955); and Ward v. City of Monroeville, 409 U.S. 57 (1972)); (see also Doc. No. 95 at 6.)  Based on these four Supreme Court decisions, Davis contends that, even where evidence of actual bias is lacking, the "appearance of impartiality" violates the Due Process Clause of the United States.

The State, on the other hand, contends that Davis' claim does not rise to the level of a due process violation because there was no evidence of actual or inherent bias presented during the state court proceedings.  It points out that, on direct appeal, the

17

Alabama Court of Criminal Appeals' independent scrutiny of the record uncovered no such evidence of bias.  (Doc. No. 94 at 18-19, citing <u>Davis v. State</u>, 554 So.2d 1094, 1099 (Ala. Crim. App. 1984).)

Moreover, the State asserts that, pursuant to 28 U.S.C. § 2254(d)(1), in order for Davis to demonstrate that the state court's decision is "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," Davis must cite precedent which is "identical at a high degree of specificity."  (<u>Id.</u> at 19-20.)  The State says, however, that none of the Supreme Court decisions cited by Davis "supports his claim" with the requisite degree of factual specificity "that a judge must under the Due Process Clause of the Fourteenth Amendment disqualify himself from adjudicating a preliminary hearing and juvenile transfer hearing in which the judge's brother is the assistant district attorney."  (<u>Id.</u> at 22.)  Relatedly, the State contends that the Supreme Court opinions cited "are off point as 'clearly established precedent.'"  (<u>Id.</u>)  Accordingly, the State contends that 28 U.S.C. § 2254(d) forecloses habeas relief on this claim.

## 2.  The State Court Decision

The state court rejected Davis' argument that Judge Teel, who presided over the preliminary proceedings in Davis' case, including the hearing concerning Davis' certification as an adult, should have *sua sponte* recused himself because he was the brother of Frank Teel, the assistant district attorney who appeared in some of the same

proceedings against Davis.  See Davis, 554 So.2d at 1098.  The Alabama Court of Criminal Appeals held that Judge Teel did not have to disqualify himself pursuant to the Canons of Judicial Ethics, state statute, or state common law.  It reasoned that Judge Teel's brother did not have an interest that could have been affected by the outcome of the proceedings, as required for disqualification under the Canons of Judicial Ethics, and he was not a "party" within the state statute governing disqualification of judges.  See id. at 1098-99.  The Alabama Court of Criminal Appeals also observed that the assistant district attorney's salary "was not dependent upon the result of the litigation" and that the district attorney "had no interest other than his 'pride in the successful outcome' of the proceedings."  Id. at 1099.

The Alabama Court of Criminal Appeals also rejected Davis' argument that his rights were violated based on the alleged "inherent bias" of Judge Teel.  Id.  It emphasized that Davis did not challenge Judge Teel's qualifications until more than two years after Judge Teel's final action in the case and that Davis had presented "no evidence of actual bias."  Id.  The court held that Davis failed to overcome the "presumption that a judge is qualified and unbiased."  Id.  Notwithstanding Davis' failure to submit evidence of actual bias, the Alabama Court of Criminal Appeals reviewed the record of both the preliminary and juvenile transfer hearings.  See id.  It, however, "found no evidence, whatsoever, of any bias against [Davis]."  Id.  To the contrary, the Alabama Court of Criminal Appeals observed that "the preliminary hearing resulted in an order 'releasing the appellant from detention,' a ruling favorable to [Davis]."  Id.

Furthermore, the Alabama Court of Criminal Appeals found that the facts adduced at the juvenile transfer hearing "well supported" Judge Teel's discretionary decision to deny Davis' motion for treatment as a youthful offender.  Id.  The court concluded that Judge Teel's decision was not arbitrary, but was based upon a consideration of many factors, including the horrendous nature of the crime, the evidence that Davis absconded from the state after being released from detention following the preliminary hearing to be returned only through extradition proceedings, and the evidence that Davis confessed to a fellow inmate that he had murdered Mrs. Alford.  See id.

Moreover, during the post-conviction proceedings, the Alabama Court of Criminal Appeals similarly rejected Davis' ineffective assistance of counsel claim predicated on his trial attorneys' failure to move to recuse Judge Teel based on his kinship to the assistant district attorney.  The Alabama Court of Criminal Appeals observed that Davis "still has not presented any evidence of actual bias on the part of the district judge."  Davis, 720 So.2d at 1015.

### 3.  Analsyis

a.)  Threshold Issues Pertaining to the Standard of Review

Before discussing the merits, the court addresses two arguments raised by the parties pertaining to the standard of review.  First, the court agrees with Davis' position set forth in his reply brief (Doc. No. 95) that the fact-specific standard cited by the State applies only to the "contrary to," and not to the "unreasonable application," prong of 28

U.S.C. § 2254(d)(1).  As discussed in Section III of this Memorandum Opinion and Order, *supra*, § 2254(d)(1)'s guideposts have independent meaning and require separate analysis.  Accordingly, the court finds that the standard argued by the State does not apply to Davis' claims which Davis bases on the "unreasonable application" prong of § 2254(d)(1).

Second, Davis is correct that the decision of the state courts discussed neither federal constitutional principles nor decisions from the Supreme Court of the United States.  It is not fatal, however, that state law governed the state courts' analysis so long as the decision does not violate the proscriptions of 28 U.S.C. § 2254(d)(1).  See Mitchell v. Esparza, 540 U.S. 12, 16 (2003) ("A state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite our opinions. . . . We have held that a state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'") (citation omitted).  The Supreme Court reiterated this premise in Bell v. Cone, when it observed that "[f]ederal courts are not free to presume that a State court did not comply with constitutional dictates on the basis of nothing more than lack of citation."  543 U.S. 447, 455 (2005) (per curiam).

### b.)  The Merits

Those threshold matters having been addressed, the court turns to the merits of Davis' claim.  As stated, Davis contends that the proceedings before Judge Teel violated

his rights to due process under the Fourteenth Amendment to the United States

Constitution because Judge Teel was impartial given his kinship to the prosecutor.

The right to a trial before an impartial judge is a paramount concept of due process

of law.  The Due Process Clause of the Fourteenth Amendment guarantees Davis a right

to a fair and an impartial judge who is neutral, detached and free from "actual bias."  *In*

*re* Murchison, 349 U.S. at 136; see also Bracy v. Gramley, 520 U.S. 899, 905-06 (1997)

("[T]he floor established by the Due Process Clause clearly requires a 'fair trial in a fair

tribunal,' . . . before a judge with no actual bias against the defendant or interest in the

outcome of his particular case.");  Ward, 409 U.S. at 59-63; Tumey, 273 U.S. at 532.

The court carefully has reviewed the four Supreme Court opinions relied upon

Davis, i.e., Murchison, Tumey, Offutt and Ward.  (Doc. No. 29 at 9); (Doc. No. 95 at 6.)

A summary of the facts and holdings of these opinions will aid the court's discussion.

In Murchison, which involved a judge who acted as a "one-man judge-grand jury,"

349 U.S. at 135, the Supreme Court held that a judge cannot "act as a grand jury" and

then preside over the trial of the individuals accused by the grand jury because "[h]aving

been a part of that process a judge cannot be, in the very nature of things, wholly

disinterested in the conviction or acquittal of those accused."  Id. at 135, 137.  The

Supreme Court concluded that the judge's actions offended the basic notion of due

process that an accused receive "[a] fair trial in a fair tribunal."  Id. at 136.  Citing,

Tumey, *supra*, and Offutt, *supra*, the Supreme Court elaborated as follows:

> Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law." Tumey v. State of Ohio, 273 U.S. 510, 532 . . . Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14.

Id.

Tumey and Ward, in turn, arose out of criminal trials in mayors' courts in Ohio where the mayors also served as judges. In Tumey, after a trial without a jury in "Liquor Court," as the court was "popularly called," 273 U.S. at 521, the mayor of North College Hill convicted the defendant of possessing liquor, in violation of the state's prohibition act. Id. at 514-16. By ordinance, part of the funds from Liquor Court was used to pay the mayor "his costs in each case in addition to his regular salary, as compensation for hearing such cases," but only if the defendant was convicted. Id. at 520. Over the course of several months in 1923, the mayor collected $696.35 as costs from Liquor Court cases, in addition to his regular salary. See id. at 521-22. The Supreme Court held that the mayor should have been "disqualified" as the judge:

> [I]t certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal

23

substantial pecuniary interest in reaching a conclusion against him in his case.

Id. at 523; see also id. at 535.

Apart from the mayor's pecuniary interest in the outcome of the proceedings, due process also was violated given the mayor's responsibilities for the fiscal-well being of his village. The Court opined: "With his interest as mayor in the financial condition of the village and his responsibility therefor might not a defendant with reason say that he feared he could not get a fair trial or a fair sentence from one who would have so strong a motive to help his village by conviction and a heavy fine?" Id. at 533-34. The Court held that the mayor, "by reason of his interest, both as an individual and as chief executive of the village, is disqualified to exercise it in the trial of the defendant." Id. at 535.

Similarly, in Ward, pursuant to a state statute, mayors were authorized to sit as traffic court judges. Exercising that statutory authority, the mayor in Ward convicted and fined the defendant for two traffic offenses. See 409 U.S. at 57. The mayor's town realized a "major part" of its revenue from traffic fines levied by the mayor in traffic court. Id. at 58. Relying on Tumey, the Supreme Court held that, because the judge exercised significant financial control over the town's finances and the fines collected in traffic court, the defendant was denied a trial before an "impartial," "neutral and detached" judge, in violation of the Due Process Clause of the Fourteenth Amendment. Id. at 59, 62.

24

Finally, in Offutt, the Supreme Court reversed the judgment of conviction because the trial judge, who invoked the use of summary contempt power post-trial, had become "personally embroiled" with the lawyer whom he held in contempt.  See 348 U.S. at 17. Citing the axiom that "justice must satisfy the appearance of justice," the Court held that a trial judge whose "personal feeling[s]" about the lawyer are "entangled" with the "contempt charged" cannot summarily punish the lawyer for contempt after the completion of the trial, but instead must recuse himself or herself and permit another judge to adjudicate the contempt.  See id. at 14, 17.

Davis contends that each of the foregoing Supreme Court decisions clearly establishes that due process "requires a judge to satisfy an 'appearance of impartiality'" and that a judge's sibling relationship to the prosecutor clearly offends the due process requirement of impartiality.  (Doc. No. 95 at 6.)  He cites language from those opinions, quoted above, including the phrases "justice must satisfy the appearance of justice" and due process does not allow any "procedure" that "might lead [the] judge to hold the balance nice, clear and true between the state and the accused."  (Doc. No. 95 at 6-7 (quoting Tumey, 273 U.S. at 532 and Murchison, 349 U.S. at 136).)

Unquestionably, Murchison, supra, Tumey, supra, Ward, supra, and Offut, supra, demonstrate that "[t]he requirement of [tribunal] neutrality has been jealously guarded by th[e] [Supreme] Court."  Marshall v. Jerrico, Inc., 446 U.S. 238, 242-43 (1980) (citing Murchison, Tumey, Ward and Offut).  The court, though, disagrees with Davis that the

25

holdings in these opinions yield a violation of due process when applied to the facts of this case.

The court finds instructive and persuasive the Third Circuit's opinion in <u>Johnson v. Carroll</u>, 369 F.3d 253 (3rd Cir. 2004), and the Seventh Circuit's opinion in <u>Del Vecchio v. Illinois Department of Corrections</u>, 31 F.3d 1363 (7th Cir. 1994), as to the application of Supreme Court precedent under 28 U.S.C. § 2254(d) to claims of judicial bias.[3]  In <u>Johnson</u>, the defendant brought a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d)(1).  <u>See</u> 369 F.3d at 255.  Charged with kidnaping his estranged daughter, the defendant argued that the judge should have *sua sponte* recused himself based upon an *ex parte* conversation the judge had with a former state prosecutor at a social gathering.  <u>See id.</u> at 255-56.  In that conversation, the former state prosecutor remarked that the defendant was a "bad guy," had "threatened" the state prosecutor, and that he hoped "justice was done" in the defendant's pending criminal case.  <u>Id.</u> at 255.

---

[3] Although <u>Johnson</u> and <u>Del Vecchio</u> are not Supreme Court opinions, <u>see</u> 28 U.S.C. § 2254(d)(1), the opinions nonetheless have assisted the court in deciphering the contours of the holdings of the Supreme Court and determining what constitutes "clearly established Federal law."  <u>Vick v. Williams</u>, 233 F.3d 213, 222 (4th Cir. 2000) ("[N]othing in <u>Williams [v. Taylor</u>, 529 U.S. 362 (2000)] suggests or commands that this court make [the reasonableness] determination in a vacuum.  Where . . . the otherwise objectively reasonable bases for a state court's interpretation of a given precedent are common to the reasoned decisions of many courts, it would be judicial myopia of the first order to ignore the force of consensus in assessing the objective reasonableness in the particular case."); <u>see also</u> <u>Barresi v. Maloney</u>, 273 F. Supp. 2d 144, 149 (D. Mass. 2003) (when evaluating clearly established federal law for purposes of habeas relief, "factually similar cases from lower federal courts provide a valuable reference point when the relevant Supreme Court rule is broad and applies to a kaleidoscopic array of fact patterns").

26

The defendant argued that there was an "appearance of bias" on the part of the judge, given the occurrence of the out-of-court conversation, and he asserted that the failure of the judge to recuse himself violated his due process rights guaranteed by the Fourteenth Amendment.  Id.  The federal district court agreed with the defendant that "the trial judge's failure to recuse himself *sua sponte* gave rise to an appearance of bias and that the appearance of bias violated his due process rights."  Id. at 258.  The defendant and the district court relied, in part, on the Supreme Court's decision in Murchison, *supra*.  The Third Circuit reversed.

For purposes of its analysis, the Third Circuit "assume[d] that there was an appearance of bias" and framed the issue as "whether the Supreme Court has ever held in any of its decisions existing at the time of the District Court's judgment . . . that an appearance of bias on the part of a state court judge, without more, violates the Due Process Clause of the United States Constitution."  Id. at 259.  After summarizing the facts and holding in Murchison, *supra*, the Third Circuit recited the following language from the Murchison opinion:

> The Court commented that although fairness certainly required "an absence of actual bias," "our system of law has always endeavored to prevent even the probability of unfairness."  Id.  The Court acknowledged that its "stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties."  Id.  However, "to perform its high function in the best way justice must satisfy the appearance of justice."  Id. (internal quotation marks omitted).

Id. at 259-60 (quoting Murchison, 349 U.S. at 136).

The Third Circuit rejected the conclusion, reached by the district court, that the foregoing language clearly established that any "appearance of bias" contravened the Due Process Clause.  Id.  The court explained:

> In re Murchison does not stand for that broad conclusion.  Instead, its holding, as opposed to dicta, is confined to the basic constitutional principle of prohibiting a judge from adjudicating a case where he was also an investigator for the government.  The rest of the language quoted in the preceding paragraph merely explains the holding.  Even a generalized reading of the holding, that a judge cannot adjudicate a case where he has an interest in the outcome, does not stand for the conclusion, drawn by the District Court and [the defendant], that a judge with an appearance of bias, without more, is required to recuse himself *sua sponte* under the Due Process Clause.  [The defendant] has not alleged, and there is no evidence, that the trial judge here had a personal interest in the outcome of the sentence.

Id. at 260 (brackets added).  The Johnson court held that the fact that the judge had been exposed to disparaging remarks about the defendant through a third-party conversation with a former prosecutor did not fit within the parameters of the holding of Murchison and that the alleged bias of the judge arising from that conversation was insufficient, in and of itself, to rise to a constitutional level.

In Del Vecchio, involving a 28 U.S.C. § 2254(d) petition, the Seventh Circuit, on rehearing *en banc*, was presented with the issue of whether a state trial judge, who as a former state attorney had supervised the prosecution of the defendant for a murder fourteen years earlier, should have disqualified himself in a second murder trial in which the defendant was convicted and the judge imposed the death sentence.  See 31 F.3d at 1367-1369.  The defendant contended that the trial judge's prior involvement in the

defendant's first murder case "created an appearance of bias." Id. at 1370.  He argued that "a showing of actual bias or prejudice" was not a prerequisite to establishing a Fourteenth Amendment violation, but rather that he merely had to demonstrate that the "trial judge had some temptation to be biased in order to demonstrate an appearance of bias." Id.

The Seventh Circuit concluded that equating the Supreme Court's "appearance of justice" language, such as found in Murchison, with a holding that due process mandates a judge's recusal "based solely on appearances" is an impermissible extension of the holdings from the Supreme Court. Id. at 1371.  "Despite the Supreme Court's broad pronouncements about the 'appearance of justice,' we cannot answer the due process question simply by concluding that it may have looked bad for [the trial judge] to preside at trial." Id.

"The Supreme Court has never rested the vaunted principle of due process on something as subjective and transitory as appearance." Id. at 1372.  Rather,

> [w]hen the Supreme Court talks about the "appearance of justice," it is not saying that bad appearances alone require disqualification; rather, it is saying that when a judge is faced with circumstances that present "some [actual] incentive to find one way or the other" or "a real possibility of bias," a court need not examine whether the judge actually was biased.

Id. (citations omitted).

The Seventh Circuit's conclusion was based on a careful examination of Supreme Court precedent.  After analyzing the Supreme Court's opinions in Tumey, Ward, and Murchison, among others, see id. at 1373-74, the Seventh Circuit observed that the

"presumption of evenhandedness" was overcome only in those cases where the judges were subject to a "strong, direct interest in the outcome of a case." Id. at 1373. In none of the opinions reviewed by the Seventh Circuit was disqualification based solely on the appearance of bias, and the decisions make clear that "not all 'possible temptations' toward bias require a judge to disqualify himself." Id. at 1374.

The Seventh Circuit concluded that, under Supreme Court precedent, to demonstrate a Fourteenth Amendment due process violation, a defendant must show either "actual bias" or "an influence or interest [the court] can conclusively presume would cause the average judge to be biased." Id. at 1378, 1379. Neither was present in the defendant's case. See id. at 1375-80; Murchison, 349 U.S. at 136 ("Fairness of course requires the absence of actual bias in the trial of cases.").

Other courts have applied the foregoing standard to judicial bias cases. See Harris v. State of Mo., 960 F.2d 738, 740 (8th Cir. 1992) ("Although Harris contends the trial judge's refusal to disqualify himself 'infected' the trial, Harris has failed to show either actual or presumed bias by the trial judge rising to the level of a constitutional violation.") (citing Dyas v. Lockhart, 705 F.2d 993, 996-97 (8th Cir. 1983)); Bell v. Haley, Civ. A. No. 95-T-913-N, 2000 WL 33682804 (M.D. Ala. 2000) (Thompson, J.) (citing opinions which demonstrate that "[f]ederal cases have elaborated that judicial bias or prejudice rising to a level that violates due process must stem from a predisposition against the defendant that is actual . . . or that is readily presumed from a judge's conduct or comments, or connection to one of the participants"); cf. U.S. v. Wood, 299 U.S. 123,

133 (1936) ("[t]he bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law").

To the extent that Davis claims that *any* appearance of bias is tantamount to a due process violation, the court finds that clearly established Supreme Court precedent is not so far reaching. The court is persuaded by the well-reasoned circuit court opinions of Johnson, *supra*, and Del Vecchio, *supra*, regarding their interpretation and application of Supreme Court precedent, that the mere "appearance of bias" on the part of the judge, without a showing of either actual bias or a personal, strong direct interest in the proceedings from which bias can be presumed, is insufficient to rise to the level of a constitutional violation. The court, thus, turns to a review of Davis' allegations of bias in light of the foregoing teachings.

i.) Actual Bias

On Davis' direct appeal, the Alabama Court of Criminal Appeals observed that Davis had not argued actual bias and that its independent review of the record of the hearings handled by Judge Teel demonstrated that there was "no evidence, whatsoever, of any bias" against Davis. Davis, 554 So.2d at 1099. Also, upon review of the state trial court's decision denying post-conviction relief to Davis, the Alabama Court of Criminal Appeals observed that Davis "still has not presented any evidence of actual bias on the part of the district judge." Davis, 720 So.2d at 1015.

31

In this proceeding, Davis has not refuted the findings of the state court that there was no evidence of actual bias on the part of Judge Teel.  Davis also has not cited any part of the record which reveals any actual bias on the part of Judge Teel, and the court is aware of no such evidence.  Accordingly, the court finds that the decision of the Alabama court that Davis failed to show actual bias was not contrary to clearly established federal law, as articulated by the United States Supreme Court, or based on an unreasonable application of established principles.

ii.)  Presumed Bias

In the state courts and now in this proceeding, Davis focuses on an alleged "inherent bias" flowing from the fact that a "pivotal decision" in his case, i.e., whether Davis would be tried as an adult, was decided by Judge Teel based upon the arguments of the prosecutor, who happened to be Judge Teel's brother.  (Doc. No. 95 at 5.)  The issue then is whether there is any other evidence revealing that the relationship between Judge Teel and the prosecutor presented the type of personal, strong direct interest from which Judge Teel's bias can be presumed.

The Supreme Court opinions cited by Davis present scenarios of substantial biased appearances, but the court finds that the facts here neither mirror, nor are comparable to, those in Murchison, Tumey, Ward and Offut.  There is no evidence that Judge Teel had a financial interest in Davis' proceedings, and none is alleged by Davis; thus, Tumey's holding, followed in Ward, that a state court decision should be set aside where there is

"the slightest pecuniary interest" on the part of the judge is inapplicable here.  Nor do the facts present a merger of prosecutorial and judicial functions by Judge Teel.  This case, therefore, is distinguishable from <u>Murchison</u>.  Moreover, Davis did not personally attack Judge Teel through insulting, abusive, or contemptuous remarks from which it could be inferred that Judge Teel harbored personal animosity toward Davis.  This case, therefore, is unlike <u>Offut</u>.  In short, the court finds that Judge Teel faced none of the biasing influences involved in the cases in which the Supreme Court required disqualification.

Consequently, given this court's conclusion that Supreme Court precedent in this area has not expressly dealt with the issue presented in this case, the court finds that the Supreme Court's prior decisions have not involved facts which are "materially indistinguishable" from the facts of this case.  It follows then that the state court ruling here was not contrary to federal law as articulated by decisions of the Supreme Court. <u>See</u> <u>Washington v. Crosby</u>, 324 F.3d 1263, 1265 (11th Cir. 2003) (stating that, where no Supreme Court precedent is on point, the state court's conclusion is not contrary to clearly established Federal law as determined by the Supreme Court).

Nonetheless, Davis essentially asks this court to find that Judge Teel's "close relationship" to the prosecutor, Frank Teel, automatically establishes a presumption of bias based on the more general principles espoused by the Supreme Court, in opinions such as <u>Tumey</u>, and, therefore, to find that the state court decision constituted an "unreasonable application" of Supreme Court precedent.  The court, however, finds that Davis' contention is undercut by language in <u>Tumey</u>.

33

In <u>Tumey</u>, and later repeated in <u>Aetna Life Insurance Co. v. Lavoie</u>, 475 U.S. 813, 820 (1986), the Supreme Court pronounced that "[a]ll questions of judicial qualification may not involve constitutional validity"; therefore, "matters of *kinship*, personal bias, state policy, remoteness of interest would seem generally to be matters merely of legislative discretion." <u>Tumey</u>, 273 U.S. at 523 (emphasis added). Indeed, the Supreme Court has pointed out on more than one occasion that "most matters relating to judicial disqualification [do] not rise to a constitutional level." <u>FTC v. Cement Inst.</u>, 333 U.S. 683, 702 (1948) (citation omitted); <u>see also Bracy</u>, 520 U.S. at 904-05 (discussing elements of a judicial-bias claim and stating that, "[o]f course, most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard"; rather, "these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar) (citing <u>Aetna</u>, 475 U.S. 820-21, 828); <u>see</u>, <u>e.g.</u>, <u>Dyas</u>, 705 F.2d at 998 ("We conclude that Judge Steele's relationship to the Prosecuting Attorneys was, standing alone, insufficient to raise the conclusive presumption of his actual bias.").

Davis, however, cites two federal circuit court opinions in support of his position that "[i]t is well established that a judge should not preside over proceedings in which a close relative is involved." (Doc. No. 92 at 8 (citing <u>Potashnick v. Port City Constr. Co.</u>, 609 F.2d 1101 (5th Cir. 1980), and <u>SCA Serv., Inc. v. Morgan</u>, 557 F.2d 110 (7th Cir. 1977)). The court, however, finds that the holdings in those opinions are not applicable

34

because they involved interpretations of the recusal statute, 28 U.S.C. § 455(a), which

mandates disqualification of federal judges in specified circumstances.  As recognized by

several circuit courts, "section 455 and the Due Process Clause are not coterminous."

U.S. v. Couch, 896 F.2d 78, 81 (5th Cir. 1990).  "[S]ection 455 establishes a statutory dis-

qualification standard more demanding than that required by the Due Process Clause."

Id.; see also Johnson, 369 F.3d at 262 (28 U.S.C. § 455(a)'s "appearance of impropriety

standard" is not "'mandated by the Due Process Clause.'") (quoting Hardy v. U.S., 878

F.2d 94, 97 (2d Cir. 1989)); U.S. v. Sypolt, 346 F.3d 838, 840 (8th Cir. 2003) (observing

that, "[i]n contrast to the due process clause, the recusal statute [i.e., 28 U.S.C. § 455(a)]

is concerned largely with insuring that the federal judiciary appears to be impartial, in

addition to actually being impartial[;] [i]t thus reaches farther than the due process clause,

which is concerned primarily with the individual rights of parties.") (internal citation

omitted) (brackets supplied).

　　　　Accordingly, the court finds that the state court decisions did not constitute an

"unreasonable application" of the principles espoused by the Supreme Court, in opinions

such as Tumey, discussed above, which emphasize the importance of impartiality.  Davis

simply has not presented, and the court has not uncovered, any Supreme Court precedent

which would allow the court to presume bias because, during some of the same

proceedings, siblings served as the prosecutor and the judge.  The court concludes,

therefore, that the blood kinship between the Teel brothers, in and of itself, does not

satisfy the presumed bias test and that a contrary finding would constitute an unwarranted extension of Supreme Court precedent.

iii.)  Conclusion

In sum, after a thorough review of the record and the relevant and controlling Supreme Court law, the court finds that Davis has not "overcome a presumption of honesty and integrity in those serving as adjudicators."  Withrow v. Larkin, 421 U.S. 35, 47 (1975).  Davis does not assert that Judge Teel was "actually" biased during the juvenile proceedings over which he presided.  Davis also has failed to present any evidence, other than the mere fact of a first-degree relationship between the judge and the prosecutor, from which bias can be presumed.  Given the absence of evidence establishing either actual or presumed bias, the court finds that Davis' claim of an appearance of bias on the part of Judge Teel is insufficient to rise to the level of a Fourteenth Amendment due process violation.

For all of the foregoing reasons, the court concludes that Davis has failed to present a federal habeas claim which resulted in a decision by the state court which was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of

the United States," or involved "an unreasonable application . . . of clearly established

Federal law, as determined by the Supreme Court of the United States."  <u>Williams</u>, 529

U.S. at 404-05 (emphasis and quotations omitted).  This claim, therefore, is due to be

denied.

<blockquote>
C.  <u>Claims E & F:  Davis' Claims that the State Court Committed<br>
Constitutional Error in Denying his Motion for Change of Venue and<br>
Request for an Individually-Sequestered Voir Dire</u>
</blockquote>

<blockquote>
<i>1. Arguments of Counsel</i>
</blockquote>

In Claims E and F, Davis asserts that, given the extensive pretrial publicity, he

"was denied a fair trial by a fair and impartial jury, and due process in violation of the

Sixth and Fourteenth Amendments to the United States Constitution as a result of the trial

court's denial of his motion for a change of venue and failure to provide adequate voir

dire to identify bias of jurors."  (Doc. No. 92 at 9.)

As to Claim E, concerning the trial court's denial of his pretrial motion for a

change of venue, Davis elaborates that the murder of Mrs. Alford and his prosecution

received "a great deal of publicity in Coosa County," as demonstrated by the testimony in

the state trial court and the evidence introduced concerning articles published in the local

newspaper, the <u>Alexander City Outlook</u>.  (<u>Id.</u> at 9-10.)  In support of Claim E, Davis also

relies on the statements of several local residents who, during the state trial court hearing

on the motion for change of venue, questioned whether Davis could receive a fair trial in

Coosa County.  Davis argues that "the extraordinary nature of the case and the

overwhelming publicity surrounding it" so permeated the media in his small, rural community that it was impossible to select an impartial juror from that community.  (Id. at 11.)  He contends that, as a result of the pretrial publicity, he suffered actual and presumed prejudice, which he says is confirmed by the voir dire proceedings.  (Davis Am. Pet. (Doc. No. 31) at 23-24, ¶¶ 42-43.)  Davis contends that the state court's denial of his motion for change of venue was "contrary to and involved an unreasonable application of" Supreme Court precedent, including Sheppard v. Maxwell, 384 U.S. 333 (1966), and Murphy v. Florida, 421 U.S. 794 (1975).  (See Doc. No. 92 at 12.)

Rebutting Davis' arguments as to Claim E, the State contends that the trial court acted "well within" its "sound discretion" in denying the motion for a change of venue and that neither Sheppard, supra, nor Murphy, supra, "support[s] [Davis'] claim that the Alabama Court of Criminal Appeals's decision was contrary to and an unreasonable application of Federal law."  (Doc. No. 94 at 25, 28.)  Relying on the Alabama Court of Criminal Appeals' written decision, rejecting Davis' arguments on direct appeal, the State contends that the state court "properly held" that a change of venue was not required on the basis of "'inherent prejudice'" because, although "'numerous,'" the newspaper articles were "'factual and objective,'" with editorial coverage which "'encouraged readers to disregard rumors,'" and a significant amount of time (i.e., fourteen months) passed between the murder and the venue hearing.  (Id. at 25 (quoting Davis, 554 So.2d at 1100).)  Furthermore, the State asserts that the state court "correctly determined" that there was no evidence that the jurors were actually prejudiced and that, therefore, the

record adequately supports a finding by this court that the state court acted "in accordance with precedent of the Supreme Court of the United States."  (Id. at 25-26.)

In Claim F, Davis avers that he was denied a fair and an impartial jury for the additional reason that the trial court failed to permit adequate voir dire, including an individually-sequestered voir dire.  Davis essentially asserts that, when a defendant is tried in a venue consisting of a "small and close-knit" community which was subjected to extensive pretrial publicity about a case, "detailed questioning of prospective jurors" is constitutionally required.  (Doc. No. 92 at 13-14.)  Pointing out that the transcript of the voir dire consists of only twenty-nine pages (id. at 11), Davis says the questions were "few" and "conclusory," particularly regarding "the subjects of pretrial publicity" and "knowledge of the victim and her family," and that the limited voir dire prevented him from determining "the extent to which extra-judicial information or opinions would influence the jurors' ability to be fair and impartial."  (Id.)  As a consequence, Davis asserts that he lacked sufficient information from which he could ascertain the effect on the venire members of the pretrial publicity, their extra-judicial knowledge of the case, and their personally-held beliefs.  (Id. at 11-12); (Davis 3rd Am. Pet., at 24-25, ¶¶ 47-50.) Davis, therefore, asserts that he lacked sufficient information to exercise his for-cause and peremptory challenges and to ascertain whether the jurors selected could give him a fair trial.  (Davis 3rd Am. Pet. at 25, ¶ 50.)

In response to Davis' position as to Claim F, the State reasserts its argument, previously rejected by this court on recommendation of the magistrate judge (see Doc.

39

No. 49 at 5-8), that Davis' claim that the trial court improvidently denied his motion for individual voir dire is procedurally barred from review by this court based on the undisputed fact that, although Davis raised the claim at trial, he did not raise the claim on direct appeal until he filed an application for rehearing in the Supreme Court of Alabama. (Doc. No. 94 at 24, 31-33.)  In any event, the State argues that Davis is not entitled to relief on the merits because the state court's determination did not involve an unreasonable application of or contravene clearly established Supreme Court law.  (Id. at 34-37.)

### 2.  Proceedings in State Court

In the state trial court, Davis filed a motion for change of venue.  The trial was to take place in Coosa County, Alabama, but Davis urged a change of venue based on alleged prejudicial pretrial publicity.  A hearing was held on Davis' motion on September 18, 1979, at which time the state trial court heard testimony from several witnesses, including the publisher of the local newspaper, the Alexander City Outlook, and received evidence, namely newspaper clippings and affidavits.  (P-21.)

At the hearing, Davis argued that the pretrial publicity arising from the reporting of the case in the Alexander City Outlook, a newspaper circulated in Coosa County every day except Saturday, when considered together with the gossip and rumors which allegedly pervaded the community where the murder occurred, made it impossible for Davis to receive a fair and an impartial trial in Coosa County.

40

At the hearing, the publisher of the <u>Alexander City Outlook</u> testified that he did

not "know of any criminal case that ha[d] received the news coverage for the <u>Alexander</u>

<u>City Outlook</u> that this case ha[d] received."  (P-21.)  There also was evidence that the

<u>Alexander City Outlook</u> was circulated primarily in Tallapoosa and Coosa counties, with

limited circulation in Clay and Elmore counties, and that, on a "high" day, the total

circulation of the <u>Alexander City Outlook</u> was a "little less than" six thousand.  Of the six

thousand, there were 850 home and/or business delivery subscribers in Coosa County.

There was no evidence presented at the hearing of television or radio coverage

concerning the murder of Mrs. Alford.  Although at the conclusion of the hearing the

State asked the court to take judicial notice of the number of residents in Coosa County,

there was no evidence presented at the hearing as to the total population of Coosa County

at that time or the number of potential eligible jurors in that county.[4]

During the hearing, approximately forty-one newspaper articles reporting on the

case were introduced.  (P-21.)  All of these articles were published in the <u>Alexander City</u>

<u>Outlook</u>.  Testimony also was received from three individuals, one of whom was a

forty-five-year resident of Coosa County and two of whom worked for Russell

Corporation in Tallapoosa County, where Davis' mother and wife also were employed at

---

[4] Although the actual statistics are not in the record as to the voter or total
population of Coosa County during the relevant time period, this court notes that the U.S.
Bureau of Census provides that in 1980 the total population of Coosa County was 11,377.
<u>See</u> Fed.R.Evid. 201; <u>Knox v. Butler</u>, 884 F.2d 849, 852 n.7 (5th Cir. 1989) (observing
that court may take judicial notice of census statistics on federal habeas review).

the time.  Two of these witnesses had read about the murder in the newspaper and one of

those individuals subscribed to <u>Alexander City Outlook</u>.  A third witness testified that

there were "just as many" who believed Davis was guilty as believed he was innocent.

These witnesses, however, testified that, based on the "gossip," "publicity" and "talk in

the community" surrounding the murder of Mrs. Alford, they did not think that Davis

could receive a fair trial in Coosa County.  (P-21.)  Several similar affidavits also were

introduced by Davis.  The State, in turn, offered four affidavits in which citizens attested

to the contrary, i.e., that Davis could receive a fair trial in Coosa County.  (P-21.)

In a written, two-page order dated September 21, 1979, the trial court denied

Davis' motion for a change of venue.  (P-26 at 1142.[5])  In its order, the trial court

acknowledged that there was opposing evidence submitted at the hearing demonstrating

that Davis both "can" and "cannot" receive a fair trial.  The trial court, however, stated

that it "should deny [Davis'] Motion, unless the Court is reasonably satisfied, from all the

evidence before the court, that [Davis] cannot receive a fair and impartial trial at this time

in Coosa County."  (<u>Id.</u>)  Denying the motion, the trial court reasoned:

> The Court . . . finds that the <u>Alexander City Outlook</u>, a newspaper
> published in Tallapoosa County, Alabama, from the time of the commission
> of this alleged crime to the present date of this hearing, did publish frequent
> accounts of this alleged crime.  The Defendant's Exhibit One, numbers
> forty-one newspapers.  However, the Court notes that the first thirty-five
> newspapers in said exhibit do[] not even mention the Defendant's name and
> it was in the thirty-sixth newspaper account of this alleged crime that the

---

[5] The state court clerk's index recites that the trial court's order is on page 1142.
The pages in the court's file, however, are not numbered.

Defendant's name was first mentioned and recited on November 20, 1978. Only five additional publications to the date of this hearing were published by said newspaper, which named the Defendant.

The Court further finds that this newspaper, from a total approximate circulation of six thousand, has a circulation to homes and businesses in Coosa County of approximately eight hundred and fifty papers.

The Court further finds that the evidence as to whether or not the Defendant can receive a fair and impartial trial at this time in Coosa County is conflicting and that the Defendant can receive a fair and impartial trial at this time in Coosa County, Alabama, and the Defendant's rights can be further protected by proper voir dire of the jury venire and instructions by the Court.

Id.

Approximately nine months later, on June 9, 1980, jury selection in Davis' case was held. The parties stipulated that the trial court had summoned 100 names from its jury box for service. (P-23 at 326.) Of those 100, approximately sixty-two or sixty-three were present for roll call. (Id.)

The Honorable Kenneth F. Ingram, then Circuit Judge, questioned the jurors as to their general qualifications to serve on a jury and excused six jurors during this phase. (P-1 at 363.) The trial court then explained different reasons which warrant a juror being excused for cause, one of those reasons being that a juror "has a fixed opinion as to the guilt or innocence of the defendant, which would bias [his or her] verdict." (P-1 at 370.) Two jurors were excused for cause, not on the latter basis, but on the ground that they were older than 65 years of age. (P-1 at 370-372.)

The State conducted voir dire first.  On the issue of jury bias, the prosecutor asked whether any juror had read or heard anything about the case which rendered him or her "so biased" to the point that he or she could not fairly judge the facts, as presented from the witness stand, and give Davis a "fair trial."  (P-1 at 374.)  No response was given by any juror which prompted the prosecution to state:  "No one stood and responded to that. That means everyone feels [who] is s[i]tting out here that you can put aside everything you heard outside and decide this case on what you hear inside the courtroom, is that right?  Let the record show there was no response."  (P-1 at 375.)

When questioned by defense counsel, no juror responded to the following question:  Are "there . . . any of you out there on the Jury Venire, stand if you don't believe a person is innocent until proven guilty beyond a reasonable doubt?"  (P-1 at 380.)  In response to a different question revealing that one juror had frequented Mrs. Alford's store, this particular juror indicated that, although she did not have a "fixed opinion about the case," she did not believe that she could "reach a fair verdict."  (P-1 at 380-382.)  This juror was challenged for cause by defense counsel and was stricken by the court; she, thus, did not serve on the actual jury.  (P-1 at 382.)

When asked by defense counsel, fourteen of the potential jurors indicated that they had read a newspaper account about the case.  (P-1 at 389.)  Seven of those fourteen did not elaborate on what they had read.  The other half volunteered the following information when asked if they had read about the case in the <u>Alexander City Outlook</u>:  "I did[,] but I forgot it"; "I read it[,] but I didn't keep up with it"; "I read it"; "I didn't keep

44

up with it" or read "all of it"; "I didn't remember what I read," and "[I read about it] right after it happened"; "I read a portion of it in the paper[;] I didn't read all of it"; "I read a portion of it in the paper, but "I don't know what it was."  (P-1 at 389-90.)

Defense counsel then asked, "How many people have discussed this case with someone, at one time or another?"  (P-1 at 390.)  Six jurors, one of whom is not identified and two of whom are part of the fourteen above who had read about the case, indicated that at some point they had discussed the case.  Some stated that their discussions had occurred "at work" or "among friends and relatives."  (P-1 at 390.)

Thereafter, defense counsel questioned the jury venire as to biases, if any.  He asked:  (1) do you "know anything about this case that you have heard on the outside or read that would [a]ffect your verdict?"; (2) "do any of you know anything that would [a]ffect your case one way or another, concerning the serious nature of this case where the State is asking you to put Timothy Charles Davis to death, in the electric chair?"; and (3) are there "any of you who cannot listen to the evidence from the witness stand and return a verdict based solely upon the evidence and assure his defense lawyers here and the State of Alabama that you have no prejudice about this case, and no pre-conceived opinions or verdicts in this case?"  (P-1 at 391-92.)  There is no indication in the record that any juror gave a response to the foregoing three questions.  (Id.)

At the conclusion of defense counsel's questioning during the voir dire process, the trial court observed that it had reserved a ruling on whether to allow individual voir dire examination.  (P-1 at 392.)  Responding to the trial court's inquiry as to "exactly . . .

45

what" defense counsel "ha[d] in mind" to ask, Davis' counsel stated that he sought to question individually those jurors who had stated that they had engaged in discussions about the case and those who had indicated that they had read about the case in the Alexander City Outlook.  (Id.)  Defense counsel proposed that the trial court take these jurors, indicating that "[t]here weren't that many," "outside the courtroom to chambers" for questioning.  (P-1 at 392.)

The trial court stated that it was amenable to questioning these jurors individually outside the presence of the other jurors (P-1 at 392) but, at the same time, expressed concern about leaving the remainder of the jurors in the courtroom without court supervision.  (P-1 at 392-393.)  The trial court stated that it "want[ed] to accommodate" defense counsel and proposed, as an alternative, that defense counsel individually question each juror whom counsel had identified, while "shield[ing] that [juror] from the rest of the venire."  (P-1 at 393.)  Defense counsel then asked for a "second" to confer about the matter and, thereafter, proposed a "solution."  (P-1 at 393.)  As the "solution," defense counsel requested that the court simply ask the jurors "to search their minds one more time to make certain they haven't read or heard anything that keeps them from understanding the principle of the law that . . . Davis is innocent" until proven guilty.  (P-1 at 393.)  The trial court, though, denied the request, finding the proposed question redundant of questions already asked by counsel.  (P-1 at 393.)  The trial court pointed out that defense counsel asked "several questions" pertaining to "newspaper accounts," heard responses from the jurors, and questioned those jurors as to whether they believed

46

that they could render a fair and an impartial verdict based solely on the evidence, "not taking into account any newspaper article."  (P-1 at 394-95.)

Twelve jurors were selected to serve on Davis' case.  (P-1 at 400.)  Three of the jurors who were selected to serve had read about the case:  Saleta Heath, Elise McDonald, and Marvalyne Kelly.  (P-1 at 400.)  Heath is the individual, above, who stated that she "did" read about the case, but had "forgot[ten] it."  (P-1 at 389.)  Kelly and McDonald identified themselves when asked if they had read "any newspaper accounts about this case," but there is no further elaboration from either of these two jurors.  (P-1 at 389.)  After jury selection, the jury was sequestered for the trial and deliberations. (P-1 at 397-98.)

### 3.  The State Court Decision

On direct appeal, the Alabama Court of Criminal Appeals rejected Davis' arguments that "the widespread publicity of the crime mandated a change of venue" and that the trial court "erred in denying [Davis'] motion for a change of venue."  Davis, 554 So.2d at 1100.  The Court reasoned as follows:

> Although the appellant presented evidence of numerous newspaper articles covering the crime, the record reveals that these articles were factual and objective in nature and that several editorials even encouraged readers to disregard rumors and withhold their judgments as to appellant's guilt or innocence until after his trial.  Consequently, the publicity did not demonstrate "inherent prejudice" against the appellant sufficient to mandate a change of venue.  See Magwood v. State, 426 So.2d 929 (Ala. 1983), affirming 426 So.2d 918 (Ala. Crim. App. 1982); Robinson v. State, 430 So.2d 883 (Ala. Crim. App. 1983).  Moreover, the mere passage of time

between the crime and the venue hearing, a passage of approximately 14 months in the instant case, was another factor negating the prejudicial effect of the publicity surrounding the instant offense and justifying the trial court's refusal to grant a change of venue.  See, Magwood v. State, *supra*; Robinson v. State, *supra*.

Furthermore, there was no proof of any "actual prejudice" among the prospective jurors.  Those who had heard about the crime could remember very little about it.  None, when questioned on voir dire, disclosed any preconceived notions or fixed opinions as to appellant's guilt and all indicated that any prior knowledge would in no way affect their verdicts.  The record clearly demonstrates compliance with the juror fairness and impartiality standards espoused in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).  See, Anderson v. State, 362 So.2d 1296 (Ala. Crim. App. 1978); Giles v. State, 554 So.2d 1073 (Ala. Crim. App. 1984).

Under these circumstances, the trial court's denial of appellant's motion for a change of venue, a decision properly left to the sound discretion of the trial court, was not improper.  See, Magwood v. State, *supra*; Anderson v. State, *supra*; Moulds v. State, 426 So.2d 942 (Ala. Crim. App. 1982).

Id.

Also, in a written opinion, on appeal from the state trial court's judgment denying post-conviction relief, the Alabama Court of Criminal Appeals rejected Davis' claim that his counsel was ineffective for failing to conduct adequate voir dire, "particularly concerning the issues of pretrial publicity, knowledge of the appellant and his family, knowledge of the victim and her family, and the jurors' feelings and opinions about the death penalty."  Davis, 720 So.2d at 1018.  The Court of Criminal Appeals stated:

A review of the record indicates that each of these areas was addressed during the voir dire examination.  Moreover, as we stated in our opinion in the appellant's direct appeal, there was no evidence that members of the venire were biased against the appellant.  See Davis, 554 So.2d at 1100.

> Similarly, in the present proceeding, the appellant has not shown any
> evidence of bias, that he was prejudiced by trial counsel's allegedly
> insufficient voir dire examination of potential jurors, and that there is a
> reasonable probability that the result of the trial would have been different
> if counsel has conducted additional voir dire examination.  <u>Strickland</u>,
> <i>supra</i>.  Again, he has made bare allegations and drawn legal conclusions
> that are not supported by facts.  Rule 32.6(b), Ala. R.Crim. P.

<u>Id.</u>

### 4. Analysis

Davis' claim that he was denied a fair and an impartial jury arises from the
guarantees of the Sixth Amendment and the Fourteenth Amendment's Due Process
Clause.  <u>See</u> <u>Ross v. Oklahoma</u>, 487 U.S. 81, 85 (1988) ("It is well settled that the Sixth
and Fourteenth Amendments guarantee a defendant on trial for his life the right to an
impartial jury."); <u>Turner v. Murray</u>, 476 U.S. 28, 36 n.9 (1986) ("The right to an impartial
jury is guaranteed by both the Sixth Amendment . . . and by principles of due process.").
Davis' claim comprises two separate, but related, components.  Davis' first contention is
that the trial court erred in denying his motion for a change of venue because the
extensive pretrial publicity in the <u>Alexander City Outlook</u>, the local newspaper, either
actually or presumptively prejudiced the jury against him in his case.  (<u>See</u> Davis 4th Am.
Pet., ¶ 46.)  Davis' second contention is that the trial court's refusal to permit an
individually-sequestered voir dire in the circumstances of his case violated his
constitutional right to a fair and an impartial jury, by depriving him of the opportunity to
expose alleged biases of the jurors through individual questioning.

49

a.)  Procedural Bar

The State again has argued that Davis' claim that he was improperly denied individually-sequestered voir dire is procedurally defaulted.  The court has reviewed the record in this case and concludes that the State is correct that, on post-conviction review, the Alabama Court of Criminal Appeals *erroneously* concluded that this claim was raised and addressed on direct appeal.  See Davis, 720 So.2d at 1017-18.  In fact, this claim was not addressed on direct appeal and, thus, could be procedurally defaulted from a merit review by this court for that reason.  See Ala. R. Crim. P. 32.2(5); Wainwright v. Sykes, 433 U.S. 72 (1977) (holding that consideration of a claim in a petition for habeas corpus can be barred by failure to comply with state procedural rules).  However, the last state court to review this claim did not conclude that the claim was procedurally defaulted because of this failure.  Rather, it refused to review the merits on post-conviction review because the issue had been raised and addressed at trial and on direct appeal.  See Davis, *supra*.

In Harris v. Reed, the Supreme Court held that a federal court has the responsibility to determine whether a state court, in fact, based its denial of relief on procedural grounds.  489 U.S. 255 (1989).  Adopting the plain statement rule as pronounced in Michigan v. Long, the Court held that, if a state court issues a "plain statement" that its decision rests on independent and adequate state grounds, a federal court should not address the merits of the federal claim.  463 U.S. 1032, 1041 (1983).  If, however, a state court's reasons for rejecting a claim are ambiguous such that a federal

court cannot determine whether the decision is based on procedural grounds or the merits, federal review is not precluded.  Id.  The plain statement rule applies only when a state court's decision creates an ambiguity over whether the decision was based on the merits or on the application of a procedural bar.  See Harmon v. Barton, 894 F.2d 1268 (11th Cir. 1990).  The question presented by the instant situation is whether the plain statement rule applies where the state court failed to acknowledge and rely upon a basis for procedural default supported by the record and instead refused to review a claim on the erroneous basis that it had been reviewed on direct appeal.  Indeed, this situation presents interesting questions concerning whether a state court's waiver of (or failure to acknowledge) its own procedural rules as a basis of default prevents this court from relying on that basis of procedural default, and whether the plain statement rule, if applicable in this instance, would require this court to review the claim on its merits.

The court, however, finds that it need not decide whether, in fact, this claim was procedurally defaulted in the first instance because, as discussed below, the court concludes that the claim lacks merit.

b.)  Pretrial Publicity as Pertains to
the Alleged Necessity for a Change of Venue

"The standards governing a change of venue ultimately derive from the due process clause of the fourteenth amendment which safeguards a defendant's sixth amendment right to be tried by 'a panel of impartial, indifferent jurors.'"  Irvin v. Dowd,

51

366 U.S. 717, 722 (1961) (superseded on other grounds by statute); see also Sheppard, 384 U.S. at 362 ("Due process requires that the accused receive a trial by an impartial jury free from outside influences.").  This fundamental constitutional right is violated where the prejudicial and inflammatory nature of the pretrial publicity so poisons the community against the defendant that it is impossible to select a fair and an impartial jury from that community.  When such a scenario is presented, due process mandates that the trial court grant a defendant's motion for a change of venue.  Rideau v. Louisiana, 373 U.S. 723, 726 (1963); see also Sheppard, 384 U.S. at 362-63.

On the other hand, a change of venue is not required merely because the crime and the defendant have been exposed to media coverage of which the potential jurors are aware.  "[I]t is not required . . . that the jurors be totally ignorant of the facts and issues involved."  Irvin, 366 U.S. at 722.  As explained by the Supreme Court in Irvin, an opinion decided nineteen years prior to Davis' trial date,

> [i]n these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

Id. at 722-23.  Impartiality exists where a potential juror indicates that he or she can put aside any preconceived notions regarding the outcome of the case and return "a verdict based on the evidence presented in court."  Id. at 723.

There are two standards to guide courts when deciding whether the Fourteenth Amendment requires a change of venue due to alleged juror bias stemming from pretrial publicity:  "actual prejudice" and "presumed prejudice."  Meeks v. Moore, 216 F.3d 951, 961 (11th Cir. 2000); see also Dobbert v. Florida, 432 U.S. 282, 303 (1977) (discussing the actual and presumed prejudice analyses; observing that in Murphy, supra, the defendant "failed to show that the trial setting was inherently prejudicial or that the jury selection process permitted an inference of actual prejudice") (citing Murphy, 421 U.S. at 802).  Davis relies on both standards and "bears the burden of demonstrating either type of prejudice."  Cummings v. Dugger, 862 F.2d 1504, 1509 (11th Cir. 1989) (citing Murphy, 421 U.S. at 803).

Moreover, a state court's finding of a juror's impartiality on federal habeas review pursuant to 28 U.S.C. § 2254 only will be overturned for "manifest error."  Depree v. Thomas, 946 F.2d 784, 788 (11th Cir. 1991); Patton v. Yount, 467 U.S. 1025, 1031 (1984).  In describing the "manifest error" standard, the Supreme Court has stated that "the question is whether there is fair support in the record for the state court['s] conclusion that the jurors here would be impartial."  Depree, 946 F.3d at 788 (quoting Patton, 467 U.S. at 1038).

### 1.)  Presumed Prejudice

The threshold for demonstrating presumed prejudice is high, and the burden on Davis "is an extremely heavy one."  U.S. v. Lehder-Rivas, 955 F.2d 1510, 1524 (11th Cir.

1992).  Prejudice is presumed only in the extreme case where the negative pretrial

publicity so saturates the community so as to render virtually impossible a fair trial by an

impartial jury drawn in that community.  See Murphy, 421 U.S. at 798-99; see also Mills

v. Singletary, 63 F.3d 999, 1010 (11th Cir. 1995) ("the principle of presumed prejudice 'is

rarely applicable and reserved for extreme situations'").

      To decide whether Davis has presented evidence from which prejudice can be

presumed, the court must examine "whether: (1) the pretrial publicity was sufficiently

prejudicial and inflammatory; and (2) the publicity saturated the community in which the

trial was held."  Mills, 63 F.3d at 1010.  Publicity which is factual and objective in nature

is not likely to be deemed "inflammatory."  Murphy, 421 U.S. at 801 n.4 (noting

distinction between "largely factual publicity" and publicity "which is invidious or

inflammatory"); Mills, 63 F.3d at 1012 ("We are satisfied that the media coverage of this

case 'was essentially factual and was not directed at arousing or inciting the passion of

the community.'"); U.S. v. De La Vega, 913 F.2d 861, 865 (11th Cir. 1990) (330

newspaper articles not sufficient to establish presumed prejudice because they were

"largely factual in nature and could not have created the sort of inflamed community

atmosphere which courts deem presumptively prejudicial").

      Moreover, the "quantum" of the publicity does not, standing alone, create a

presumption that a defendant was denied a fair trial by an impartial jury.  Dobbert, 432

U.S. at 303 (rejecting petitioner's argument that "extensive coverage by media denied him

a fair trial" because the argument "rest[ed] almost entirely upon the quantum of publicity

which the events received," without any evidence of "constitutional unfairness").  Rather, "[t]he nature of the publicity and whether it is the sort that could be laid aside by jurors, rather than its volume, is the crucial factor to be considered."  Brofford v. Marshall, 751 F.2d 845, 851 (6th Cir. 1985) (citing Murphy, 421 U.S. at 794).

In addition to the volume and content of the pretrial publicity, two other factors are relevant in determining whether prejudice is presumed.  First, the court should consider the amount of time which has elapsed between the peak pretrial publicity and the actual trial.  Murphy, 421 U.S. at 803; see also Lehder-Rivas, 955 F.2d at 1524 (holding that, court's evaluation of the existence of presumptive prejudice should include consideration of "the time lapse between peak publicity and the trial").  Although noting that "[i]t would be fruitless to attempt to identify any particular lapse of time" that would lessen the prejudicial impact of pretrial publicity, the Supreme Court has observed:  "That time soothes and eases is a perfectly natural phenomenon, familiar to all."  Patton, 467 U.S. at 1034-35.  Second, the court should consider "the credibility of prospective jurors who indicate during voir dire that they could be impartial despite having been exposed to pretrial publicity about the case."  Lehder-Rivas, 955 F.2d at 1524.

In support of his claim that he was denied a fair trial by virtue of the extensive pretrial publicity, Davis relies on two Supreme Court decisions:  Sheppard v. Maxwell, supra, and Murphy v. Florida, 421 U.S. 794, 800 (1975).  Given that "the question whether prejudice should be presumed is by its very nature shaped by the facts," Coleman v. Kemp, 778 F.2d 1487, 1490 (11th Cir. 1985), the court begins by reciting the facts of

55

Murphy and Sheppard as illustrative of when pretrial publicity does and does not render possible the seating of a constitutionally fair jury.

In Murphy, which involved the robbery trial of a criminal defendant who previously had gained notoriety as a jewel thief, earning him the nickname "Murph the Surf," the Supreme Court held that the defendant was not deprived of due process when the trial court denied his motion for change of venue.  In part because of his flamboyant lifestyle and his prior criminal activities, including a murder conviction, the defendant received a lot of media coverage when he was arrested on the robbery charge at issue in Murphy.  The Supreme Court rejected the defendant's presumed prejudice claim, however, finding that the defendant had failed to demonstrate an inflamed community atmosphere.  See 421 U.S. at 803.  Although "scores of articles report[ed] on [defendant's] trials and tribulations," id. at 796, both past and present, the Court emphasized that the newspaper articles were primarily factual in nature and that the bulk of news coverage occurred some seven months prior to the trial.  See id. at 802.

Sheppard, a federal habeas corpus proceeding, is one of the rare cases where the publicity reached the level required to constitute presumed prejudice.[6]  The publicity, to put it mildly, was extraordinary.  It was so extraordinary, i.e., "massive, pervasive and prejudicial," that the Supreme Court held that the defendant, a then prominent doctor in an Ohio suburb, was denied a fair trial in his prosecution for "bludgeon[ing] to death" his pregnant wife in their home in 1954.  Consequently, the Supreme Court reversed the defendant's judgment of conviction for murder in the second degree, holding that the defendant was denied a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment.  See 384 U.S. at 335.

The defendant, who was the prime suspect since day one of the murder, repeatedly was headlined in every form of the news media.  Prior to the defendant's arrest, the media emphasized the defendant's lack of cooperation with law enforcement, his refusals to submit to a lie detector test and an injection of truth serum, his reluctance to be questioned outside the presence of counsel, and his alleged extramarital affairs.  Id. at 338-39.  The editorials published about the defendant were ruthless and scathing.  One

_____

[6] The Supreme Court of the United States has found presumed prejudice based on pretrial publicity in the following three cases:  Sheppard, above; Rideau, 373 U.S. at 724 (holding that the defendant's uncounseled 20-minute custodial confession, which was televised three times prior to the trial in the community where the crime and trial occurred, was so pervasive and inflammatory as to saturate the community such that any subsequent court proceeding would "be but a hollow formality"); Estes v. Texas, 381 U.S. 532, 535-36 (1965) (reversing judgment of conviction where jury pool first was exposed to extensive televised pretrial publicity, which was then followed by a circus-like atmosphere at trial due to television cameras in the courtroom).

57

described the defendant as a "'liar, still free to go about his business, shielded by his family, protected by a smart lawyer who has made monkeys of the police and authorities, carrying a gun part of the time, left free to do whatever he pleases.'"  Id. at 341.

Another editorial demanded that the coroner hold an inquest, which the coroner did.  The day after the newspaper's invitation, in a packed gymnasium brimming with print, television and radio reporters, the coroner commenced a three-day inquest with the county prosecutor and detectives by his side and the defendant present by subpoena.  During the inquest, which essentially turned into a pep rally for the prosecution, law enforcement officers "searched [the defendant] in full view of several hundred spectators," and the defendant answered questions for more than five hours about his actions on the night of the murder and an alleged extramarital "love affair."[7]  Id. at 340.  At one point, when the defendant's counsel tried to participate in the proceedings, counsel was "forcibly ejected from the room by the Coroner, who received cheers, hugs, and kisses from ladies in the audience."  Id. at 338, 340.  Other editorials on the subject of the murder, included "front-page charge[s] that somebody is 'getting away with murder," and "'Why Isn't [the defendant] in Jail?'"  Id. at 340-41.

The area newspapers were replete with incriminating evidence against the defendant and demands for his arrest.  After the defendant's arrest, the negative publicity,

_____

[7] Indeed, one particular affair was suggested to have been the motive for the murder, but there also was additional coverage devoted to the defendant's alleged and numerous illicit sexual relationships with other and women.  Sheppard, 384 U.S. at 340.

including front page headlines, intensified, becoming more sensational and satirical.  For example, one newspaper featured a cartoon of the defendant's head atop a sphinx, with a satirical caption reading:   "'I Will Do Everything in My Power to Help Solve This Terrible Murder.'–Dr. Sam Sheppard.'"  Id. at 341-42, 339-41.  The foregoing represents but a sample of the media coverage which continued unabated from the discovery of the victim's body until trial.[8]

Three months prior to the trial, the news media, by invitation of the coroner, provided in depth coverage, including photographs, of the defendant's performance during a re-enactment of the events occurring on the day of the murder.  Id. at 338, 354. Nine days prior to jury selection, an editorial accused defense counsel of "jury tampering" for polling community residents on their beliefs of the defendant's guilt or innocence to support a motion for change of venue.  See id. at 345-46.  On the second day of voir dire, a local radio station broadcast a live debate forum in which newspaper reports "accused [defense] counsel of throwing roadblocks in the way of the prosecution and asserted that [the defendant] conceded his guilt by hiring a prominent criminal lawyer."  Id. at 346.  Also, during jury selection, a front-page news story – with a two-inch headline stating "But Who Will Speak for Marilyn?" – promised readers through

---

[8] Indeed, the Supreme Court observed that the record contained "five volumes" of newspaper clippings from all three of the Cleveland newspapers during the period from the day of the murder until the defendant was convicted.  Sheppard, 384 U.S. at 342.  It confidently assumed that radio and television coverage "was equally large."  Id.

quotes from a detective that the prosecution's evidence "would speak for Marilyn."  Id.

at 346-47.

Moreover, the area newspapers published the names and addresses of each of the

jury venire.  As a result, prospective jurors received letters and telephone calls from both

friends and foes.  Id. at 342.  At voir dire, all but one of the selected jurors had read or

listened to broadcasts about the case, and seven subscribed to home delivery of at least

one area newspaper.  Id. at 345.  The jury, which was ultimately selected, was

sequestered only during its deliberations, with inadequate instruction from the judge

during the trial not to "read or listen to anything concerning the case."  Id. at 353.

As Davis' claim focuses on pretrial publicity,[9] it suffices for present purposes to

observe that, during the entirety of the defendant's trial in Sheppard, the courtroom was

filled with a plethora of print, television and radio reporters, and the "intense publicity

continued unabated."  Id. at 345.  More than twenty local newspaper personnel and wire

service representatives had special seating inside the bar during the entirety of the trial.

Id. at 342-43.  Television and radio reporters, as well as out-of-town print media,

_____

[9] Davis has not attacked the atmosphere of the trial itself, and the record is devoid of any evidence suggesting that Davis was deprived of the "judicial serenity" to which he was entitled.  Sheppard, 384 U.S. at 344-45.  Rather, as stated, Davis contends that the pervasive *pretrial* publicity demonstrates that any juror from Coosa County would be presumptively prejudiced.  Because Davis has focused on the *pretrial* publicity, the court notes that the articles in the record which were published after the jury was selected "are, by definition, not 'pretrial publicity'" and, thus, are not material to Davis' claim of presumed prejudice.  Chandler v. Crosby, No. 8:03-CV-1347-T-30, 2006 WL 305918, *23 (M.D. Fla. 2006).

occupied the majority of the space on three of the four rows of benches in the courtroom. Id.  The media, subject only to very few restrictions, essentially was given free rein of the courtroom and the courthouse "during the entire nine weeks of the trial."  Id. at 345. Indeed, the Supreme Court admonished the trial court for its failure to control the press and prevent the "carnival atmosphere" in the courtroom during the trial.  Id. at 358.

The Supreme Court concluded that, although it could not "say that [the defendant] was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone," the trial judge's "arrangements" with the media, which resulted in pure "bedlam" and a "carnival atmosphere" during the trial, "caused [the defendant] to be deprived of that 'judicial serenity and calm to which [he] was entitled.'"  Id. at 344-45, 358 (quoting Estes, 381 U.S. at 536).  As noted by the Supreme Court in its later decision of Murphy, discussed above, "Sheppard arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival."  Murphy, 421 U.S. at 799.  The Supreme Court in Sheppard, however, did not completely bypass the question of when *pretrial* publicity alone requires the trial judge to take precautionary measures:  "[W]here there is a reasonable likelihood that prejudicial news will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity."  384 U.S. at 363.

In view of the forgoing principles, the court turns to consideration of whether the pretrial publicity here was so intensive and extensive so as to compel a finding of

presumed bias or preformed opinion.  For the reasons to follow, the court finds that the facts of the case fall short of the pretrial media frenzy in Sheppard and more aptly fall within the permissible constitutional boundaries established in Murphy.

In this case, approximately twenty-three months elapsed between the date of the murder (i.e., July 20, 1978) and the commencement of the trial (i.e., June 9, 1980). Examining the nature of the pretrial publicity, the court discusses, first, the initial four months of news coverage and, second, the news coverage which occurred thereafter during the nineteen months preceding the trial.  Third, the court examines Davis' arguments generally relating to demographics.  Fourth, the court compares the pretrial publicity in this case to that which occurred in Sheppard.

### a.) The Initial Four Months of News Coverage

Davis emphasizes in these proceedings, and the court has not overlooked, the fact that the publisher of the Alexander City Outlook testified during the hearing on Davis' motion for change of venue that he (the publisher) did not "know of any criminal case that ha[d] received the news coverage for the Alexander City Outlook that this case ha[d] received."  Undoubtedly, the senseless, violent murder of Mrs. Alford shocked the residents of Coosa County and received considerable newspaper coverage in the Alexander City Outlook, particularly during the immediate aftermath of the murder. Indeed, during the four months immediately following the murder, the media coverage of the murder and the unnamed "teenage" suspect was at its height.  The court agrees with

Davis that, at least during these four months, articles reporting on the case frequently

appeared in the Alexander City Outlook.  The evidence adduced at the hearing on Davis'

motion for change of venue reveals that at least thirty-eight articles appeared in the

Alexander City Outlook between July 21, 1978 (i.e., the day after the murder) and

November 20, 1978, when Davis was identified for the first time by name in a news

article reporting that Davis had been certified as an adult for trial.

Although Davis has failed to point to any specific reference or statement in any of

the numerous articles which he contends is unduly prejudicial, save one editorial which

the court discusses below, the court independently has examined the articles in the

record.  The court concludes, as did the state court, that the articles are predominantly

"factual and objective in nature."  Davis, 554 So.2d at 1100.

A majority of the articles focus on the eight-week prolonged process surrounding

the juvenile extradition proceedings which Davis did not waive and which occurred in

Georgia, where Davis relocated after the juvenile court initially determined that there was

insufficient evidence to hold Davis.  Although some of these articles report that Coosa

County "authorities" considered Davis to be a "runaway" from the juvenile court system,

arguably an inculpatory description, the articles also reported Davis' side of the story as

relayed by his lawyers, i.e., that Davis' release by the juvenile court was "unconditional,"

meaning that it was Davis' right to travel to Georgia if he so desired, and that Davis had

left Coosa County because of death threats he had received.  One editorial, on the subject

of extradition, even cautioned readers from forming preconceived opinions as to the

juvenile suspect's decision to challenge the extradition proceedings, observing that, while the decision may appear "unwise," the Alexander City Outlook did not "pretend to know all the factors which contributed to this decision either."

The articles published during this four-month period also contain descriptions of the legal proceedings which had occurred to date and explain what would occur in upcoming hearings; for example, one article sets forth the factors which the trial court could consider when deciding whether "the young suspect in the Avis Alford murder case [would] be tried as a juvenile or as an adult."  In short, these articles report the events unfolding in the murder of Mrs. Alford and the "juvenile" suspect, and the court does not discern the articles as slanting one way or the other or as inflaming the senses.

In his brief, however, Davis relies, almost exclusively, on a particular editorial published in the Alexander City Outlook on August 2, 1978, as an indicator of the alleged untamed publicity allegedly surrounding the trial.  (See Doc. No. 92 at 10 (citing P-21 at 192-93).)  Davis quotes the portion of that editorial which refers to the "refusal" of the "seventeen year old suspect" to "voluntarily return to Alabama for a court hearing," and describes the suspect's "refusal" as one of many, but probably not the last, "peculiar turn" in the case.  (Id.)  Davis also cites the editorial's comment of the potential of the case "becoming one of those trials that give the judicial system a bad name by its very excesses" and "becoming a circus that winds up not serving well the friends and relatives of the late Mrs. Alford or the suspect or the larger community, or the cause of justice."

64

The court finds that the prejudicial impact, if any, of this editorial is minimal for at least four reasons.  First, the editorial was published a mere two weeks after the murder and more than twenty-two months prior to the actual trial date.  The editorial's temporal nexus to the trial date, therefore, is remote.  Second, Davis' name is not mentioned in this article; thus, at the time of publication, readers would not have had any reason to associate Davis with the crime.  Third, although Davis points out that the editorial announced that "community feelings are . . . running high" and that "rumors are running rampant" (id.), any argument that the editorial comments portrayed the general attitude among Coosa County residents is substantially weakened based upon the publisher's testimony that no scientific polls were used to determine the public opinions and that the editorial merely "reflected [his] feelings."

Fourth, notably absent from Davis' brief is any mention of other portions of the editorial which urge the community not to make, and to put aside, any preconceived judgments based upon rumors and innuendo.  Specifically, the editorial reminds "everyone" that the suspect under investigation may not be the actual culprit, that the "current suspect . . . enjoys the benefit of the presumption of innocence in the eyes of the law" and that hopefully "he enjoys that same presumption in the eyes of the community, unless it is proven otherwise."  The editorial further provides:  "Here at the newspaper we are going to do our best to heed our own advice and to report legitimate developments in a complicated case which is of high interest to people in this area and at the same time screen out groundless rumors and avoid sensationalism."  Repeating its caution, the

65

editorial concludes:  "We would like for this matter to be adjudicated fairly and in a dignified atmosphere befitting its seriousness.  We would like for this community to be calm and patient.  We would like to see justice done."  Such cautioning is a far cry from inflammatory.

Another article, emphasized by Davis at the hearing on his motion for change of venue presumably due to its alleged inflammatory content, was published on August 3, 1978, the day after the above editorial, and is titled "Columbus Cops Lost Interest after Early Alford Case Inquiry."  This article included a statement that neighboring Georgia law enforcement authorities contacted the Coosa County Sheriff's Office, shortly after the murder of Mrs. Alford, in relation to its investigation of a series of stranglings in a Georgia locale.  The article, however, was quick to dispel any suggestion that the main "suspect" targeted in the investigation of the murder of Mrs. Alford also was under investigation for the strangling murders in Georgia.  Namely, the article includes a statement and quote that Georgia authorities discerned no connection between the crimes and that the Alford case presented a "completely different situation" from the murder investigation in Georgia.  Moreover, the same article observed that the "suspect" in the Alford murder case was released "for lack of evidence" by a juvenile court, a fact which certainly was not prejudicial to Davis.

In its evaluation of whether the news coverage as a whole was sufficiently inflammatory, the court also has considered the nature and words chosen by the Alexander City Outlook to describe the brutal murder.  See, e.g., Meeks, 216 F.3d at 964

(finding of presumed prejudice sufficient to warrant change of venue was not warranted, where among other things, there was "no horrible description of the details of the killings").  The court recognizes that two of the articles, one published the day after the murder and another published six days after the murder, describe the murder in some detail.  For example, the article published in the Alexander City Outlook the day after the murder reports that the victim was found "face down in a pool of blood," having "died of multiple stab wounds in the back," and included a statement that authorities "declined to speculate about whether or not the nude victim had been sexually molested."  Although somewhat graphic, the court does not find these descriptions to be grossly inflammatory.  The majority of the articles following this one, save a July 26, 1978 article which, although omits mention that Mrs. Alford's body was nude, references the repeated stabbings and the pool of blood, describe the murder in mere short fashion as a "slaying" or "murder," without further elaboration.  Although some of the articles published closer in time to the trial include accounts that Mrs. Alford was "stabbed to death" and a few articles reference the related charge against Davis for "sodomy," the gruesome details, particularly as to the evidence of sodomy, are omitted.  In short, the court finds that the Alexander City Outlook accurately reported the cause of death in a manner which did not overemphasize the gory details of the brutal murder and did not suggest in its reporting that the suspect in custody was guilty of the brutal crime.  The court simply cannot say that the accounts of the murder were written so as to inflame the community.

Moreover, it is noteworthy that at the hearing on the motion for a change of venue, it was stipulated that none of the thirty-five articles referenced during the hearing even mentioned Davis' name, and the articles do not.  Rather, given Davis' juvenile status, the Alexander City Outlook identified Davis in the various articles by descriptions only, such as the "teenage suspect," "youth suspected in the murder" of Mrs. Alford, the "seventeen[-]year[-]old suspect" and "young suspect."  The court finds that the fact that Davis' name was withheld from publication is another factor which softens the prejudicial impact, if any, of the pretrial publicity during the initial four-month phase of intense reporting on the murder.

The first time Davis' name appeared was in an article published on November 20, 1978, after Judge Teel certified Davis as an adult.  Even then, in the same edition, the Alexander City Outlook included an editorial, titled "Decision Not a Verdict," cautioning readers that no proceedings concerning Davis' guilt or innocence had yet occurred and repeating its earlier caution that the readers must not "forget that in the eyes of the law any suspect remains innocent unless at the end of this long process a guilty finding is reached."  The editorial again urged readers "to avoid making judgments."

The Alexander City Outlook issued other cautions, similar to the ones discussed above, throughout the course of its reporting on the murder case and the arrest of Davis.  The editorials reveal not a bias against Davis, but quite to the contrary, an urging by the Alexander City Outlook to its readers to remain impartial and fair-minded and to withhold judgment until such time that a trial is held and the evidence received.  The

court finds that the Alexander City Outlook sought to neutralize any community prejudice against Davis, not to "arous[e] or incit[e] the passion of the community." Mills, 63 F.3d at 1012 (quotations and citation omitted).  Indeed, the court finds that the Alexander City Outlook heeded its own advice in reporting non-inflammatory and unemotional news stories on the case.

### b.) The Nineteen Months Preceding the Trial

After the initial flurry of reporting, which occurred for approximately four months, the volume of news coverage on the murder in the Alexander City Outlook subsided significantly.  During the nineteen months which preceded Davis' trial date, that is, between November 21, 1978 (i.e., the day after the Alexander City Outlook published Davis' name for the first time) and June 9, 1980 (i.e., the first day of the trial), the record reveals that only seven articles were published in the Outlook.  (See Vol. 14, Appeal to Alabama Court of Criminal Appeal, Pet. for Relief from Sentence.)  Notably, only one of these seven articles appeared during the nine months immediately preceding the trial. The latter article, which was published in the Alexander City Outlook on June 8, 1980, merely alerted readers that Davis' capital felony trial was to begin the next day.[10]

Regarding the content of the news coverage during this nineteen-month time frame, the seven articles consist of news pertaining to Davis' arraignment, his youthful-

_____

[10] In other words, prior to June 8, 1980, there was an absence of coverage between September 17, 1979 and June 7, 1980.

offender application, his motion for a change of venue based upon "pretrial publicity," and the fact that a court-ordered psychological examination revealed that Davis was mentally competent to stand trial.  (See Vol. 14, Appeal to Alabama Court of Criminal Appeals.)  The court carefully has reviewed these articles and finds that they are factual in nature and do not contain innuendos or subtle gestures pointing a finger at Davis. Neither the titles nor the subject matter of these articles is inflammatory or sensational in nature.[11]  There is nothing in the record which indicates that the news coverage up to this point was tilted against Davis or otherwise inflammatory.

As stated, courts consider as relevant the temporal proximity of the news coverage to the commencement of the trial, a factor which in this case weighs strongly against a finding of presumed prejudice.  Considering that there was an appreciable decrease in news coverage for more than a year-and-a-half prior to the trial, in combination with the fact that the articles were predominantly factual in nature, the court finds that the evidence fully supports a finding of an absence of presumed prejudice.  See Murphy, 421 U.S. at 802 (large-scale publication of news articles about defendant ceased approximately seven months before the jury was selected); Lehder-Rivas, 955 F.32d at 1525 (given that "peaks of publicity occurred" eight and six months "before the

---

[11] The factual nature of the articles is revealed by the articles' titles: (1) "Davis Arraignment Slated" (not dated);  (2) Friday, April 13, 1979, "Davis Files for 'Youthful' Status"; (3) July 19, 1979, "Davis Venue Hearing Ends"; (4) July 27, 1979, "Davis Found Able for Trial"; (5) August 12, 1979, "Davis to Face Murder Charges as an Adult"; (6) September 16, 1979, "Davis Venue Decision Due"; and (7) June 8, 1980, "Davis Trial Begins Monday."

beginning of the trial, we fail to find a 'barrage of inflammatory publicity immediately prior to trial' sufficient to demonstrate presumptive prejudice").

### c.) Demographics

Davis argues that, even if the news coverage is deemed factual and objective, the state courts failed to consider the cumulative effect of the coverage in <u>Alexander City Outlook</u> of a brutal murder on a "small" community.  Namely, he asserts that the decision of the state courts did not "take into account that factual and objective articles about a death penalty case involving horrific crimes, including murder and anal sodomy, against a storekeeper . . . have a much greater and more prejudicial impact" on a small, rural community, than factual and objective media coverage of a less serious and sensational crime in an area with a greater population."  (Doc. No. 92 at 12.)  The court, however, is not persuaded that, in this case, the fact that pretrial publicity occurred in a county with a much smaller population than say, for example, metropolitan Miami-Dade County, Florida, where the crime and trial occurred in <u>Murphy</u>, *supra*, demonstrates presumed prejudice.

The court recognizes that the size of the town is a factor in determining the effect of pretrial publicity on the citizens of that community.  <u>See</u> <u>Rideau</u>, 373 U.S. 724 (finding due process violation after defendant's filmed confession was repeatedly broadcast on local television news of small town); <u>Goss v. Nelson</u>, 439 F.3d 621, 633 (10th Cir. 2006) (recognizing that "the relatively small population" of the trial venue "is a factor in

71

assessing pretrial publicity," but holding that the record "point[ed] to a community able to supply a sufficient pool of unbiased potential jurors").  Nonetheless, the court finds that Davis' argument that the pervading effect of the news coverage is amplified given the size of Coosa County is weakened by at least three factors.

First, the news coverage came from a single print source, i.e., the Alexander City Outlook, not all forms of the media as in Sheppard.  Second, there were only 850 subscribers to the Alexander City Outlook in Coosa County, a county with a population at that time of approximately eleven thousand, see supra footnote 4.  Third, as discussed in further detail in the next section of this opinion, most of the prospective jurors had not been exposed to the newspaper coverage concerning the case.  Only 26 percent of the potential jurors had read about the case, and those jurors who elaborated could recall little of what they had read.  Moreover, only three of the twelve jurors empaneled had read a news account concerning the murder of Mrs. Alford.  By comparison, in Sheppard, all but one of the selected jurors had read something about the case.  See 384 U.S. at 345. Fourth, none of the jurors who were selected to serve on Davis' case indicated that they had formed an opinion about Davis' guilt.[12]  See Murphy, 421 U.S. at 800 n.3 (noting distinction for purposes of the presumed prejudice analysis "between mere familiarity with petitioner or his past and an actual predisposition against him").

_____

[12] In the next subsection, the court addresses, but rejects, Davis' contention that, notwithstanding the jurors' assertions of neutrality, the voir dire was inadequate to divulge preformed biases, particularly biases arising from the pretrial publicity.

Davis also argues also that gossip and rumors pervaded the community, preventing the selection of a fair and an impartial jury in Coosa County.  To this end, Davis points out that three witnesses testified on behalf of Davis at the hearing in the state trial court on the motion for a change of venue that the murder and Davis' alleged involvement were hot topics of gossip in Coosa County and, in particular, at Russell Corporation where Davis' mother worked at the time.  These witnesses questioned whether Davis could receive a fair trial in Coosa County.  No doubt the evidence was conflicting on this issue, a fact duly noted by the state trial court, given the opposing evidence submitted by the State.  (See P-26 at 1142.)  This court, however, finds that, as in Meeks, where the defendant presented eight affidavits attesting that "the murders were a topic of public conversation," the similar affidavits submitted by Davis, do not come close to establishing presumed prejudice.  216 F.3d at 964.  Notably, not one of the jury venire, potential or actual, indicated that he or she had formed an opinion about the case based upon "talk among the town."

d.)  Comparison of the Pretrial Publicity in Davis' case
to that which Occurred in Sheppard

Even adjusting for the smaller size of Coosa County as compared to larger metropolitan venues, the court finds that the pretrial publicity in Davis' case does not begin to compare to the widespread television, radio and press coverage that bombarded the community and the trial in Sheppard.  The articles covering Davis' prosecution do not

contain the type of incendiary remarks, as the articles in <u>Sheppard</u> which included, among other derogatory innuendos, descriptions of the defendant as a gun-toting, jury-tampering "liar" represented by a scheming lawyer; rhetorical questions inquiring why the defendant "wasn't in jail" and "who will speak for Marilyn?"; and satirical portrayals of the defendant, such as the cartoon depicting the defendant as a tight-lipped sphinx.  <u>See</u> 384 U.S. at 341-42, 345-47.  There was no suggestion by the press that Davis' conduct pointed to a finding of guilt, unlike in <u>Sheppard</u>, where, in addition to the above, the media was quick to emphasize the defendant's lack of cooperation during the investigation and his refusal to take a lie detector test.  <u>See id.</u> at 338-39.  To the contrary, the publicity in this case focused primarily on the facts of the case, not on inflammatory material that could not have been admitted in evidence, such as occurred in <u>Sheppard</u>. Indeed, the editorial coverage in the <u>Alexander City Outlook</u>, on more than one occasion, urged readers to remain neutral and unbiased.  The predominantly factual articles appearing in the <u>Alexander City Outlook</u> simply cannot be construed as attempting to sway the outcome of the trial against Davis, the obvious intent and effect of the coverage in <u>Sheppard</u>.

There is no evidence in this case that radio or television publicity saturated the community; in fact, there is no mention or evidence of any coverage by either radio or television, a scenario which is completely antithetical to the inflammatory and extensive televised broadcasts and radio coverage outlined in <u>Sheppard</u>.

Moreover, Davis was not made a public spectacle in the media, as was the defendant in Sheppard, and nothing in the days preceding Davis' trial occurred which was even remotely akin to the media's coverage of the inquest in Sheppard.  Furthermore, there is no evidence, as in Sheppard, that the jurors were subjected to direct persuasion from the public at large.  384 U.S. at 342.  The Alexander City Outlook did not expose the names and addresses of the prospective jurors, as occurred in Sheppard.

It becomes clear through the foregoing distinctions, which are merely representative and not inclusive, that the pretrial publicity in Sheppard was much more "massive," "pervasive" and "virulent," than the coverage in this case.  Id. at 353-54.  This simply is not one of the rare and extreme cases where prejudice can be presumed.  See Coleman, 778 F.2d at 1537 (noting that "the presumptive prejudice standard . . . is only 'rarely' applicable . . . and is reserved for an 'extreme situation'").

### e.)  Summary of the Presumed Prejudice Analysis

In sum, having considered the totality of the news coverage, the court finds that the articles and editorials appearing in the Alexander City Outlook did not expose the potential or actual jurors to highly incriminating or inflammatory material, but rather consisted of predominantly factual, unsensational coverage.  The Alexander City Outlook issued several cautions throughout the course of its reporting on the murder case and developments.  There also was a significant decline in news coverage over time, as only seven articles were published during the nineteen months preceding the trial.  The court

finds that the news coverage pales in comparison to the quantity and nature of articles which preceded the trial in Sheppard,

Accordingly, the court finds that the community where Davis' trial was held was not so saturated by prejudicial and inflammatory pretrial publicity so as to render the state court's denial of a change of venue violative of the principles of presumed prejudice enunciated in the Supreme Court's pretrial publicity line of cases.  The court, therefore, concludes that the decision of the state courts on the issue of presumed prejudice did not "result[] in a decision that . . . involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

2.)  Actual Prejudice and the Denial of Individually-Sequestered Voir Dire

Davis also contends that he suffered actual prejudice due to juror bias arising from the pretrial publicity and that the voir dire was inadequate to reveal the juror prejudice, compelling a conclusion that he was denied a fair trial in violation of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.  For the reasons to follow, the court disagrees.

To show "actual prejudice," a defendant must demonstrate, first, that "'one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty'" and, second, that this or "'these jurors . . . could not have laid aside these preformed opinions and rendered a verdict based on the

76

evidence presented in court.'"  Meeks, 216 F.3d at 961 (quoting Coleman v. Zant, 708

F.2d 541, 544 (11th Cir. 1983)).  As to the second requirement, the court in Irvin has

emphasized:

> To hold that the mere existence of any preconceived notion as to the guilt
> or innocence of an accused, without more, is sufficient to rebut the
> presumption of a prospective juror's impartiality would be to establish an
> impossible standard.  It is sufficient if the juror can lay aside his impression
> or opinion and render a verdict based on the evidence presented in court.

366 U.S. at 723.

Focusing on the actual jurors, as Meeks commands, the court observes that only

three of the twelve empaneled jurors – or one-fourth – had read any account of the case,

and one of those individuals had "forgot[ten]" what she had read.  (P-1 at 389.)

Notwithstanding their exposure to the news coverage, these three jurors assured the state

trial court and the attorneys that they did not have a fixed opinion as to Davis' guilt or

innocence, flowing from the information they had read concerning the case or from any

other extra-judicial source, and the other nine jurors who served on Davis' case provided

the same assurances.  Namely, the panel which ultimately was selected to hear Davis'

case was questioned, alongside the entire venire, by the court, defense counsel and the

prosecution, concerning whether any juror was "so biased" that objective consideration of

the facts was impossible or whether any juror had "heard" or "read" anything which

would affect his or her verdict.  No juror indicated any biases in response to these

questions.  Moreover, no juror indicated that he or she had formed an opinion based on

what he or she had read in the newspaper or otherwise had acquired knowledge about the

case which would "affect [his or her] verdict."  Indeed, each juror in the venire pool indicated that he or she could remain impartial, notwithstanding the news coverage. Additionally, not one juror indicated that he or she did not believe in the presumption of innocence accorded to criminal defendants or could not "return a verdict based solely upon the evidence."  (P-1 at 374-75, 380, 392.)

In his present habeas proceeding, Davis has not identified any particular juror on his panel whom he says harbored a preformed opinion as to his guilt.  In fact, during the jury selection process, there is no indication in the record that Davis challenged for cause any of the twelve jurors selected to hear his case, a fact which the Supreme Court of the United States has indicated is "strong evidence that [the defendant] was convinced the jurors were not biased and had not formed any opinions as to his guilt."  Beck v. Washington, 369 U.S. 541, 557 (1962); see also Patton, 467 U.S. at 1037 n.12.

Even if Davis had presented evidence indicating that one of the jurors who served on his case possessed a prejudicial bias, arising from an extra-judicial source, which he has not, Davis still would have the burden under the second Meeks prong of demonstrating that that particular juror or jurors could not have put aside the bias and rendered a verdict based solely on the evidence.  In short, there simply is no evidence in

the record to support either element of the Meeks' two-pronged test for assessing the

existence of actual prejudice among the jurors.[13]

The court, however, recognizes that there are some instances when "[a] juror's

assurances that he can lay aside his impression or opinion and render a verdict based

upon the evidence presented in court" is not "'dispositive of the accused's rights'" and

that "it remains open to the defendant to demonstrate 'the actual existence of such an

opinion in the mind of the juror as will raise the presumption of partiality.'"  Marsden v.

Moore, 847 F.2d 1536, 1543 (11th Cir. 1988) (quoting Murphy, 421 U.S. at 800).  For

instance, as in Marsden, a defendant may seek to prove actual bias through evidence that,

during the voir dire process, the jurors revealed a  "hostility" toward him or her "that

would suggest an impartiality that could not be set aside."  Id.; see also Mu'Min v.

Virginia, 500 U.S. 415, 429 (1991) (reiterating the principle that pretrial publicity

_____

[13] The court notes that, on the question of whether pretrial publicity denied Davis a fair trial by a jury free from actual prejudices, the court finds that it is appropriate to consider as a mitigating factor any cautionary instructions given by the state trial court to the jury.  Cf. U.S. v. Richmond, 222 F.3d 414, 416 (7th Cir. 2000) (holding that trial court did not abuse its discretion in denying motion to continue due to pretrial publicity, in part, because court instructed jury on three separate occasions to consider only evidence presented in the courtroom).  In Davis' case, the state trial court reinforced during its instructions to the jury at the conclusion of the evidence that "[t]he jury should decide th[e] case solely on the evidence presented here in the courtroom."  (P-8 at 1001.)  The court further instructed the jury to "completely disregard any press, television, or radio reports which [it] may have read, seen or heard," stating that "[s]uch reports are not evidence, therefore, you [the jury] should not be influenced in any way or manner whatsoever by such publicity."  (Id.)  The court's admonishment to the jury serves to lessen the negative impact, if any, of the pretrial publicity.

sometimes can be so inflammatory so as to "'create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed.'") (quoting Patton, 467 U.S. at 1031).

In Marsden, where the defendant argued actual juror prejudice arising from pretrial publicity, "thirty-two of the forty prospective jurors had heard or read something about the case"; however, "only four of them stated that they had formed some type of an opinion on the case." Id. at 1543. Rejecting the defendant's argument of actual prejudice, the Eleventh Circuit observed that, of the latter four prospective jurors, only one "indicated that his previous opinion would affect" his verdict, and that this juror "was challenged for cause and did not become a member of [the defendant's] jury." Id.

Here, as in Marsden, during voir dire, the sole juror who indicated that she did not believe that she could "reach a fair verdict" was stricken upon defense counsel's challenge and, thus, did not serve on the jury. (P-1 at 382.) Moreover, only 26 percent of the prospective jurors (fourteen out of fifty-four or fifty-five) reported reading about Davis' case in the newspaper, as opposed to 80 percent of the jurors in Marsden who had been exposed to media coverage, and at least half of the foregoing prospective jurors in Davis' case, when further questioned by defense counsel, said that their recollection of what they had read was only vague.[14]  Based on these facts, the court finds that there was

_____

[14] The court notes that of the sixty-two or sixty-three jury members present at roll call for jury selection, the trial court excused six jurors when it generally qualified the jury and then excused two for "cause," given their ages, leaving fifty-four or fifty-five jurors in the venire pool.

no "hostility" evidenced by jurors during the voir dire proceedings in Davis' case which "suggests an impartiality that could not be set aside."  Id. at 1543.

The court's analysis of actual prejudice (or, rather, the lack thereof) is not over, because, as stated above, Davis complains that the trial court did not permit him to question the potential jurors individually, particularly about their exposure to the newspaper reports about the case and that, therefore, he did not have "enough information to determine the extent to which extra-judicial information or opinions would influence the jurors' ability to be fair and impartial."  (Doc. No. 92 at 11.)  Without the opportunity to conduct an individually-sequestered voir dire, Davis claims that the voir dire proceedings were constitutionally inadequate and that he was denied an opportunity to expose the alleged actual biases of the jurors.  Davis' argument is not an insubstantial one.  See, e.g., Marsden, 847 F.2d at 1543 (finding no merit to defendant's actual prejudice claim, but observing that, "because the trial court did not allow [defense] counsel to question each prospective juror outside the presence of the other members of the jury venire, [defendant's] claim of actual prejudice cannot be easily dismissed").

Davis' claim that he was denied a fair and an impartial jury based on the state trial court's refusal to permit individually-sequestered voir dire is inextricably intertwined with his claim that the state trial court erred in denying his motion for a change of venue based upon alleged actual biases resulting from the pretrial publicity.  The two claims intersect by virtue of the fact that voir dire must be constitutionally adequate to expose actual prejudices, even where the pretrial publicity, in and of itself, is insufficient to

81

require a change of venue.  Jordan v. Lippman, 763 F.2d 1265, 1278 (11th Cir. 1985).

The court, thus, turns to the issue of whether the Sixth and Fourteenth amendments

required individually-sequestered voir dire in Davis' case.

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate

voir dire to identify unqualified jurors."  Morgan v. Illinois, 504 U.S. 719, 729 (1992).

"Voir dire plays a critical function in assuring the criminal defendant that his

[constitutional] right to an impartial jury will be honored.  Without an adequate voir dire

the trial judge's responsibility to remove prospective jurors who will not be able

impartially to follow the court's instructions and evaluate the evidence cannot be

fulfilled."  Id.  However, "[t]o be constitutionally compelled," a trial court's failure to ask

more probing questions on the requested subject "must render the defendant's trial

fundamentally unfair."  Mu'Min, 500 U.S. at 425-26.

Although not cited by the parties, the court finds that the Supreme Court's decision

in Mu'Min, supra, is instructive.  In Mu'Min, the Supreme Court was not squarely

confronted with the issue of whether the United States Constitution requires individual

sequestration of jurors for follow-up questioning on topics surrounding pretrial publicity,

but the Supreme Court did address the issue of when the United States Constitution

requires a state trial court to interrogate jurors with respect to the content of their

exposure to pretrial publicity.  Mu'Min, thus, provides guidance pertaining to a state trial

court's constitutional obligations when conducting voir dire on issues pertaining to the

effect of pretrial publicity on the venire.

82

In Mu'Min, a federal habeas case following a state murder conviction, the defendant, who while serving time for first-degree murder, escaped from a prison work detail and killed the owner of a store located in a nearby shopping center.  In that case, it was not questioned that the murder was the subject of extensive pretrial publicity by the news media.  500 U.S. at 418.  Forty-seven newspaper articles were submitted to the state trial judge regarding the pretrial publicity.  The articles contained information about the brutal crime and crime scene, the defendant's criminal history and prison rules violations, the fact that the defendant had been denied parole six times, the fact that death was unavailable as a penalty for his prior murder conviction, and comments suggesting that the defendant had confessed to the murder.  See id.

During voir dire, sixteen of the prospective twenty-six jurors answered affirmatively when asked if they had learned information about the crime from either the news media or any other source.  See id. at 419.  The state trial court refused to conduct voir dire on all of defendant's questions, ten to be exact, "relating to the content of news items that potential jurors might have read or seen."  Id.  The trial court, though, did inquire as to whether the information the jurors had obtained about the case would affect their abilities to be impartial and to hear the evidence with an "open mind" before "reaching a fixed opinion or conclusion as to the guilt or innocence of the accused."  Id. at 420.  Only one of the prospective jurors admitted that his knowledge of the case rendered him unable to be impartial, and this juror was dismissed for cause.  See id.

83

Moreover, although the trial court denied defense counsel's motion for an individually-*sequestered* voir dire, it separated the prospective jurors into panels of four in order to address the issue of pretrial publicity.  See id. at 419, 420-21.  The court inquired as to each group of four whether the jurors had heard or read anything about the case.  A positive response prompted the court to inquire whether that juror could remain impartial or had formed a fixed opinion.  See id. at 420.  Eight of the twelve empaneled jurors had read or heard about the case, but all indicated that they had not formed any opinion regarding guilt or innocence, and would remain open-minded during the presentation of the evidence.  See id. at 421.  The defendant, thereafter, was convicted of capital murder and sentenced to death.  See id. at 421.

On certiorari before the Supreme Court of the United States, the defendant argued that his "Sixth Amendment right to an impartial jury and his right to due process under the Fourteenth Amendment were violated because the trial court refused to question further prospective jurors about the specific contents of the news reports to which they had been exposed."  Id. at 417.  The Supreme Court disagreed.

The Supreme Court first noted the distinction between the "requirements of voir dire" in state and federal court.  As opposed to federal voir dire proceedings over which the Court "enjoy[s] more latitude in setting standards" pursuant to its "supervisory power," id. at 424, a federal habeas court's review of a state court's conduct during voir dire "is limited to enforcing the commands of the United States Constitution."  Id. at 422.  Consequently, only a state court's refusal to ask jurors "constitutionally compelled"

84

questions merits habeas relief.  Id. at 425.  Questions are "constitutionally compelled" only when "the trial court's failure to ask these questions [renders] the defendant's trial fundamentally unfair."  Id. at 425-26 (citing Murphy, 421 U.S. at 799).  Examining the principles underlying its precedent dealing with voir dire issues in state court, the Supreme Court observed that it had held, in Turner v. Murray, 476 U.S. 28 (1986), a capital case involving an African-American who was accused of committing a violent crime against a Caucasian victim, that the Fourteenth Amendment *compelled* that the state trial court adequately explore issues of racial prejudice during voir dire.  See id. at 423-24.  "On the subject of pretrial publicity, however," the Supreme Court observed that "there was no similar consensus, or even weight of authority, favoring [the defendant's] position.  Id. at 426.

The Supreme Court expressly rejected the defendant's argument "that the Fourteenth Amendment requires more in the way of voir dire with respect to pretrial publicity than [Supreme Court] cases have held that it does with respect to racial or ethnic prejudice," and, thus, disagreed that the Fourteenth Amendment "require[s] precise inquiries about the contents of any news reports that potential jurors have read."  Id. at 424.  Although the Court recognized that the defendant's argument had "a certain commonsense appeal," it declined to elevate such questioning to a constitutional level:

> Undoubtedly, if counsel were allowed to see individual jurors answer questions about exactly what they had read [about the case], a better sense of the juror's general outlook on life might be revealed, and such a revelation would be of some use in exercising peremptory challenges.  But, since peremptory challenges are not required by the Constitution, Ross v.

> Oklahoma, 487 U.S. 81, 88 . . . (1988), this benefit cannot be a basis for
> making "content" questions about pretrial publicity a constitutional
> requirement.

Id. at 424-25.

As a general rule, the Supreme Court observed that "trial court[s]" retain[] great

latitude in deciding what questions should be asked on voir dire," including what

questions should be asked about pretrial publicity, and, furthermore, that "primary

reliance on the judgment of the trial court makes good sense."  Id. at 426-27.  The

ultimate inquiry is "'not whether the community remembered the case, but whether the

jurors . . . had such fixed opinions that they could not judge impartially the guilt of the

defendant.'"  Id. at 430 (quoting Patton, 467 U.S. at 1035).  The Constitution does not

"'require[] . . . that the jurors be totally ignorant of the facts and issues involved.'"  Id.

at 430.

The Supreme Court in Mu'Min also rejected the defendant's argument that its

decision in Irvin v. Dowd, 366 U.S. 717 (1961), necessitated a conclusion that voir dire

inquiry as to content questions on the subject of pretrial publicity was constitutionally

mandated.  See id. at 427-28.  The Supreme Court concluded that Irvin was "instructive,

but not in the way [the defendant] employ[ed] it."  Id. at 428.  The Court stated,  Irvin

"did not deal with any constitutional requirement of voir dire inquiry, and it is not clear

from our opinion how extensive an inquiry the trial court made."  Id.  The Supreme Court

concluded that, in the case before it, although "substantial," the pretrial publicity did not

create a "'wave of public passion,'" such as occurred in <u>Irvin</u>, *supra*.  <u>See</u> <u>id.</u> at 429-30.

On the other hand,

> [h]ad the trial court in this case been confronted with the "wave of public
> passion" engendered by pretrial publicity that occurred in connection with
> Irvin's trial, the Due Process Clause of the Fourteenth Amendment might
> well have required more extensive examination of potential jurors than it
> undertook here.  But the showings are not comparable; the cases differ both
> in the kind of community in which the coverage took place and in extent of
> media coverage.

<u>Id.</u> at 429; <u>see also</u> <u>Gentile v. State Bar of Nevada</u>, 501 U.S. 1030, 1039 (1991)

(observing that in <u>Mu'Min</u> it held "that the publicity [in that case] did not rise even to a

level requiring questioning of individual jurors about the content of publicity").

Applying the Supreme Court's principles espoused in <u>Mu'Min</u>, the court is not

persuaded that the failure of the state trial court in Davis' case to permit individually-

sequestered voir dire rendered the voir dire proceedings so inadequate that the resulting

trial was fundamentally unfair.  <u>Mu'Min</u>, 500 U.S. at 425-426.  The court reaches this

conclusion for two reasons.

First, as in <u>Mu'Min</u>, the court finds that the voir dire proceedings were "by no

means perfunctory," as multiple questions were posed to the venire for the purpose of

discerning biases.  <u>Id.</u> at 431.  Both the State and Davis' counsel had the opportunity to

specifically ask the jurors whether their knowledge, if any, of the case obtained from the

local news or other sources affected their ability to remain fair and impartial in this case.

In all, seven questions were posed to the jury which touched on extra-judicial biases.  The

court asked the first question, inquiring as to whether any jury had "a fixed opinion as to

the guilt or innocence of the defendant, which would bias [his or her] verdict."  (P-1 at 370.)  Davis' counsel and the State each specifically asked the jurors about the effect on the prospective jurors of the pretrial publicity.  Namely, the State inquired as to whether media exposure rendered any juror "so biased" that he or she could not judge the facts based upon the evidence presented during the trial (P-1 at 374), and Davis' counsel expressly inquired as to whether any member of the venire had acquired any outside information about the case which would "[a]ffect" his or her verdict one way or the other.  (P-1 at 391-92.)  Two questions were asked, one by defense counsel and one by the State, as to whether or not the jurors could keep an open mind and decide the case only on the evidence presented during the trial.  (P-1 at 375, 391-92.)  Relatedly, defense counsel also was permitted to essentially charge the law and ask whether anyone did not believe in the presumption of innocence accorded to criminal defendants.  (P-1 at 380.)  The seventh question was posed by defense counsel pertaining to whether the "serious nature" of the case would "affect" any juror's verdict "one way or another."  (P-1 at 391-92.)

Having carefully reviewed the voir dire proceedings, the court concludes that the state trial court's examination of prospective jurors was within "the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias."  Mu'Min, 500 U.S. at 427.  Even though Davis' counsel was not allowed to ask more specific questions regarding the publicity, every seated juror stated his or her willingness and ability to set aside the effect of publicity and to approach the case with an open mind.  Further probing as to the

88

specific contents of the juror's media exposure obviously could have been beneficial to Davis for purposes of exercising his peremptory challenges, but Mu'Min explicitly has rejected this benefit as a basis for bringing a constitutional challenge to the adequacy of the state court voir dire proceedings.  See id. at 424-25 (holding that, because peremptory challenges are not constitutionally mandated, "this benefit cannot be a basis for making 'content' questions about pretrial publicity a constitutional requirement").  The court finds that the fact that the state trial court could have engaged in a more exacting inquiry, by acquiescing to defense counsel's request for an individually-sequestered voir dire, does not infringe upon the Constitution.[15]

Second, the court finds that the pretrial publicity which occurred in this case, as outlined extensively in the preceding section, is in no way comparable to that which occurred in Irwin, so as to create a presumption of actual bias which automatically belies the jurors' claims of impartiality.  Mu'Min, 500 U.S. at 429; see also Irvin, 366 U.S.

---

[15] The court recognizes that there is a distinction between this case and Mu'Min in that the trial court in Mu'Min segregated the venire into panels of four to make further inquiries as to the jurors' ability to be impartial.  At least one court, however, has recognized that such a distinction is not decisive.  Brown v. State, 632 So.2d 14 (Ala. 1992).  Relying on Mu'Min, the Supreme Court of Alabama, upon examination of a trial court's voir dire examination conducted en masse, observed that "[t]he method of determining impartiality is not critical.  The crucial requirement is that the trial court get enough information to make a meaningful determination of juror impartiality."  Id. at 17. As stated in Mu'Min, "Whether a trial court decides to put questions about the content of publicity to a potential juror or not, it must make the same decision at the end of the questioning:  is this juror to be believed when he says he has not formed an opinion about the case?"  500 U.S. at 425.

at 727-28 (finding actual prejudice where 90 percent of 370 prospective jurors and two-thirds of jurors who actually served on panel had a preconceived opinion that defendant was guilty, with some going "'so far as to say that it would take evidence to overcome their belief' in his guilt"); see also Marsden, 847 F.2d at 1544 (contrasting Irwin and holding that defendant failed to demonstrate actual juror bias due to inadequate voir dire, so as to find error in trial court's denial of the motion for a change of venue based upon pretrial publicity where only four of forty prospective jurors who had knowledge of case said that they had formed "some type opinion about the case") (citing Irvin, 366 U.S. at 727).  As in Mu'Min, the court finds that the record simply does not support a finding that the pretrial publicity generated such an outcry of hostility in the community so to constitutionally mandate a more probing inquiry of the jurors regarding their exposure to the pretrial publicity.  See 500 U.S. at 429.  Because in Davis' case the Constitution did not require more detailed voir dire questioning by the state trial court about the content of the news reports to which some of the jurors had been exposed, it logically follows that the Constitution did not require that the state trial court conduct an individually-sequestered voir dire.

Accordingly, for the foregoing reasons, the court concludes that the voir dire was sufficiently probing so as to satisfy constitutional standards and to protect Davis' right to a fair trial by a panel of impartial jurors who were untainted by the pretrial publicity.  Furthermore, the court concludes that Davis has failed to establish that the jurors who were actually impaneled in his case lacked the capacity to be fair and impartial.  In short,

90

the court finds no "manifest error" in the decisions of the state court.  Mu'Min, 500 U.S. at 428.

### 5. Conclusion

In sum, based on the foregoing, the court rejects Davis' Claims E and F that, based on the extensive pretrial publicity, the state court denied him a fair and an impartial jury by denying his motion for a change of venue and by failing to conduct an adequate and individually-sequestered voir dire.  Based on the court's assessment of Supreme Court precedent, the court finds that Davis has not shown that the decisions of the state courts were contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.  See 28 U.S.C. § 2254(d).  The court concludes that, under the totality of the circumstances, the failure of the state court to grant a change of venue or to conduct an individually-sequestered voir did not violate the principles laid down by the Supreme Court in the opinions discussed herein.

### D.  Claim D:  The State's Alleged Brady Violations

#### 1. Arguments of Counsel

Claim D of Davis' habeas petition implicates the Fourteenth Amendment Due Process Clause and the Supreme Court's principles emanating from Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.  Davis contends that, despite his requests, the State failed to disclose material, exculpatory impeachment evidence concerning Curtis Smith

91

("Smith"), a key witness in the State's case.  (Doc. No. 92 at 14.)  Davis claims that he

was not apprized by the State, prior to the trial, that Smith "was initially a suspect," that

Smith had been convicted twice, in 1947 and 1964, for "sexual assault," and that Smith

gave inconsistent statements to law enforcement officers about the color of the

motorcycle helmet Davis was wearing on the day of the murder.  (Doc. No. 92 at 14-15.)

Such evidence, Davis contends, "could have been used to impeach and discredit Smith's

testimony" and its suppression "undermine[d] the confidence in the outcome of the trial."

(Id. at 14.)

Davis argues that the State's alleged suppression of evidence entitles him to habeas

relief, pursuant to 28 U.S.C. § 2254(d)(1) and (d)(2).  Regarding § 2254(d)(1), Davis

contends that the "standard for materiality" of suppressed evidence applied by the

Alabama Court of Criminal Appeals was contrary to, or involved an unreasonable

application of, clearly established Supreme Court precedent, namely Brady v. Maryland,

supra, and its lineage.  See 28 U.S.C. § 2254(d)(1); (Doc. No. 92 at 16, 17.)  Davis'

argument in this regard has two components.  First, Davis asserts that the Alabama Court

of Criminal Appeals' failure to analyze the "suppressed evidence individually[,] as

opposed to cumulatively," is contrary to and an unreasonable application of the holding

in Kyles v. Whitley that exculpatory evidence must be "considered collectively, not item

by item."  514 U.S. 419, 436 (1995).

Second, Davis says that the Alabama Court of Criminal Appeals "unreasonably

applied an incorrect standard" (Doc. No. 92 at 17) when it concluded that evidence of

92

Smith's past convictions was not material because the evidence "'would not have created a reasonable doubt as to [Davis'] guilt.'"  (Id. (quoting Davis, 720 So.2d at 1028).)  The standard applied by the Alabama Court of Criminal Appeals, according to Davis, is contrary to the holding in Kyles, *supra*, that favorable, suppressed evidence is material when it "'undermines the confidence in the outcome of the trial.'"  (Doc. No. 92 at 17 (quoting Kyles, 514 U.S. at 436).)  Moreover, invoking 28 U.S.C. § 2254(d)(2), Davis contends that the Alabama Court of Criminal Appeals' determination that the State did not know about Smith's two prior convictions and, therefore, did not suppress the evidence "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."  Davis premises the latter argument on the fact that one of the special prosecutors who participated in some of the proceedings in Davis' murder case also represented Smith on the charge upon which Smith was convicted in 1964 and that the special prosecutor's knowledge of the conviction is imputed to the entire prosecutorial team.  28 U.S.C. § 2254(d)(2); (Doc. No. 92 at 17-18); (Doc. No. 95 at 10.)

Countering Davis' contentions, the State maintains that the state court applied the correct standard of law as to materiality.  Also relying on Kyles, *supra*, the State argues that the Alabama Court of Criminal Appeals was not required to analyze the allegedly suppressed evidence "collectively" because it specifically held that two of the three categories of undisclosed evidence of which Davis complains were neither favorable to

the defense nor suppressed by the State.[16]  (Doc. No. 94 at 50.)  "In other words," the

State says that "courts are not required to determine whether the non-disclosure of

multiple Brady items would have, when taken together, created a reasonable probability

that the outcome of the proceedings would have been different unless the court first

determines that the evidence was, in fact, favorable to the defendant and suppressed by

the State."  (Id.)  The State continues:  "Because the Court of Criminal Appeals found

that Davis failed to prove that two of the three items that he alleges constitute Brady

material were favorable to him, its failure to analyze the materiality of these [three] items

cumulatively did not constitute error."  (Id. at 51.)

        Moreover, the State contends that the Alabama Court of Criminal Appeals

"correctly found" that Smith's two prior convictions for sexual assault – i.e., the third

category of undisclosed evidence – were not material because Smith's testimony was

"strongly" corroborated by other evidence, and, therefore, "there is not a reasonable

probability that had those convictions been known to the defense, the outcome of the trial

would have been different."  (Doc. No. 94 at 38-41); Davis, 720 So.2d at 1028.  In

addition, the State contends that the Alabama Court of Criminal Appeals reasonably

determined that the State cannot be deemed to have "knowledge" of those convictions,

where its search of the National Criminal Information Center database did not reveal the

---

        [16] These two categories of evidence concern two handwritten notes in the ABI case
file which Davis argues demonstrate that Smith initially was a suspect and that Smith
changed his testimony regarding the color of Davis' motorcycle helmet.

convictions and where the special prosecutor to whom Davis refers above ceased

representation of the State "at least one year before the trial began." (Doc. No. 94

at 43-44.)  The State also asserts that "there was no suppression" because, "although not

mentioned by the Court of Criminal Appeals, . . . Smith's prior convictions were public

records"; thus, the State argues that this evidence was available from another source. (Id.

at 45.)  It also contends that defense counsel "could have simply asked Smith while on the

witness stand whether he had any prior felony convictions." (Id. at 46.)

## 2.  The State Court Decision

Davis discovered the existence of the undisclosed evidence during his state

post-conviction habeas proceedings.  (Doc. No. 92 at 16); see also Davis v. State, 720

So.2d 1006, 1026 (Ala. Crim. App. 1998) (observing that State delayed 17 years in

disclosing the alleged Brady material).  Although Davis was unable to assert his Brady

claim on direct appeal, Davis generally complained in that proceeding that "the trial

court's refusal to order the state, pursuant to [Davis'] discovery motion, to provide

[Davis] with the criminal record of each expected witness for the state" violated Brady v.

Maryland, supra.  Davis, 554 So.2d at 1100.  The Alabama Court of Criminal Appeals

rejected this claim on state law grounds, holding that "[i]n Alabama a defendant is not

entitled to the general disclosure of the criminal records of the state's witnesses." Id.

The Alabama Court of Criminal Appeals observed that the trial court thoroughly

addressed all of Davis' discovery requests, granted many, "but chose to deny the request

for the criminal records of the state's witnesses." Id.  It concluded: "Under these circumstances and in the absence of proof to the contrary, we cannot say that this denial of discovery, a decision within the trial court's sound discretion, was improper." Id.

Davis discovered the undisclosed evidence in time to present it to the state habeas court.  After thorough discussion of Davis' Brady claim, the Alabama Court of Criminal Appeals affirmed the lower court's denial of post-conviction relief on this ground.  Davis, 720 So.2d at 1026-28.  After quoting the applicable law, as set out in Brady, supra, United States v. Bagley, 473 U.S. 667, 676 (1985), Giglio v. United States, 405 U.S. 150, 154 (1972), and United States v. Agurs, 427 U.S. 97, 112-113 (1976), among others, the Alabama Court of Criminal Appeals turned to an examination of each of Davis' Brady violation claims.  See id.

First, the Alabama Court of Criminal Appeals examined Davis' claim that "the State violated Brady because it did not make the defense aware that Curtis Smith had two prior convictions involving sexual offenses." Id. at 1027.  Unpersuaded by this claim, the Alabama Court of Criminal Appeals reasoned as follows:

> During discovery, the appellant asked that the State be required to make the defense aware of the prior convictions of State witnesses.  The trial court denied that request.  There is no absolute right to discovery, including discovery of prior convictions of witnesses or of possible impeachment evidence, in criminal cases.  Smith v. State, 639 So.2d 543 (Ala. Cr. App. 1993); Bailey v. State, 421 So.2d 1364 (Ala. Cr. App. 1982).  Rather, the trial court has discretion in determining whether to order discovery of the prior convictions of witnesses or other possible impeachment evidence, and such a decision will not be overturned absent an abuse of discretion.  Ross v. State, 555 So.2d 1179 (Ala. Cr. App. 1989); Williams v. State, 451 So.2d 411 (Ala. Cr. App. 1984); Wright v. State, 424 So.2d 684 (Ala. Cr. App.

> 1982); <u>Mardis v. State</u>, 423 So.2d 331 (Ala. Cr. App. 1982).  The appellant
> has not shown that the trial court abused its discretion in denying his
> request for the prior convictions of the State's witnesses.

<u>Id.</u> at 1027.  The Alabama Court of Criminal Appeals also concluded that Davis failed to

prove that the State had any knowledge of the prior convictions, but, in any event, that the

evidence was not material.  <u>See</u> <u>id.</u> at 1027-28.  The Court explained:

> Furthermore, there is no evidence that the State suppressed evidence of
> Smith's prior convictions.  One investigator who worked on the case
> testified that he checked Smith's criminal record through the National
> Criminal Information Center just before the trial and did not find any prior
> convictions.  The printout of this search supports his testimony that he did
> not know that Smith had any prior convictions.  Further, the printout
> contradicts the statement of a witness who said that Smith had raped a
> woman before.  Therefore, the appellant has not shown that the State
> suppressed this information in violation of <u>Brady</u>.  <u>See</u> <u>Donahoo</u> and
> <u>Kinder</u>, *supra*.
>
> Finally, Smith's prior convictions, which occurred in 1947 and 1964, were
> not material.  Although the appellant might have attempted to impeach
> Smith with these convictions, such impeachment would not have created a
> reasonable doubt as to the appellant's guilt.  "Evidence tending to impeach
> [the witness] on totally collateral grounds-a conviction from the remote
> past-would not have created a reasonable doubt.  Thus, the fact of his
> conviction was not material in the constitutional sense."  <u>Donahoo</u>, 552
> So.2d at 896.  The appellant argues that the convictions would have
> destroyed Smith's credibility as a witness.  However, Smith's testimony
> was strongly corroborated by the physical evidence, the appellant's
> incriminating statements, and testimony of other witnesses.  Even his trial
> attorneys admitted that Smith's trial testimony was corroborated by other
> evidence.  The appellant has not established that there is a reasonable
> probability that, had the convictions been disclosed to the defense, the
> result of the proceeding would have been different.  Therefore, he has not
> established that a <u>Brady</u> violation occurred.

<u>Id.</u> at 1027-28.

Next, the Alabama Court of Criminal Appeals discussed Davis' claim that the State failed to disclose that Smith was a "suspect" in the murder investigation of Mrs. Alford:

> The appellant also contends that the State improperly withheld evidence that Smith was a suspect in this case based on the following handwritten notation found in the Alabama Bureau of Investigation (ABI) file:  "Ron Brant runs store Al. 22 in Ray community Home 234-7666 knows Smith sub. that raped a woman before, he lives on Covered Bridge Rd. approx. 40 years of age."  (SCR. 1134.)  There is no indication that the abbreviation "sub." is an abbreviation for "suspect."  It appears instead to mean "subject," which is the way law enforcement officers referred to Smith during the Rule 32 proceedings.  Further, the officers did not indicate that Smith was ever a suspect in the murder.  The appellant has assumed and asserted that Smith was a suspect in the case, but he has not satisfied his burden of supporting that contention factually.  Rule 32.3 and Rule 32.6(b), Ala. R. Crim. P.  Therefore, the appellant has not shown that this notation was material or that the State suppressed it, and he has not proven that a <u>Brady</u> violation occurred.  <u>See</u> <u>Donahoo</u>, <u>Kinder</u>, and <u>Johnson</u>, *supra*.

<u>Id.</u> at 1028.

Finally, the Alabama Court of Criminal Appeals rejected Davis' claim that the State violated <u>Brady</u> by failing to disclose that "Smith made an inconsistent statement about the color of the helmet worn by [Davis]."  <u>Id.</u>  The Court wrote:

> In support of his contention, [Davis] introduced a handwritten note about Smith's statements to police officers where the word "blue" was crossed out and replaced with the word "gold."  Based on this note, the appellant contends that Smith initially stated that the appellant's helmet was blue and later at trial stated that it was gold.  The only reference in the entire ABI file to a blue helmet is in that one handwritten note, the author of which is unknown.  It was not in a formal statement made by Smith.  Furthermore, the word "blue" is crossed out and the word "gold" is written above it.  This is consistent with Smith's trial testimony.  The appellant's claim that the State suppressed exculpatory evidence in this regard is not supported by the record.  He also has not shown that there is a reasonable probability that the

98

outcome of the trial would have been different if the note had been
disclosed to the defense.  Therefore, he has not shown that this correction in
a note was material to the issues in his case, and he has not shown that a
<u>Brady</u> violation occurred.  <u>See</u> <u>Donahoo</u>, <u>Kinder</u>, and <u>Johnson</u>, *supra*.

<u>Id.</u>


### 3.  The Clearly Established Supreme Court Law

In <u>Brady v. Maryland</u>, the Supreme Court of the United States held that "the

suppression by the prosecution of evidence favorable to an accused upon request violates

[Fourteenth Amendment] due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83,

87 (1963) (brackets supplied).  In <u>Giglio</u>, the Supreme Court held that material

impeachment evidence, affecting a witness' credibility, also is covered by <u>Brady</u>.  <u>See</u>

405 U.S. at 154.  Subsequently, in <u>Bagley</u>, the Supreme Court reiterated its

pronouncement in <u>Giglio</u> that "[i]mpeachment evidence . . . as well as exculpatory

evidence, falls within the <u>Brady</u> rule."  <u>Bagley</u>, 473 U.S. at 676.  The <u>Bagley</u> Court

continued, "Such evidence is 'evidence favorable to an accused,' . . . so that, if disclosed

and used effectively, it may make the difference between conviction and acquittal."  <u>Id.</u>

(quoting <u>Brady</u>, 373 U.S. at 87).  The Supreme Court in <u>Bagley</u> also made clear that the

Government has a duty to disclose <u>Brady</u> material, even when not requested.  473 U.S.

at 682; <u>Kyles</u>, 514 U.S. at 433-34.

99

In Giglio, the Government did not disclose the fact that the sole witness who could connect the defendant to the crime received a promise from the government that he would not be prosecuted if he testified against the defendant before the grand jury and at trial. See 405 U.S. at 151, 152.  When the credibility of a Government witness "is an important issue," such as in Giglio where the prosecution's case depended almost completely on a single witness' testimony, "evidence of any understanding or agreement as to a future prosecution is relevant to his credibility and the jury is entitled to know of it." Id. at 154-55.

In Bagley, the Government failed to tender to the defense "evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest."  473 U.S. at 667.  Specifically, although the defendant requested information from the Government pertaining to "any deals, promises or inducements made to witnesses in exchange for their testimony," the defendant did not learn until after he had been convicted that the two principal government witnesses had each received $300.00 for their testimony.  Id. at 669-71.  Framing the issue, the Bagley court stated that "[t]he constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination."  Id. at 678.  The suppression of evidence, however, rises to the level of a "constitutional error . . . only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."  Id.

After exploration and discussion of relevant precedent, the Bagley court expounded upon the standard of materiality for ascertaining when the prosecution violates the Constitution in suppressing favorable evidence: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. at 682. The Supreme Court reversed and remanded the case to the court of appeals "for a determination whether there [was] a reasonable probability that, had the inducement offered by the Government to [the witnesses] been disclosed to the defense, the result of the trial would have been different." Id. at 684.

Subsequently, in Kyles, the Supreme Court provided further context to the Bagley materiality standard. 514 U.S. at 434-36. It explained that there are "[f]our aspects of materiality under Bagley." Id. at 434. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal"; rather, the question is "whether in [the evidence's] absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. Second, the Bagley materiality standard "is not a sufficiency of evidence test," and, third, once a Bagley violation occurs, the violation is not subject to a further harmless-error review. Id. at 434-35. Fourth, the favorable evidence which has been suppressed must be "considered collectively, not item by item." Id. at 436. The Kyles court, however, clarified that it "evaluate[s] the tendency and force of the

undisclosed evidence item by item; there is no other way.'" Id. at 437 n.10. "We evaluate its cumulative effect for purposes of materiality separately." Id.

Moreover, material exculpatory or impeaching evidence known by one member of the prosecutorial team, which includes law enforcement officers involved in the case, is imputed to all members of the team. Giglio, 405 U.S. at 154; see also Kyles, 514 U.S. at 437 (state has a "duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police"). On the other hand, the prosecution is not constitutionally required to "point the defense toward potentially exculpatory evidence when that evidence is either in the possession of the defendant or can be discovered by exercising due diligence." Rector v. Johnson, 120 F.3d 551, 558-59 (5th Cir. 1997).

The foregoing principles can be condensed into three elements which must be proven to sustain a Brady violation: "(1) the evidence must be favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice." Stephens v. Hall, 407 F.3d 1195, 1203 (11th Cir. 2005); see also Strickler v. Greene, 527 U.S. 263, 281-82 (1999) ("There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.").

102

*4. Analysis*

Davis claims that the State violated his Fourteenth Amendment right to due process by failing to disclose three categories of impeachment evidence pertaining to a primary prosecution witness, Smith.  It is not disputed by the State that it failed to turn over to Davis prior to trial (1) Smith's two prior convictions for sexual assault, (2) the handwritten notation in the ABI file referring to Smith as a "sub.," and (3) the anonymous handwritten note, discussing Smith's statement and changing the description of Davis' motorcycle helmet from "blue" to "gold."  In general terms, the issue is whether the state court's determination that the failure of the State to disclose the foregoing evidence did not constitute a Brady violation contravenes the standards set forth in 28 U.S.C. § 2254(d)(1) and (d)(2).

*a.)  The Brady Cumulative Materiality Analysis*

The court first addresses Davis' contention that the state court's determination was an unreasonable application of Supreme Court law because the state court failed to engage in a collective materiality inquiry in determining whether a Brady violation had occurred.  See Kyles, *supra*, 514 U.S. at 436 (holding that materiality analysis turns on the cumulative effect of the suppressed evidence, not an item-by-item analysis).  The State acknowledges that the Alabama Court of Criminal Appeals did not consider whether, cumulatively, a reasonable probability existed that the undisclosed evidence, if disclosed, would have changed the outcome of the proceedings (i.e., was not material).

103

As stated, however, the State contends that a collective materiality assessment of the undisclosed evidence was not required because the Alabama Court of Criminal Appeals also concluded that two of the three categories of undisclosed evidence were either not favorable and/or not suppressed.  For the reasons to follow, the court agrees with the State.

Kyles provides that, for purposes of examining the materiality requirement, "the state's disclosure obligation turns on the cumulative effect of all suppressed evidence favorable to the defense."  514 U.S. at 420.  The express language of Kyles mandates "cumulative" consideration only of "*suppressed* evidence" which is "*favorable* to the defense."  Id. at 420 (emphasis added).  There is no requirement in Kyles that, when a court considers whether undisclosed evidence is favorable or suppressed, the first and second steps of the Brady analysis, it must do so cumulatively.  At least one federal circuit court of appeals expressly has commented on the distinction.  See Monroe v. Angelone, 323 F.3d 286, 298 n.18 (4th Cir. 2003) (contrary to Brady's materiality analysis, which is to be performed cumulatively, the court "accord[s] item-by-item deference to a state court determination that material was not exculpatory or had not been suppressed"); see also Spellman v. Haley, Civ. Act. No. 97-T-640-N, 2004 WL 866837, *5 (M.D. Ala. 2002) (Thompson, J.) (analyzing Kyles, *supra*, and finding that, "[o]nly after a piece of evidence is identified as (1) having been suppressed and (2) as being either exculpatory or impeachment evidence, does the materiality inquiry come into play").  In light of the foregoing principles emanating from Supreme Court precedent, the

104

court finds that the state appellate court did not contravene Supreme Court law in analyzing item-by-item whether the three categories of undisclosed evidence were suppressed by the State and unfavorable to the defense.

The court's inquiry, however, is not over because, even where a state court adheres to the "correct governing legal principle," a state court's decision constitutes an "unreasonable application of" clearly established Supreme Court precedent if the court "unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413; 28 U.S.C. § 2254(d)(1).  For the reasons to follow, the court finds that the state court's decision that the handwritten notations (referring to Smith as a "sub." and changing the description of the color of Davis' helmet) were not suppressed and/or not favorable was a reasonable application of Supreme Court principles to the facts before it.

Regarding the first handwritten notation, the Alabama Court of Criminal Appeals concluded that Davis failed to provide any factual support for his assertion that the abbreviation "sub." written after Smith's name in the ABI file meant "suspect."  The Court observed that, given that the officers described Smith as the "subject" during the post-conviction habeas trial court proceedings and never referred to Smith as a "suspect," the more logical, commonsense conclusion was that "sub." stood for "subject," not "suspect."  See Davis, 720 So.2d at 1028.  Consequently, because Davis failed to satisfy "his burden of supporting" his argument factually, the Alabama Court of Criminal Appeals concluded that the "sub." notation was not "suppressed" by the State.  See id.

105

Turning to the second handwritten notation, the Alabama Court of Criminal Appeals similarly concluded that there was no record support for Davis' argument that the handwritten note, wherein the word "gold" was crossed out and substituted above was the word "blue," meant that Smith changed his testimony in regard to the color of the helmet Davis was wearing on the day of the murder.  Id.  The Court pointed out that the source and author of the handwritten note were unknown and that the note was not Smith's formal statement.  See id.  The Alabama Court of Criminal Appeals, thus, held that Davis' "claim that the State suppressed exculpatory evidence in this regard [was] not supported by the record."  Id.  In addition to concluding that the State did not "suppress[]" the latter notation, the Alabama Court of Criminal Appeals, by pronouncing that there was no record evidence to support the argument that the evidence was "exculpatory," necessarily concluded that the evidence was not "favorable."  See, e.g., Strickler, 527 U.S. at 281-82 (noting that "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching").

In light of the AEDPA, the court finds that the Alabama Court of Criminal Appeals' determination that the record was devoid of factual support to substantiate Davis' arguments as to the two handwritten notations must be presumed correct by this court.  See 28 U.S.C. § 2254(e); Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998) (holding that a § 2254 court was "bound" by the state court's rejection of the petitioner's "factual assertions that evidence was suppressed").  To rebut the presumption of correctness, Davis must present clear and convincing proof to the contrary.  See 28

U.S.C. § 2254(d).  Davis, however, has not attempted to rebut these state court findings, but instead merely has argued that the "favorable" inquiry must be examined collectively, (Doc. No. 95 at 12), an argument with which the court disagrees for the reasons already stated herein.  The court agrees with the state appellate court that there is no evidence in the record which indicates that the State ever considered Smith as suspect or that Smith changed his testimony as to the color of Davis' helmet.  According AEDPA deference, this court finds that the state appellate court's factual determinations were reasonable and that Davis has not presented clear and convincing proof from which this court can conclude to the contrary.

Because it rejected the above two categories of evidence on the first and second elements of Brady, the Alabama Court of Criminal Appeals was not obliged to tackle the materiality inquiry "collectively" as to all three categories of the alleged Brady evidence.  Kyles, 514 U.S. at 436 n.10.  Accordingly, the court concludes that the Alabama Court of Criminal Appeals' analysis of materiality as to the one arguably suppressed category of favorable evidence, i.e., Smith's prior convictions, constitutes a proper application of Brady, and its lineage.  Whether the Alabama Court of Criminal Appeals' determination that the State did not violate Brady in failing to disclose Smith's prior convictions constitutes an unreasonable application of clearly established Supreme Court precedent presents a separate issue to which the court now turns.  See Williams, 529 U.S. at 413.

b.)  Smith's Prior Convictions and <u>Brady</u>

i.)  The State Appellate Court's Formulation of the <u>Brady</u> Materiality Standard
and Its Application of that Standard to the State's
Failure to Disclose Smith's Prior Convictions

Davis asserts that the Alabama Court of Criminal Appeals applied the wrong legal standard when it held that the disclosure of Smith's past convictions to the defense for use at the trial "'would not have created a reasonable doubt as to [Davis'] guilt.'"  (Doc. No. 92 at 17.)  For the reasons to follow, the court is unpersuaded by Davis' argument.

The foregoing standard recited by the Alabama Court of Criminal Appeals mirrors the language in the Supreme Court's opinion in <u>Agurs</u>, *supra*:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt.  Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt.  **It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.**  This means that the omission must be evaluated in the context of the entire record.  If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.  On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

427 U.S. at 112-113 (emphasis added).  Although this court recognizes that the <u>Agurs</u> standard for materiality has undergone "reformulation[s]" through the years, <u>Bagley</u>, 473 U.S. at 681, the basic tenets of <u>Agurs</u> remain unaltered.  In <u>Bagley</u>, the Supreme Court analyzed its precedent and adopted the "<u>Strickland</u> formulation of the <u>Agurs</u> test for

materiality."[17]  See Bagley, 473 U.S. at 682 (citing Strickland v. Washington, 466 U.S. 668 (1984)).  Nowhere in its opinion, however, did the Supreme Court reject the "reasonable doubt" language of Agurs.  To the contrary, the Bagley court specifically recognized that the "Strickland formulation of the Agurs test for materiality" had refined the meaning of the "reasonable probability" standard, see supra footnote 18, when the Strickland Court stated that "'the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'"  Bagley, 473 U.S. at 682 n.13 (quoting Strickland, 466 U.S. at 695) (emphasis added).

The foregoing aside for the moment, assuming arguendo that the Agurs standard is obsolete, the Alabama Court of Criminal Appeals also recited the test of materiality directly from Bagley.  Specifically, the Alabama Court of Criminal Appeals' conclusion that the alleged Brady evidence was immaterial also was based upon its determination that Davis failed to establish "that there is a reasonable probability that, had the

---

[17] The Bagley court found the Strickland formulation to be "sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused[,]" i.e., the three categories of prosecutorial suppression discussed in Agurs.  Id. at 682 (citing Strickland v. Washington, 466 U.S. 668 (1984)).  The Bagley court adopted the Strickland standard as a uniform standard to cover all three of the latter situations, eliminating any distinction of how or if a request for impeachment or exculpatory evidence is made.  That standard is:  "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  Bagley, 473 U.S. at 682.

convictions been disclosed to the defense, the result of the proceeding would have been different." Davis, 720 So.2d at 1028.  This standard employed by the Alabama Court of Criminal Appeals mirrors, word for word, the test articulated by the Supreme Court in Bagley.  See Bagley, 473 U.S. at 682 ("The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.").

In addition, the Alabama Court of Criminal Appeals appropriately followed the teachings of Agurs by considering the absence of the undisclosed evidence in light of the record as a whole.  See Davis, 720 So.2d at 1028; Agurs, 427 U.S. at 112.  Namely, it examined whether the testimony of Smith was substantiated by other evidence introduced at trial and, in doing so, as discussed in more detail below, concluded that his testimony was "strongly corroborated" by both the physical and testimonial evidence.  Davis, 720 So. 2d at 1028.  Relatedly, in keeping with the dictates of Supreme Court precedent, the Alabama Court of Criminal Appeals reasonably factored into its analysis the age of Smith's convictions when reaching its decision that the convictions were not material and would not "have destroyed Smith's credibility as a witness."  Id.; Conley v. U.S., 415 F.3d 183, 188 (1st Cir. 2005) ("We evaluate the strength of the impeachment evidence and the effect of its suppression in the context of the entire record to determine its materiality.") (citing Bagley, 473 U.S. at 683; Agurs, 427 U.S. at 112).  This court recognizes that, at this point in its analysis, the Alabama Court of Criminal Appeals cites a state opinion, Donahoo v. State, 552 So. 2d 887 (Ala. Cr. App. 1989), not a Supreme

110

Court case.  Reliance on Donahoo, though, was appropriate, as Donahoo is grounded on fundamental Supreme Court principles; in fact, Donahoo's determination of immateriality rested on a direct application of Agurs, *supra*, to the facts before it, and reliance also on Bagley.  See Donahoo, 552 So.2d at 896.  Accordingly, for the foregoing reasons, the court finds that the Alabama Court of Criminal Appeals correctly identified the controlling legal principles embraced by the Supreme Court when analyzing Davis' Brady claim concerning the failure of the State to disclose Smith's two prior convictions.

ii.) The Brady Elements as Applied by the State Appellate Court
to the Undisclosed Prior Convictions

Having concluded that the state appellate court identified the "correct governing legal principle" for evaluating the materiality of undisclosed evidence,  Williams, 529 U.S. at 413, the court turns to the three Brady elements, recited *supra*, in order to ascertain whether the state court "unreasonably applie[d]" Brady and its progeny to the facts of this case.  See id.; 28 U.S.C. § 2254(d)(1).  For the reasons to follow, the court finds that the state court's decision was not deficient under this standard.

The State has not challenged the fact that evidence of a government witness' prior criminal history is evidence which is "favorable," within the meaning of the first Brady element.  See Bagley, 473 U.S. at 676; Giglio, 405 U.S. at 153.  The second prong of the Brady analysis, concerning whether the State "suppressed" evidence of the convictions,

111

however, is subject to some dispute.  The State contends that the Alabama Court of Criminal Appeals correctly ascertained that there was no evidence of suppression because the State's search of the National Criminal Information Center database did not disclose either of Smith's two prior convictions.  Davis, on the other hand, contends that the Alabama Court of Criminal Appeals acted unreasonably in ignoring the fact that the attorney who represented Smith on one of the prior charges at issue served as a special prosecutor during the early stages of the prosecution in Davis' case.

The participation of Smith's prior counsel as a special prosecutor in Davis' case appears to be Davis' strongest argument of suppression, as this fact arguably invokes the imputed knowledge rule of Giglio.  See 405 U.S. at 154.  The court, however, finds that it need not explore the particulars of this issue because Davis' Brady claim is defeated by the lack of materiality of the allegedly withheld evidence.  Namely, for the reasons to follow, the court concludes that the Alabama Court of Criminal Appeals' determination that the failure of the State to disclose Smith's prior convictions was not "'material in the constitutional sense,'" Davis, 720 So.2d at 1028, did not involve an unreasonable

112

application of clearly established Supreme Court precedent.[18]  See, e.g., Miller v. Dretke,

431 F.3d 241, 250 (5th Cir. 2005) (declining to "decide whether the evidence was either

suppressed or favorable" because the evidence was not material).

     The Alabama Court of Criminal Appeals concluded that Smith's testimony was not

material because it was "strongly corroborated by the physical evidence," Davis, 720

So.2d at 1028, a fact which it noted was admitted by Davis' trial counsel.  Applying

Brady, federal courts have been unanimous in their conclusions that, "when the testimony

of the witness who might have been impeached by the undisclosed evidence is strongly

corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence

generally is not found to be material."  U.S. v. Snipe, 388 F.3d 471, 478 (5th Cir. 2004);

---

[18] The court has not overlooked the State's other arguments of non-suppression.
The court has considered the State's contention that there can be no suppression when a
defendant has cross-examination available to inquire of a government witness about that
witness' prior convictions.  The court, however, has not found any authority, and the
State has not cited any, to support its argument.  At least one federal circuit court of
appeals has refused to excuse the Government of its constitutional Brady obligations on
the ground asserted by the State that "a defendant who does not have information about a
witness' criminal history may obtain it through the well-honored, traditional non-Brady
method of simply asking the witness while he is testifying about his criminal history."
Crivens v. Roth, 172 F.3d 991, 997 (7th Cir. 1999).  The Seventh Circuit observed in part,
"[W]e find it entirely possible that [the state's witness] would not have told the complete
truth if asked about his criminal history based on the fact that he had previously lied to
police officers and the courts as evidenced by his use of aliases."  Id.  The court, thus, is
not persuaded by this argument.  Neither is the court convinced that the fact that Smith's
prior convictions arguably were "public records" and, thus, accessible to Davis, would
excuse the State's failure to turn over the evidence.  Cf. Harbison v.Bell, 408 F.3d 823,
844 (6th Cir. 2005) (observing that defendant and his counsel "were entitled to rely on the
presumption that the prosecutor had produced all Brady material in response to
Harbison's pre-trial discovery requests").

accord Conley, 415 F.3d at 199-200 ("Equally important for Brady purposes, Walker's testimony is fully corroborated by valid, interlocking evidence, which makes the alleged Brady violation harmless."); Mataya v. Kingston, 371 F.3d 353, 356-57 (7th Cir. 2004) (State's failure to disclose that its principal witness testified in exchange for leniency was not "material because the witness' testimony was 'self-validating'") (citing Strickler, 527 U.S. at 293-94); Kopycinski v. Scott, 64 F.3d 223, 226-27 (5th Cir. 1995) (rejecting a habeas petitioner's Brady claim where the suppressed impeachment evidence was immaterial in light of the other, corroborated testimony and physical evidence supporting petitioner's conviction).

In this case, the court finds that the evidence in the record supports the conclusion reached by the Alabama Court of Criminal Appeals, as demonstrated by the following facts.  First, Davis made a statement which placed him at the crime scene around the estimated time of the murder, and a witness saw a motorcyclist enter the parking lot of the store around the general time of the murder on the day in question.  This witness' description "generally matched" that of Davis and his motorcycle.  Davis, 554 So.2d at 1097.  Second, Mrs. Alford's wallet which was stolen from Mrs. Alford during the course of the robbery-murder was located off a logging road in an area where Smith said he saw Davis, and the track pattern on the road was consistent with that which a motorcycle tire would make if it was "spinning out."  Id.  Third, the bloody murder weapon – a knife – was of a kind similar to the knives in Davis' home.  Fourth, the blood on Davis' clothing matched Mrs. Alford's blood type.  Davis' motorcycle helmet, clothes

114

and shoes also had blood stains, and all of the blood which was capable of typing matched Mrs. Alford's blood type which was "A." Davis' blood type, on the other hand, was "O." Fifth, the location of the blood on Davis' clothes was consistent with the physical evidence regarding the condition of Mrs. Alford's body which revealed numerous stab wounds and manifestations of sodomy. Namely, the button hole which fastened the waist of Davis' blue jeans had blood smears, and the outside and inside of the waist area of Davis' jeans were stained with blood. Also, the undershorts Davis wore on the day of the murder not only had a bloodstain, but also a yellowish-brown stain which consisted of "a combination of human sperm mixed with fecal matter and human tissue of the type found inside the rectum" of Mrs. Alford. Sixth, there was evidence presented by a jail mate that Davis had confessed to killing Mrs. Alford. The court believes that the foregoing facts are substantial as to Davis' guilt and are consistent with and validate Smith's trial testimony, just as the Alabama Court of Criminal Appeals concluded.

Moreover, the court finds that the evidence reasonably supports the Alabama Court of Criminal Appeals' determination that the remoteness of Smith's prior convictions weakened the probative value of the evidence as a tool to impeach Smith's credibility and "would not have created a reasonable doubt as to [Davis'] guilt. See Davis, 720 So.2d at 1028; see also Conley, 415 F.3d at 188 ("We evaluate the strength of the impeachment evidence and the effect of its suppression in the context of the entire record to determine its materiality.") (citing Bagley, 473 U.S. at 683; Agurs, 427 U.S.

115

at 112).  Smith's undisclosed convictions of which Davis complains occurred some thirty-three and sixteen years prior to Davis' trial.  Namely, in June 1980, when Davis was tried and Smith testified, Smith's convictions were far removed from the trial date, the judgments thereon having been rendered in 1947 and 1964.[19]

The court finds that, given the evidence adduced at trial which substantially corroborated Smith's testimony, described above, and the fact that the undisclosed

_____

[19]  The court notes that, pursuant to Alabama's evidentiary law at the time, the issue of whether Davis would have been allowed to impeach Smith's credibility based upon the prior convictions would have been a matter vested in the discretion of the trial judge, a decision which would have required consideration of the individual circumstances of the case, one factor being the remoteness of the prior convictions.  See Lanier v. State, 179 So. 2d 167, 170 (Ala. Civ. App. 1965); cf. Fed. R. Evid. 609(b) (evidence of witness' conviction and sentence more than ten years old not admissible unless probative value substantially outweighs prejudicial effect).  It is questionable whether Smith's prior convictions, even if they had been disclosed, would have been admissible for use in Davis' trial.  Although the Supreme Court of the United States has not expressly decided whether inadmissible evidence ever is material for Brady purposes, its holding in Wood v. Bartholomew, 516 U.S. 1, 6 (1995) – i.e., that "[d]isclosure of the polygraph results . . . could have had no direct effect on the outcome of trial," given that state law precluded its admission, "even for impeachment purposes" – has generated a lack of clarity in some circuits on the issue of when nondisclosure of *inadmissible* evidence gives rise to a Brady violation.  See, e.g., Felder v. Johnson, 180 F.3d 206, 212 (5th Cir. 1999) (observing that "[t]he Fifth Circuit has not clearly specified how to deal with Brady claims about inadmissible evidence – a matter of some confusion in federal courts" and noting the varied interpretations of the Supreme Court's decision in Wood v. Bartholomew, *supra*); Paradis v. Arave, 240 F.3d 1169, 1179 (9th Cir. 2001); but see U.S. v. Veras, 51 F.3d 1365, 1375 (7th Cir. 1995) (holding that information of other conduct by the investigating police officer was not material under Brady because the information would not have been admissible under Fed.R.Evid. 608(b) as it would have been extrinsic evidence impeaching the witness on collateral matters).  It is not necessary for the court to address issues surrounding the admissibility of the prior convictions for impeachment purposes and its effect on the viability of a Brady claim, as these issues have not been raised or addressed by the parties and resolution thereof would not change the court's ultimate conclusions herein.

convictions were remote in time, the nondisclosed evidence, at best, presents a mere possibility that the convictions would have so undermined the credibility of Smith, a key prosecution witness, that the jury could not have believed his story as to his encounter with Davis on the day of the murder.  However, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome does not establish materiality in the constitutional sense."  Agurs, 427 U.S. at 112 n.20.

In conclusion, the court finds that the potential impeachment material arising from Smith's two prior convictions would not have created "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Bagley, 473 U.S. at 682.  Davis had a fair trial resulting in a verdict worthy of "confidence."  Id.  Accordingly, the court finds that the Alabama Court of Criminal Appeals' decision that the State's failure to disclose Smith's two prior convictions did not constitute a violation of Davis' rights under Brady and was not an unreasonable application of Supreme Court law.

E.  Claim H: Introduction at Trial of Davis' Statements Allegedly
Obtained in Violation of *Miranda v. Arizona*, 384 U.S. 436 (1966)

*1.  Arguments of Counsel*

Davis asserts that the admission at trial of certain incriminating statements made by Davis to law enforcement officers prior to receiving Miranda warnings violated his constitutional right to avoid self-incrimination.  Davis' argument in this habeas proceeding is twofold.  First, relying on 28 U.S.C. § 2254(d)(2), he contends that the state courts' determination that Davis was not "in custody" when he gave the incriminating statements "was based upon an unreasonable determination of the facts presented at trial."  (Doc. No. at 21); (Doc. No. 95 at 14, 17.)  Second, citing 28 U.S.C. § 2254(d)(1), Davis argues that "[t]he decision of the Alabama courts was an unreasonable application of established federal law as determined by the United States Supreme Court."  (Doc. No. at 21.)

The State counters Davis' arguments, asserting that the Alabama Court of Criminal Appeals "correctly held that Davis was not in custody when he made his exculpatory statements to law enforcement; thus, law enforcement was not required to read him the Miranda warnings."  (Doc. No. 94 at 52.)  Therefore, the State contends that neither 28 U.S.C. § 2254(d)(1) nor (d)(2) provide relief for Davis.  (Id. at 51.)

## 2.  The State Court Decision

On direct appeal, the Alabama Court of Criminal Appeals held that Davis'

statements given to two law enforcement officers on the day of the murder were

exculpatory, non-custodial and volunteered, and, thus, Davis was not entitled to Miranda

warnings.  For the sake of thoroughness, the court sets out in full that portion of the

Alabama Court of Criminal Appeals' decision on this issue:

> The state was permitted to introduce, through the testimony of two of the
> investigating officers, the exculpatory statements made by the appellant on
> the night of the murder but before he was taken into custody.  The appellant
> insists that admissions of these statements violated § 12-15-67, Code of
> Alabama 1975, which prohibited the use of statements by a child,
> unadvised by counsel, made to law enforcement officers while in their
> custody.  See also, A.R.Juv.P. 21 (1975).

> The state argues, and we agree, that the statements in question were not
> made while the appellant was in the custody of the investigating officers.
> Sergeant James Boggs testified that the appellant and his mother
> approached Boggs at the murder scene less than an hour after the murder
> and told him that the appellant had found the victim inside the store, had
> "gotten scared," and had gone home.  Boggs explained that this information
> was unsolicited and that he immediately introduced the appellant to Sheriff
> Vernon Peters of the Coosa County Sheriff's Department.  He stated that he
> did not question the appellant, that he did not arrest him, and that at that
> time he did not consider the appellant a suspect in the murder.

> Sheriff Peters testified that he was introduced to the appellant by Sergeant
> Boggs and that at Boggs's suggestion he took the appellant to a nearby
> patrol car only because other people at the scene were beginning to crowd
> around them.  He explained that he had no reason to suspect the appellant
> and had no reason to arrest him at that time.  He did not place the appellant
> in custody.  The appellant voluntarily made a statement essentially identical
> to what he had told Sergeant Boggs.  The appellant added that on his way
> home after discovering the victim inside the store he had seen two black

119

males walking down the highway away from the store.  Peters asked him for a description of the two men.  The appellant "hemmed and hawed" and reported only that one was tall and one was short.  After the appellant had told Peters where he, the appellant, worked and that the clothes he had on were the same ones he had worn to work, Peters asked the appellant how he had managed to keep his clothes so clean.  The appellant then "went to crying like" and revised his story about finding the body.  He explained that he lifted the body to see if he could help in any way and "got blood all over himself" and then went home and changed clothes.  It was at this point that Sheriff Peters became suspicious and he immediately interrupted the appellant and read him his rights.  The appellant was then taken into custody.  Later that night he was arrested for Mrs. Alford's murder.

There was also evidence that a driver's license check of the appellant was made at some point while the appellant was in the car talking with Sheriff Peters.  However, it was not clear from the record when that check was made or by whom it was authorized.  Peters testified that he did not authorize it and knew nothing about it until after he had placed the appellant in custody, initially as a key witness in the investigation.

Under these circumstances, essentially uncontradicted in the record, it is our conclusion that the statements made to Sergeant Boggs and Sheriff Peters before Peters read the appellant his rights were not made while the appellant was in custody and, in fact, were exculpatory statements volunteered by the appellant.  *Compare*, Harris v. State, 376 So.2d 773 (Ala. Crim. App.), *cert. denied*, 376 So.2d 778 (Ala.1979); Stewart v. State, 398 So.2d 369 (Ala. Crim. App., *cert. denied*, 398 So.2d 376 (Ala.1981); Manigan v. State, 402 So.2d 1063 (Ala. Crim. App.), *cert. denied*, 402 So.2d 1072 (Ala. 1981); Cork v. State, 433 So.2d 959 (Ala. Crim. App. 1983).

Therefore, the trial court did not err in admitting them into evidence.

Furthermore, appellant's mother, the key witness for the defense, generally confirmed, from the witness stand, the substance of these statements and the circumstances that existed when they were made.  Moreover, these statements were exculpatory and were not inconsistent with appellant's theory in defense at trial, that he arrived at Alford's Grocery after Mrs.

120

Alford had been killed and left upon discovering the body only because he was "scared."

Id. at 1100-01.  The Supreme Court of Alabama affirmed this aspect of the decision of the

Alabama Court of Criminal Appeals without discussion.  See Davis, 554 So.2d at 1113.


### 3.   The Trial Testimony

James Boggs, who on July 20, 1978, was employed as the post commander for the

Alabama Department of Public Safety with the rank of Sergeant, testified at Davis' trial.

On July 20, at approximately 5:40 p.m., Sergeant Boggs received a radio call to report to

Mrs. Alford's store.  (P-4 at 657-59, 677.)  While surveying the scene, at approximately

5:55 p.m., a white male and white female, later identified as Davis and his mother,

approached Sergeant Boggs.  (Id. at 672-73.)  Sergeant Boggs did not know these two

individuals, stating that he "had never seen [Davis] before."  (Id. at 673.)  The "lady

spoke first," stating, "'[T]his is my son[;] he found her [Mrs. Alford], and it scared him

and he come home, and I brought him back over here to tell you what he knows and what

he had seen.'"  (Id.)  Davis spoke next, stating, "'I was over here riding my motorcycle[;]

I went in there and found her[;] she had blood all over her.'"  (Id. at 674.)  Davis added,

"'[T]here were two [African-Americans] walking up the road.'"  (Id.)  Sergeant Boggs

testified that, at this point, Davis was not a suspect.  (Id. at 673.)  Sergeant Boggs also

stated that he did not ask Davis or his mother any questions.  Instead, Sergeant Boggs

called for Veston Peters, the Sheriff of Coosa County, Alabama, who also was at the scene of the murder.  (Id. at 674-75.)

Sheriff Peters testified as to what occurred after Sergeant Boggs summoned him.[20] With Sergeant Boggs were "several" individuals, two of whom Sheriff Peters later learned were Davis and his mother.[21]  (Id. at 718-19, 721.)  Sergeant Boggs informed Sheriff Peters that these individuals needed to speak to him.  (Id. at 720.)  Sheriff Peters testified that he did not know Davis, that Davis was not a suspect at that time, that Davis was not in "custody," and that Davis was not under any police restraint.  (Id.)

Sheriff Peters testified that Davis' mother spoke first.  She said, "Tim [Davis] found her [Mrs. Alford,] and he run[,] and he wants to talk to you about it."  (Id. at 721.) Davis added to his mother's comment that, when he left the store, he saw two African-Americans "walking up the road."  (Id.)  Sheriff Peters testified that, because several individuals were beginning to "gather around," Sergeant Boggs recommended that they "get in" one of the patrol cars where they would have "more privacy."  (Id.); (see also id. at 675.)  At that point, Sheriff Peters, Davis and another officer (Corporal Gilliland) "went to" another officer's "patrol car" which was parked "right in front of the store,"

---

[20] Sheriff Peters testified that, at approximately 5:40 p.m. on July 20, 1978, he responded to a "call" and proceeded to Alford's Grocery on Fishpond Road.  (P-4 at 699.)  By approximately 5:50 p.m., he arrived at the store.  (Id. at 700.)  Sheriff Peters had just appraised the inside of the store when Sgt. Boggs summoned him.  (Id.)

[21] Sheriff Peters also stated that he learned later that another of the individuals present, whom he describes as "a young girl," was Davis' wife.  (P-4 at 705.)

approximately ten to fifteen feet from where they were standing.  (Id. at 722, 724.)

Sheriff Peters testified that the patrol car, a Ford LTD, was new and had not yet been

equipped with a protective "screen" between the front and back seats and that the locks

on the back doors had not been removed, meaning that the back doors opened from the

inside.  (Id. at 722.)

Sheriff Peters testified that Corporal Gilliland and he "got in the front seat and

[Davis] got in the back seat."[22]  (Id. at 723, 708-09.)  Sheriff Peters elaborated that neither

he nor Corporal Gilliland "put" Davis in the back seat, but rather Davis was the one who

"want[ed] to talk to [them]."[23]  (Id.)  Sheriff Peters stated that Davis was not a suspect,

was not in custody, and was under no restraints.  (Id. at 723-24.)  Responding to the

question of whether Davis could "have gotten out and walked away at any time," Sheriff

Peters said, "[H]e sure could."  (Id. at 724.)  "[A]ll he had to do, was to open the door

and step out."  (Id. at 709.)  At this time, Sheriff Peters estimated that it was

approximately 6:15 p.m., but Sheriff Peters said "it could [have been] a little sooner or

little after."  (Id. at 724.)

Seated in the back seat of the patrol car, without any prompting, Davis told Sheriff

Peters and Corporal Gilliland that "he went into the store and found Mrs. Alford" and

---

[22] Sergeant Boggs did not accompany the officers and Davis.  Rather, he stayed
near the road and "tried to keep people from stopping on the road."  (P-4 at 676.)

[23] On cross-examination, Sheriff Peters was asked twice and twice denied that he
"put" Davis in the car, instead stating that Davis "got" into the car.  (P-4 at 735.)

"reached over and felt" her arm.  (<u>Id.</u> at 724-25, 710.)  Davis told the officers that, after

surmising that Mrs. Alford was dead, "he panicked," ran out the door, and saw two

African-Americans "walking up the road"  (<u>Id.</u> at 725.)  At that point, Sheriff Peters asked

Davis to describe the African-Americans.  (<u>Id.</u> at 713.)  Davis, however, "just kind of

hem-hawed on that," (<u>id.</u>), stating that one was "short" and the other was "tall"; Davis

also may have given "some kind of a description of the clothing."  (<u>Id.</u> at 713-14, 725.)

Sheriff Peters testified that Davis repeated this same story "two or three" times during the

course of their conversation which lasted approximately 10 to 15 minutes.  (<u>Id.</u> at 725,

713.)

　　　After Davis had repeated his story "two or three" times, Sheriff Peters testified that

he asked Davis some questions.  First, Sheriff Peters asked Davis where he worked.  (<u>Id.</u>

at 725, 713.)  Davis answered that he worked at Russell Mills' Distribution Center in

Alexander City.  (<u>Id.</u> at 725, 713.)  Second, Sheriff Peters asked Davis if he had worked

that day to which Davis responded in the affirmative.  (<u>Id.</u> at 713.)  Third, Sheriff Peters

remarked that Davis "looked mighty clean" and asked Davis if he was wearing the same

clothes that he wore to work that day.  (<u>Id.</u> at 725, 713.)  At that point, Sheriff Peters

testified that Davis "kind of went to crying like, or something, and said, 'I'll tell you

truth, I went in and found her and raised her up and got blood on me.'"  (<u>Id.</u>)  At that

point, Sheriff Peters said, "[W]ait a minute[;] I'm going to advise you of your rights,'"

which he did.  (<u>Id.</u>)  After Sheriff Peters advised Davis of his Miranda rights, Sheriff

Peters placed Davis in custody as a "material witness."  (<u>Id.</u> at 726.)  There is no evidence

that, after having been advised of his <u>Miranda</u> rights. Davis made any further statements or was asked any more questions by Sheriff Peters.  (<u>Id.</u>)  The same day, but later that evening, Davis was arrested for the murder of Mrs. Alford.  (<u>Id.</u> at 728-30.)

A radio log book, maintained by a Department of Public Safety police communications officer, indicates that at 6:11 p.m. Corporal Gilliland requested a driver's license check on Davis.  (<u>Id.</u> at 683, 690.)  Although Sheriff Peters did not dispute the information in the log book, he said that "he didn't have any knowledge" that Davis' driver's license was being "checked."  (<u>Id.</u> at 713.)

### 4.  *The Clearly Established Supreme Court Law*

The Fifth Amendment commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  "[I]n-custody interrogation[s]," which place "inherently compelling pressures" on the individuals interrogated, chill the exercise of the Fifth Amendment privilege against self-incrimination.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 467 (1966).  In order to protect this core Fifth Amendment right, the Supreme Court in <u>Miranda</u> held:  "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  <u>Id.</u> at 444.  The now well-familiar prophylactic, procedural safeguards require that a suspect who is interrogated

while in police custody must be advised, "[p]rior to any questioning, . . . that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id.

These Miranda warnings or procedural safeguards apply only to "custodial interrogation." Id. "By custodial interrogation," the Supreme Court "mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id.; see also Rhode Island v. Innis, 446 U.S. 291, 300 (1980) ("The Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."). When assessing whether a suspect is "in custody," "a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" Stansbury v. California, 511 U.S. 318, 320 (1994). "The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Id.

In Thompson v. Keohane, 516 U.S. 99 (1995), the Supreme Court held that the determination of whether a suspect is "in custody," so as to entitle the suspect to Miranda warnings, presents "two discreet inquiries: "[F]irst, what were the circumstances

126

surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not a liberty to terminate the interrogation and leave." Id. at 112 (internal footnote omitted).  The first inquiry is "distinctly factual," and the "[s]tate court's findings on these scene- and action-setting questions" are entitled to a presumption of correctness.  Id. (citing former 28 U.S.C. § 2254(d), now 28 U.S.C. § 2254 (e)(1)).  The second inquiry, "however, calls for application of the controlling legal standard to the historical facts," id., and, thus, presents a "'mixed question of law and fact,'" requiring "independent review" by the court in federal habeas corpus proceedings.[24]  Id. at 112-13.

Although the Keohane two-step inquiry remains unaltered, the level of "independent review" mandated by Keohane has been tempered by the passage of the AEDPA, which became effective after the ruling in Keohane.  The AEDPA mandates that courts also must accord deference to legal determinations made by a state court so that, in this proceeding, habeas corpus relief is not available to Davis unless the legal decision "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Yarborough v. Alvarado, 541 U.S. 652, 663 (2004).

_____

[24] The Supreme Court granted certiorari to resolve the question whether, in federal habeas corpus proceedings, a state-court "in custody" determination for purposes of Miranda is a factual finding entitled to a presumption of correctness or a mixed question of law and fact warranting independent review by the federal habeas court.  See Keohane, 516 U.S. at 102.

The Supreme Court's opinion in Alvarado, *supra*, is illustrative of the proper application of the foregoing standards.  In Alvarado, the Supreme Court addressed the precise issue which is before this court, namely, whether "a state court unreasonably applied clearly established law when it held that the respondent was not in custody for Miranda purposes."  541 U.S. at 655.  Alvarado was an accomplice in a murder which occurred during the robbery of a driver of a parked truck.  Alvarado, who was seventeen years old at the time, did not pull the trigger of the .357 Magnum which killed the driver, but he helped the trigger man hide the weapon.  Id. at 656.

Approximately a month after the murder, a detective with the Los Angeles County Sheriff's office who was in charge of the investigation "left word" at Alvarado's house and with his mother that she wanted to talk to Alvarado.  Alvarado's parents brought him to the sheriff's station for an interview and sat in the lobby while Alvarado was interviewed in another room by the detective.  For two hours, without being advised of his Miranda rights, Alvarado answered the questions posed by the detective.  Id.  At first, Alvarado denied any involvement or knowledge of the murder, but the detective "pressed on."  Id.  The detective informed Alvarado that witnesses had identified him and that it was time for him to "tell the truth."  Id. at 657.  Alvarado then "slowly began to change his story."  Id.

Finally, after an "appeal[] to [Alvarado's] sense of honesty and the need to bring the man who shot [the victim] to justice," Alvarado admitted that he helped the trigger

man steal the truck, knew that this man was armed and helped him hide the weapon after the shooting.  Id. at 658.  Alvarado, however, said that he "did not expect [the man] to kill anyone," only to scare the driver with the weapon.  Id.

During the interview, toward its conclusion, the detective asked Alvarado two times if he "needed to take a break," but Alvarado declined.  Id.  Alvarado's parents drove him home after the interview.  Id.  A few months later, Alvarado was arrested for first-degree murder and attempted robbery.  Id.

At his state trial, Alvarado moved to suppress his statements as violative of the holding in Miranda.  Id.  Finding that Alvarado was not in custody when he made the incriminating statements, the trial court denied the motion.  Id.  Alvarado subsequently was convicted.  Id. at 658-59.  On direct appeal, relying on Keohane, supra, the state appellate court agreed with the trial court that the interview was non-custodial and affirmed the judgment of conviction.  Id. at 659.  The state's highest court denied discretionary review.  Id.

Alvarado then filed a § 2254 habeas petition in the U.S. District Court for the Central District of California.  The district court denied the petition, concurring with the state court that Alvarado was not in custody for purposes of Miranda, and that, at the very least, the AEDPA's deferential standard of review precluded relief.  Id.  The Ninth Circuit reversed, and the Supreme Court granted certiorari to resolve whether the state

court had unreasonably applied clearly established federal law in determining that Alvarado was not in custody and, thus, was not entitled to Miranda warnings.  Id.

After discussing § 2254(d)(1)'s clearly-established law requirement and the pertinent Supreme Court precedent, including California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam), discussed infra, Stansbury, supra, and Keohane, supra, the Supreme Court elaborated on the meaning § 2254(d)(1)'s "reasonable" requirement.  The Court explained that, although the term was one with which federal judges were very familiar, "the range of reasonable judgment can depend in part on the nature of the relevant rule." Id. at 664.  The Court stated that the range may be narrow when the rule is specific and that application of a narrow rule "may be plainly correct or incorrect."  Id.  On the other hand, the Court said that "[o]ther rules are more general, and their meaning must emerge in application over the course of time."  Id.  "The more general the rule, the more leeway courts have in reaching outcomes in case by case determination."  Id.  The Miranda custody rule, the Court concluded, was a general rule.  Id. at 665.

On the basis of those principles, the Alvarado Court concluded that the state court's application of clearly established law was reasonable because "fair-minded jurists could disagree over whether Alvarado was in custody."  Id.  The Court observed that the following factors weighed against a finding that Alvarado was in custody:  "The police did not transport Alvarado to the station or require him to appear at a particular time"; the police "did not threaten him or suggest he would be placed under arrest"; "Alvarado's

130

parents remained in the lobby during the interview, suggesting that the interview would be brief"; the detective focused on the crime committed by the trigger man, rather than on Alvarado's crime; the detective did not threaten Alvarado with arrest and prosecution; the detective twice asked Alvarado if he needed a break; and, after the interview, Alvarado went home with his parents.  Id. at 664.  According to the Court, "all of these objective facts [were] consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave."  Id. at 654-65.

On the other hand, the Supreme Court recited that there were facts which cut against a non-custodial finding.  Id. at 665.  Those facts were as follows:  The duration of the interview was two hours; the interview occurred at a police station; the detective never told Alvarado that he was free to leave; Alvardo's legal guardians brought him to the station, "making the extent of his control over his presence unclear"; and, to the extent that Alvarado knew that his parents had made a request to be present during the interview, which was denied, that fact "might reasonably have led someone in Alvarado's position to feel more restricted than otherwise."  Id.  The Court observed that these facts "weigh[ed] in favor of the view that Alvarado was in custody."  Id.

After an examination of all of the foregoing facts, both for and against a finding of custody, the Supreme Court disagreed with the Ninth Circuit Court of Appeals, holding:

> These differing indications lead us to hold that the state court's application of our custody standard was reasonable.  The Court of Appeals was nowhere close to the mark when it concluded otherwise.  Although the question of what an "unreasonable application" of law might be difficult in

131

some cases, it is not difficult here.  The custody test is general, and the state court's application of our law fits within the matrix of our prior decisions. We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a de novo matter.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly."  Relief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable.  Under that standard, relief cannot be granted.

Id. (internal citations omitted).

### 5.  *Analysis*

In light of the foregoing standards, the court turns to the issue of whether Davis was in custody for the purposes of Miranda at the time he made statements to Sheriff Peters and Sergeant Boggs on July 20, 1978, the day of the murder.  As to the first Keohane inquiry which involves a factual determination of the "circumstances surrounding the interrogation," 516 U.S. at 112, Davis focuses primarily, but not exclusively, on the trial evidence regarding the timing as to when law enforcement officers conducted a driver's license check on Davis.  (Doc. No. 95 at 14.)  Davis takes specific issue with one of the factual findings made by the Alabama Court of Criminal Appeals, arguing that the state appellate court decision involved "an unreasonable determination of the facts presented at trial."  (Doc. No. 92 at 21); 28 U.S.C. § 2254(d)(2).  Namely, Davis contends that the record "blatantly contradict[s]" the finding of the Alabama Court of Criminal Appeals that "it was not clear from the record

132

when [the driver's license] check was made[,]" given that the log book indicated that the request for the check occurred at 6:11 p.m.  (Doc. No. 95 at 14-15); <u>Davis</u>, 554 So.2d at 1101.  Based upon Sheriff Peters' estimation that he issued <u>Miranda</u> warnings to Davis at approximately 6:25 p.m. or 6:30 p.m. (Doc. No. 95 at 15), Davis argues that the driver's license check preceded the giving of Miranda rights and that that fact indicates that Davis was a suspect prior to the time that he was advised of his <u>Miranda</u> rights.  (<u>Id.</u> at 15-16); (<u>see also</u> Doc. No. 92 at 18.)  For two reasons, the court is unpersuaded by Davis' argument.

First, Davis' legal argument finds only limited support in the holdings of the Supreme Court of the United States.  In <u>Stansbury v. California</u>, the Supreme Court reiterated that "[i]t is well settled . . . that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda[,]" that question being solely an objective one.  511 U.S. 318, 324 (1994) (per curiam); <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984) ("[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in  custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation").  Here, there is no evidence that Davis was informed that any officer had called in a driver's license check on him.  Indeed, Sheriff Peters said that he had no knowledge, at the time, that his fellow officer had made such a request.  Because there is no evidence that Davis knew that a driver's license check had been requested, this fact is

not relevant to the objective inquiry of whether a reasonable person in Davis' position would have felt to free to leave.  The Alabama Court of Criminal Appeals, thus, acted reasonably in not considering evidence of the driver's license check in deciding whether Davis was in custody.[25]  On the other hand, if prior to Sheriff Peters issuing Miranda warnings to Davis, he or another officer had told Davis that a driver's license check had been requested, consideration thereof would factor into the objective "in custody" analysis.  See Stansbury, 511 U.S. at 325.

Second, as to this purely factual determination made by the state appellate court, a presumption of correctness attaches which can be overcome only by clear and convincing evidence to the contrary.  Miller-El, 537 U.S. at 340 (citing 28 U.S.C. § 2254(e)).  Initially, the court finds that the Alabama Court of Criminal Appeals' factual finding cannot be examined in a vacuum; rather, the Court's finding that "it was not clear from the record when that [driver's license] check was made or by whom it was authorized," Davis, 554 So.2d at 1101, must be read in conjunction with the Court's prior statement: "There was also evidence that a driver's license check of [Davis] was made *at some point*

---

[25] With that said, however, the court recognizes that the Supreme Court in Stansbury noted in a parenthetical that instances "may arise in which the officer's undisclosed views are relevant in testing the credibility of his or her account of what happened during an interrogation[,]" but again the Court emphasized that "it is the objective surroundings, and not any undisclosed views, that control the Miranda custody inquiry."  Id.  Here, Sheriff Peters testified as to the facts surrounding his pre-Miranda conversations with Davis on July 20, 1978, emphasizing that Davis initially was not a suspect.  Based on Stansbury's parenthetical statement, perhaps the fact that a driver's license check was requested would bear on Sheriff Peters' credibility, but only if the evidence revealed that Sheriff Peters had knowledge thereof.

*while [Davis] was in the car talking with Sheriff Peters*." Id. (emphasis added). The foregoing statement illuminates that what was unclear to the Alabama Court of Criminal Appeals was at what precise moment during Davis' conversation with Sheriff Peters an officer requested a license check on Davis. For the following reasons, the court finds that Davis has not presented clear and convincing evidence to rebut the presumption of correctness which attaches to this finding, pursuant to 28 U.S.C. § 2254(e).[26]

Contrary to Davis' suggestion, this court does not interpret the Alabama Court of Criminal Appeals' finding as being contrary to the record created by the log book that the request for the driver's license check occurred at 6:11 p.m. The time of the request for the driver's license check becomes material, if at all, only if it the facts demonstrate that the request occurred prior to Sheriff Peters advising Davis of his Miranda rights. See Stansbury, 511 U.S. at 325. The court, however, finds that it would not be incorrect for a state court to conclude that Sheriff Peters' testimony is ambiguous as to the precise time that he talked with Davis in the patrol car. Sheriff Peters said that he had no knowledge at the time that the request for the driver's license check had been issued; thus, he could not testify whether the request was made before or after he had advised Davis of his Miranda rights. Rather, he could only attempt to reconstruct a timeline of his own

---

[26] Assuming *arguendo* that only 28 U.S.C. § 2254(d)(2) is applicable, the court would reach the same result because the decision of the Alabama Court of Criminal Appeals was not based upon an unreasonable determination of the facts in light of the evidence presented to the state court. See Rice v. Collins, ___ U.S. ___, ___ 126 S.Ct. 969, 974 (2006).

actions on that day.  In this regard, Sheriff Peters did not state with preciseness, but rather merely estimated, that it was 6:15 p.m. when Davis and he were seated in the patrol car and that he believed their conversation lasted ten to fifteen minutes.  As to his estimate of 6:15 p.m., Sheriff Peters elaborated that the time "could [have been] a little sooner or little after" 6:15 p.m.[27]  (Id. at 724.)  Because Sheriff Peters' testimony does not pinpoint with certainty whether he advised Davis of his Miranda rights before or after 6:11 p.m., the court finds that it would be reasonable for a state court to conclude that uncertainty existed as to whether the driver's license check occurred before or after Davis was advised of his Miranda rights.  Accordingly, the court finds that the factual finding made by the Alabama Court of Criminal Appeals "shall be presumed to be correct" because Davis has not rebutted it by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Keohane, 516 U.S. at 109.  The court also finds that the determination is reasonable in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d)(1).

The remainder of Davis' arguments, with one exception noted below, see *infra* footnote 28, involves challenges to the state court's application of Supreme Court law to the historical facts.  For the reasons to follow, however, the court finds that, in the best-case scenario for Davis, as in Alvarado, *supra*, reasonable jurors could disagree as to whether Davis was in custody when he was interviewed in the back seat of the patrol car

---

[27] The court notes that another point during his testimony, Sheriff Peters also could not ascertain exactly what time it was when Sergeant Boggs summoned him to talk with Davis and his mother, stating that it was 6:00 p.m., "maybe" 6:15 p.m. or "something like that."  (P-4 at 704.)

and that, therefore, the admission at trial of Davis' statement to Sheriff Peters did not involve an unreasonable application of Supreme Court precedent, because the objective facts and circumstances support the state court's determination that Davis was not in custody.

On July 20, 1978, the day of the murder, Davis returned to Mrs. Alford's store for the specific purpose of informing law enforcement officers that he had discovered Mrs. Alford's dead body earlier that day, but overcome with panic had fled.  It is clear from the record, and not challenged by Davis, that law enforcement officers did not play any role in Davis' decision to leave his home and go back to the scene of the crime and that Davis voluntarily initiated contact with law enforcement authorities on July 20, 1978. (Doc. No. 92 at 18.)  Moreover, when Davis, accompanied by his mother and wife, approached Sergeant Boggs, Sergeant Boggs did not ask Davis or his mother any questions.  Rather, Davis' mother, and then Davis himself, freely volunteered information.  That the facts up to this point are indicative of a non-custodial conversation is not seriously challenged by Davis.  Rather, Davis contends that "what may have begun as a consensual inquiry in a public place escalated into a custodial interrogation" once Davis was in the back seat of the patrol car.  (Id. at 18-19.)

Davis is correct that the Supreme Court has recognized that the location of the interrogation is one factor in determining whether a suspect is in custody, but Davis has not cited any Supreme Court authority to the effect that "in custody" may be proved

137

solely on the basis of questioning which occurs in a police cruiser.  By comparison, the Supreme Court has refused to hold that <u>Miranda</u> warnings are required "'simply because the questioning takes place in the station house.'"  <u>Beheler</u>, 463 U.S. at 1125.  Here, although ultimately Davis accompanied Sheriff Peters to a police cruiser where he engaged in further discussion with Sheriff Peters, the court finds that, based upon the specific circumstances of this case, a reasonable person in Davis' position would not have perceived the request to talk in private as prohibiting his freedom to leave.  Namely, there is no evidence that either Sergeant Boggs or Sheriff Peters commanded Davis' presence in the patrol car.  Rather, Sergeant Boggs merely communicated to Sheriff Peters, in Davis' presence, that a patrol car would offer more "privacy" given that "people" were beginning to "gather around."[28]  (P-4 at 721, 675.)

Additionally, once at the unmarked patrol car, the testimony indicates that Sheriff Peters did not direct Davis to sit in the back seat of the patrol car.  Rather, Sheriff Peters testified that Davis sat in the back seat on his own accord, with no prompting from him. There is no evidence that, prior to the issuance of the Miranda warnings, while seated in

_____

[28] In his brief, Davis asserts that testimony elicited from Sheriff Peters from a pretrial hearing which took place five days after the crime "demonstrates that the police took Mr. Davis to the police car." (Doc. No. 95 at 16.)  The court, however, finds that one must draw inferences which stretch the testimony beyond permissible parameters in order to reach Davis' conclusion that Davis essentially was in custody when he accompanied the officers to the patrol car.  Accordingly, to the extent that Davis has challenged as unreasonable the Alabama Court of Criminal Appeals' factual determination that Davis was not in custody when the officers "took [Davis] to a nearby patrol car" <u>Davis</u>, 554 So.2d at 1101, the court rejects Davis' argument.

the back seat, Davis was told that he had to remain in the patrol car and could not leave. Davis also was not informed that he was a suspect or that he was under arrest.

Moreover, there is no evidence that Davis was physically restrained in any manner while seated in the unmarked patrol car.  Davis was not handcuffed.  Davis was not ensnared in a locked back seat with no way out of the patrol car.  The door handle would have provided an escape, and there was no screen barrier between the front and back seats.  The patrol vehicle was parked, not moving, and it was parked "right in front of the store," not in an isolated, inaccessible area.  (P4-724, 707); Cf. U.S. v. Bordeaux, 400 F. 3d 548, 558 (8th Cir. 2005) (holding, on direct review, that defendant was not "in custody" when he was interviewed by law enforcement officers in a parked police vehicle which was unmarked and unlocked); Burket v. Angelone, 208 F.3d 172, 195 (4th Cir. 2000) (holding, on habeas review, that defendant was not "in custody" for Miranda purposes and reciting among other facts that defendant was transported to a police station for questioning in an unmarked police car which was not equipped with a "shield" inside the car).

Finally, the interview in the patrol car lasted only ten to fifteen minutes.  Davis initiated the dialogue, without being questioned, and, thereafter, Sheriff Peters asked Davis only four questions.  There is no evidence that Sheriff Peters engaged in any type of coercive, harassing or deceptive tactics in talking with Davis.  Weapons were never drawn.

The court finds that the foregoing facts, when judged by the principles espoused by the Supreme Court, are consistent with a determination that Davis was not in custody, i.e., that he could not have reasonably felt that he was restrained in his freedom of movement and was not free to terminate the interview and leave.  See Miranda, 384 U.S. at 461 (stating that Miranda rule applies to "[a]n individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to [coercive] techniques of persuasion").  In other words, the court finds that the facts reasonably permit a conclusion that Davis was not in custody when he made the statements at issue.

As in Alvarado, however, the court recognizes that not all of the facts point to a finding that the interview was non-custodial.  Other facts exist which arguably weigh in favor of a finding of custody.  Davis was not expressly told that he was free to leave or that he was not a suspect.  See Alvarado, 541 U.S. at 665 (factor indicative of custody is that officer "did not tell [suspect] that he was free to leave"); cf. Keohane, 516 U.S. at 103 (noting that troopers who conducted interview "constantly assured [Defendant] he was free to leave").  Davis was accompanied by his wife and mother, the latter of whom initiated the conversation by stating, in sum and substance, that "[m]y son has something to tell you, arguably "making the extent of his control over his presence unclear." Alvarado, 541 U.S. at 665 (noting that exclusion of parents from interview might reasonably make suspect "feel more restricted than otherwise").  Davis was separated from his wife and mother when he went with the officers to a more private setting (i.e., a

140

patrol car) and was alone in the patrol car with two law enforcement officers during questioning.  Cf. id.  The court does not find, however, that these facts are so weighty when considered as part of the totality of the circumstances so as to dictate that only a finding of custody would be reasonable.  At best, the court finds that "fair-minded jurists could disagree over whether [Davis] was in custody."  Id. at 665.  It is clear from the teachings of Alvarado that, when the circumstances demonstrate that a jurist reasonably could conclude either that Davis was in custody or that he was not in custody, the state court's determination falls within the realm of reasonableness on federal habeas review.  See id.

Davis, however, argues that the Alabama Court of Criminal Appeals unreasonably failed to consider and give appropriate weight to Davis' youthful age and the fact that he had no prior criminal background and, thus, no "familiarity with legal procedures."  (Doc. No. 92 at 20-21.)  The Supreme Court in Alvarado disposed of this argument.  In Alvarado, supra, the Court rejected the federal court of appeals' conclusion that the state court had unreasonably applied clearly established law as to the meaning of "custody" because it did not consider the defendant's age, which was seventeen, and the defendant's "inexperience with law enforcement," given the absence of a criminal record.  Id. at 660, 666.  The Supreme Court observed that its "opinions applying the Miranda custody test ha[d] not mentioned the suspect's age, much less mandated its consideration," and also that "the objective Miranda custody inquiry could reasonably be viewed as different from doctrinal tests that depend on the actual mindset of a particular suspect, where [the

141

courts] do consider a suspect's age and experience." Id. at 667.  Accordingly, the

Supreme Court held that "the state court's failure to consider [the defendant's] age does

not provide a proper basis for finding that the state court's decision was an unreasonable

application of clearly established law."[29]  Id. at 668.

As to "reliance on [a defendant's] prior history with law enforcement," the Court

went one step further, concluding that such reliance is "improper not only under the

deferential standard of 28 U.S.C. § 2254(d)(1), but also as a de novo matter."  Id.  The

Court acknowledged that "suspects with prior law enforcement experience may

understand police procedures and reasonably feel free to leave unless told otherwise."  Id.

"On the other hand, they may view past as prologue and expect another in a string of

---

[29] Davis cites United States v. Mendenhall, 446 U.S. 544 (1980), in support of his
argument that "[a]ge and level of education of the individual are relevant" to the Miranda
custody determination.  (Doc. No. 92 at 20.)  At issue in Mendenhall was the
voluntariness of the defendant's consent, not whether a defendant was in custody for
Miranda purposes.  See Mendenhall, 446 U.S. at 557-58 (holding that "[t]he question
whether the [defendant's] consent to accompany the agents was in fact voluntary or was
the product of duress or coercion, express or implied, is to be determined by the totality
of all the circumstances") (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1980)).
The distinction is significant.  In Alvarado, the Supreme Court examined the federal
circuit court of appeals' conclusion "that there was 'no principled reason' why such
factors [i.e., the suspect's age, education and intelligence] should not also apply to the
Miranda custody inquiry."  541 U.S. at 667 (brackets supplied).  The Supreme Court,
however, expressly differentiated Schneckloth, supra, and its progeny, observing that "the
voluntariness of a statement[,]" consideration of which "logically can depend on 'the
characteristics of the accused,'" is an inquiry distinct from the Miranda custody issue.
541 U.S. at 667 (quoting Schneckloth, 412 U.S. at 226).  "[T]he custody inquiry states an
objective rule designed to give clear guidance to the police, while consideration of a
suspect's individual characteristics–including his age–could be viewed as creating a
subjective inquiry."  Id.

arrests."  Id.   The Court concluded that consideration of a suspect's familiarity with law enforcement procedures "turns too much on the suspect's subjective state of mind and not enough on the 'objective circumstances of the interrogation.'"  Id. at 669 (quoting Stansbury, 511 U.S. at 323).

Accordingly, based upon the principles espoused in Alvarado, the court finds that the Alabama Court of Criminal Appeals' decision was not objectively unreasonable because it did not factor into its analysis Davis' age and lack of a criminal record.  The court observes that Justice O'Conner's remarks, quoted in her concurring opinion, are particularly fitting in this case where Davis was seventeen years old, married and accompanied by his wife on the day in question.  See id. (noting that age may be relevant to custody inquiry, but not in case of a seventeen-and-a-half year old because it is "difficult to expect police to recognize that a suspect is a juvenile when he is close to the age of majority" and "to ascertain what bearing it has on the likelihood that the suspect could feel free to leave") (O'Connor, J., concurring).

Davis also argues that the Alabama Court of Criminal Appeals unreasonably applied the clearly established law established in Miranda by relying on the subjective beliefs of Sheriff Peters and Sergeant Boggs.  (Doc. No. 95 at 18.)  It is true that the Alabama Court of Criminal Appeals recited both Sergeant Boggs' and Sheriff Peters' testimony that they did not initially consider Davis a suspect as a factor in its analysis. See Davis, 554 So.2d at 1101.  Because neither Sergeant Boggs nor Sheriff Peters

communicated his belief to Davis, the court agrees with Davis that the officers' subjective

intent is not relevant to the objective question of whether Davis was in custody.  See

Stansbury, 511 U.S. at 323–25.  Even if the Alabama Court of Criminal Appeals'

statement, when taken in isolation, is inconsistent with Supreme Court precedent,

however, the court is confident that the state appellate court's decision, as a whole,

constitutes a proper application of clearly established Supreme Court precedent.  Cf.

Franklin v. Johnson, 290 F.3d 1223, 1233 (9th Cir. 2002) (holding that, pursuant to 28

U.S.C. § 2254(d)(1), "[i]f . . . the state court reached the correct result with respect to

petitioner's claim of constitutional violation (even if on erroneous reasoning), that is the

end of our inquiry") (internal footnote omitted).  The court observes that, as discussed

herein, the Alabama Court of Criminal Appeals considered factors which the Supreme

Court deems relevant in the objective analysis, such as the fact that Davis' appearance at

the scene of the murder was not at the behest of law enforcement officers, that the initial

comments made by Davis to Sergeant Boggs and Sheriff Peters were "unsolicited," and

that Davis was not formally arrested.  Davis, 554 So.2d at 1101.

In sum, the court finds that the objective circumstances of Davis' interview

reasonably support a conclusion that Davis was not in custody and that, therefore,

Miranda warnings were not required.  See Stansbury, 511 U.S. at 322.  Because the

Alabama Court of Criminal Appeals' conclusions are not unreasonable under Supreme

Court precedent, the admission of Davis' statements at his trial does not merit habeas relief.[30]

### F.  Claim M:  Davis' Fourth Amendment Claim that his Undershorts were "Fruit of the Poisonous Tree" and the State's Reliance on *Stone v. Powell*, 428 U.S. 465 (1976)

#### 1.  Arguments of Counsel

Davis complains that law enforcement seized the undershorts which he was wearing on the day of the murder only "after a series of [three] interrogation techniques that each violated [] Davis' Constitutional rights."  (Doc. No. 92 at 22.)  First, he complains that he was questioned in the backseat of a patrol car, in violation of Miranda, a claim which this court addressed and rejected in the previous section of this opinion.  (Id.)  Second, Davis contends that, after being transported to the police station, he was "formally arrested" without probable cause for the murder of Mrs. Alford.  (Id.)  Third, Davis states that, at the station house, law enforcement illegally obtained a second statement from Davis, who was not advised by counsel, a statement which ultimately the trial court suppressed as violative of former § 12-15-67 of the Alabama Code.  (Id.)

---

[30] The court notes that the absence of citation to U.S. Supreme Court precedent by the Alabama Court of Criminal Appeals does not alter this court's findings.  See Davis, 554 So.2d at 1101 (citing four Alabama opinions).  As observed earlier in this opinion, a state court need not cite or even be knowledgeable of Supreme Court precedent "so long as neither the reasoning nor the result of the state court decision contradicts [it]."  Mitchell, 540 U.S. at 16.

Davis argues that his undershorts constituted "fruit" of the foregoing "illegally obtained statements and arrest" and, therefore, were inadmissible at trial, pursuant to the Fourth Amendment.  (Id.)

The State, on the other hand, maintains that Stone v. Powell, 428 U.S. 465 (1976), forecloses review of this Fourth Amendment issue in the present federal habeas corpus proceeding.  (Doc. No. 94 at 67-71.)  Alternatively, the State asserts that Davis' claim lacks merit under the standards of review set forth in 28 U.S.C. § 2254(d).  (Id. at 67-81.)

## 2.  State Trial Court Proceedings

In the state trial court in September 1979, approximately nine months prior to his trial, Davis filed a one-paragraph motion to suppress.  (P-26 at 1131.)  Therein, Davis moved

> to suppress any and all materials seized by the State or its agents pursuant to all search warrants issued in this case and to suppress any and all materials seized by the State or its agents other than those seized pursuant to the search warrants issued in this case in that, the Defendant states that any and all material seized by the State or its agents were seized against his will and seized illegally and in violation of his constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

(Id.)  The trial court continued the motion for a ruling at trial.  (Id.)  Also, on June 3, 1980, less than a week prior to the trial, Davis filed in the trial court a separate "motion to

146

suppress," which focused solely on the exclusion of the undershorts.  The basis for the latter motion was that Davis was a "juvenile" who was "arrested unlawfully and detained unlawfully in violation of his Constitutional rights and in violation of Alabama law," and that "the undershorts were seized as a direct result of his unlawful illegal arrest."  (P-26 at 1164.)

On June 9, 1980, the day of the trial but prior to its commencement, the court heard arguments regarding Davis' motion to suppress the undershorts, and the State stipulated to certain facts.  (P-23 at 335-341.)  Thereafter, the trial court denied the motion to suppress.  (P-23 at 341.)  The undershorts, thus, were admitted at trial.  (See Vol. V at 791-97.)

It is not disputed that, on direct appeal to the Alabama Court of Criminal Appeals, Davis did not rely on the Fourth Amendment when presenting his argument that the

undershorts should have been suppressed.[31]  (Doc. No. 94 at 69); (Doc. No. 95 at 19-20);

(P-27 at 70-71 (Davis' Br. on Direct Appeal).)  Instead, Davis rested his theory of

suppression on § 12-15-67 of the Code of Alabama.[32]  (Doc. No. 94 at 69); (Doc. No. 95

at 19-20.)  In its published opinion, the Alabama Court of Criminal Appeals rejected his

argument:

> The trial court did not err in admitting into evidence the undershorts taken
> from the appellant on the night of the murder, after he had been officially
> arrested for Mrs. Alford's murder.  Appellant's theory is that his
> undershorts should have been suppressed as "the fruit" of a statement taken
> in violation of § 12-15-67.  We disagree.
>
> The appellant was originally taken into custody between 6:15 and 6:30 p.m.
> on the night of the murder.  As more and more information was obtained

---

[31] In his brief on direct appeal, Davis confined his argument to the following:

Section 12-15-67 of the Code of Alabama, 1975, prohibits the use of the
statements of a child or other information or evidence derived directly or
indirectly from such statements made while in custody to police or law
enforcement officers.  The Appellant respectfully submits that the
introduction of the shorts into evidence was specifically prohibited by the
Juvenile Code due to the fact that the investigating officer had just taken a
statement from the Appellant (the use of which was also prohibited) and
that in said statement, the Appellant was quoted as stating that he had blood
on his pants and changed them.  This statement taken in conjunction with
the other inadmissible statements made to Veston Peters and Sgt. Boggs
obviously gave rise, either directly or indirectly, to the taking of the shorts
from the Appellant.

(P-27 at 71.)

[32] Section 12-15-67 of the Code of Alabama, 1975, now repealed but in effect at
the time of these proceedings, automatically prohibited the use of statements and
evidence obtained by law enforcement from a juvenile without advise of counsel while in
custody.  (See P-34A at 25.)

148

the investigation focused upon the appellant.  He was officially arrested for Mrs. Alford's murder at approximately 9:30 p.m.  The appellant, unadvised by counsel, made a custodial statement at 10:05 p.m.  That statement was obtained in violation of § 12-15-67 and was, therefore, suppressed by the trial court.  At approximately 11:00 p.m., at the request of the same investigating officer who had earlier taken the inadmissible statement, the appellant voluntarily surrendered the undershorts he was wearing, the same undershorts he was wearing when arrested.

Despite appellant's arguments to the contrary we are not persuaded that these undershorts were inadmissible.  Although the undershorts were obtained after the inadmissible statement was obtained, the record does not confirm appellant's theory that the undershorts were "the fruit" of that statement.  There was evidence that the victim had been sexually attacked. The appellant had previously told the authorities that he had changed clothes after he discovered the victim.  The investigators recovered from appellant's residence the clothes he had removed before returning to the scene of the crime.  An inventory revealed a T-shirt and blood splattered blue jeans and jogging shoes, but no undershorts.  With this information, after the investigation had focused upon the appellant and he had been legally arrested for Mrs. Alford's murder, the authorities were justified in obtaining the undershorts which the appellant was wearing at the time of his arrest.  <u>Thomas v. State</u>, 50 Ala.App. 227, 278 So.2d 230 (1973); <u>Turk v. State</u>, 53 Ala.App. 106, 298 So.2d 37 (1974); <u>Foy v. State</u>, 387 So.2d 321 (Ala. Crim. App. 1980).  Whatever information was revealed in the inadmissible statement, there was sufficient independent information to justify the request for appellant's undershorts.

There is no merit whatsoever in appellant's argument that he was arrested illegally.

<u>Davis</u>, 554 So.2d at 1101-02.

Subsequently, Davis filed a petition for writ of certiorari in the Supreme Court of Alabama, seeking review of the Alabama Court of Criminal Appeals' affirmance of the judgment of the conviction.  Davis' brief in support of his petition set forth numerous

149

issues.  One issue, namely "Issue IV," was addressed to the admission at trial of Davis'

undershorts.  Issue IV is titled, "Did the trial judge err to reversal in denying appellant's

motion to suppress the introduction into evidence of the undershorts taken from the

appellant?"  (P-34A at 24.)  Therein, Davis argued as follows:  "[T]he introduction of the

shorts into evidence was specifically prohibited by the Juvenile Code due to the fact that

the investigating officer had just taken a statement from [Davis] (the use of which was

also prohibited) and that in said statement, [Davis] was quoted as stating that he had

blood on his pants and changed them."  (Id. at 25-26.)  Davis continued:  "This statement

taken in conjunction with the other inadmissible statements made to Veston Peters and

Sgt. Boggs obviously gave rise, either directly or indirectly, to the taking of the shorts

from [Davis]."  (Id. at 25-26.)  He concluded:  "Hence, this evidence should have been

suppressed by the Trial Court.  The undershorts were thus 'fruit of the poisonous tree'

and their introduction into evidence mandates a reversal."[33]  (Id. at 26.)

On certiorari, the Supreme Court of Alabama affirmed the judgment of the

Alabama Court of Criminal Appeals and summarily rejected Issue IV.  After quoting

"Issue IV," among others, the Supreme Court of Alabama ruled as follows:

> We have searched the record for any plain error or defect in the proceedings
> at trial and have reviewed the opinions of the Court of Criminal Appeals as

---

[33] By way of comparison, the court notes that Davis' argument in his brief filed in support of his petition for writ of certiorari differs only in one respect from the argument Davis presented to the Alabama Court of Criminal Appeals on direct appeal, see supra footnote 31.  Namely, on certiorari, Davis added the "fruit of the poisonous tree" language, cited above, but included no citation of authority.

they relate to the issues enumerated above and the opinions of the United
States Supreme Court in Baldwin v. Alabama, 472 U.S. 372 . . . (1985);
Hopper v. Evans, 456 U.S. 605 . . . (1982); Beck v. Alabama, 447 U.S. 625
. . . (1980), on remand, 396 So.2d 645 (Ala. 1981); and Ritter v. State, 403
So.2d 154 (Ala. 1981).  Having done so, we affirm the judgment of the
Court of Criminal Appeals as to issues I through XI and issue XIII, leaving
issues XII, XIV, and XV for discussion in this opinion.  See Davis v. State,
554 So.2d 1094 (Ala. Crim. App. 1986).

Ex parte Davis, 554 So.2d 1111, 1113 (Ala. 1989).[34]

Davis then filed an application for rehearing which the Supreme Court of Alabama

denied.  (P-36).  In his brief in support of his application for rehearing, Davis argued that

his "undershorts" and other items of physical evidence "were all admitted into evidence

against [] Davis in violation of his rights under the Fourth, Fifth, Eighth, and Fourteenth

Amendments to the United States Constitution," as well as his rights under the Alabama

Constitution.  (P-36 at 19.)  Furthermore, citing Wong Sun v. United States, 371 U.S. 471

(1963), Davis asserted that the undershorts and other evidence "were obtained by law

enforcement authorities as fruits of an illegal arrest and as such should have been

suppressed."  (Id. (internal footnote omitted).)  The Supreme Court of Alabama overruled

Davis' application for rehearing.  See Davis, 569 So.2d at 742.  The Court summarily

rejected, among others, the foregoing issue, concluding as follows:  "We have carefully

considered the remaining issues raised by Davis in his original brief on rehearing and we

---

[34] The court notes that the Supreme Court of Alabama's citations to Supreme Court
cases, i.e., Baldwin and Beck, pertain to issues surrounding the constitutionality of a
sentence of death, not Fourth Amendment issues.

find that they were correctly decided by this Court in its opinion of September 15, 1989. Therefore, we will not address those issues here." Id. (citing *Ex Parte* Davis, 554 So.2d 1111 (Ala. 1989)).

After the Supreme Court of Alabama affirmed Davis' judgment of conviction (and sentence of death), Davis sought post-conviction relief in state court. The Alabama Court of Criminal Appeals rejected Davis' contention "that the State improperly used his undershorts" as evidence at trial because the undershorts "were obtained as a result of an allegedly illegal detention of the appellant." Davis, 720 So.2d at 1018. It held: "This claim is procedurally barred because it was raised and addressed at trial and on appeal." Id. at 1018-19.

### 3. Analysis: *Stone v. Powell*

The nature of Davis' claim is that Davis' undershorts were obtained as a product of an alleged unlawful arrest and illegally-obtained statements and, thus, the undershorts should have been suppressed at trial pursuant to the "fruit of the poisonous tree" doctrine of Wong Sun, *supra*, 371 U.S. at 488. The claim Davis has presented in these proceedings concerns the scope of the Fourth Amendment's protection against illegal

seizures and the application of the exclusionary rule.[35]  Before the court can reach the

merits of Davis' Fourth Amendment claim, however, Davis must overcome the holding in

Stone v. Powell, 428 U.S. 465 (1976).

In Stone, the Supreme Court held that, if the State "has provided an opportunity

for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be

granted federal habeas corpus relief on the ground that evidence obtained in an

unconstitutional search or seizure was introduced at his trial."  428 U.S. at 494 (Powell,

J.).  Subsequently, in Cardwell v. Taylor, a federal habeas proceeding, the Supreme Court

was faced with a Wong Sun claim, similar to the claim presented by Davis, that evidence

admitted at trial was the fruit of an illegal arrest.  See 461 U.S. 571, 571-73 (1983) (per

curiam).  The Cardwell Court held that review of this Fourth Amendment claim was

barred by the holding in Stone, so long as the state courts had afforded a full and fair

opportunity to litigate that claim.  See id. As explained by the old Fifth Circuit in Caver

v. State of Alabama, the Supreme Court in Stone grounded its decision

> on its conviction that federal habeas corpus relief based on the application
> of the exclusionary rule, when the state courts had already afforded the
> opportunity for full and fair litigation of the issue, would make a minimal
> contribution to the effectuation of fourth amendment rights compared to the
> substantial societal costs associated with exclusion of otherwise probative
> evidence.

---

[35] The Fourth Amendment exclusionary rule, a judicially-created doctrine,
precludes the use at trial, not only of evidence obtained in violation of the Fourth
Amendment, but also "fruit of the poisonous tree" evidence "derived from the illegally
seized evidence itself."  U.S. v. Houltin, 566 F.2d 1027, 1030 (5th Cir. 1978).

577 F.2d 1188, 1192 (5th Cir. 1978); <u>see also</u> <u>Withrow v. Williams</u>, 507 U.S. 680, 686

(1993) ("[W]e simply concluded in <u>Stone</u> that the costs of applying the exclusionary rule

on collateral review outweighed any potential advantage to be gained by applying it

there."); <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 374 (1986) ("[T]he Fourth Amendment

is not a trial right. . . .   The gravamen . . . is that the complainant's legitimate expectation

of privacy has been violated by an illegal search or seizure.").

In these proceedings, the State has seized on <u>Stone</u>'s language that a petitioner

need only have an "*opportunity* for full and fair litigation," 428 U.S. at 494, asserting that

in state court Davis had a process available to him to raise his Fourth Amendment claim

and, furthermore, that on direct review the Alabama Court of Criminal Appeals, in fact,

"decided the issue of the legality of Davis' arrest and the admission of the underwear on

the merits."  (Doc. No. 94 at 67, 69-70.)  Because Davis litigated or, at the very least, had

the opportunity to litigate his Fourth Amendment claim in state court, the State argues

that this court should apply the rule of <u>Stone</u> and refuse to consider the merits of Davis'

claim.

Davis presents a countervailing argument.  Davis argues that on direct appeal he

"did not receive meaningful appellate review, because the Alabama Court of Criminal

Appeals . . . did not review Mr. Davis' suppression claim with respect to the Fourth

Amendment."  (Doc. No. 92 at 26.)  He lodges the same complaint as to the Supreme

Court of Alabama's treatment of his claim on direct appeal, asserting that its decision also

was not predicated on Fourth Amendment principles.  (Id.)  Davis contends that, on direct

appeal, these two tribunals "limited their review to whether [] Davis' undershorts had to

be suppressed because of a violation of Ala. Code § 12-15-67 (1975)."  (Id. at 27); (Doc.

No. 95 at 19.)  He, thus, contends that Stone presents no obstacle to this court's review of

his Fourth Amendment claim.  For the reasons to follow, the court disagrees with Davis.

Although in Stone the Supreme Court provided limited guidance as to the meaning

of the phrase, "an opportunity for full and fair litigation," 428 U.S. at 494, the old Fifth

Circuit has interpreted Stone's language as "mean[ing] just that: an opportunity."  Caver,

577 F.2d at 1192.[36]  In Caver, the court explained, "If a state provides the processes

whereby a defendant can obtain full and fair litigation of a Fourth Amendment claim,

Stone v. Powell bars federal habeas corpus consideration of that claim whether or not the

defendant employs those processes."  Id.  The court continued:

> If police officers who are conducting a search or making an arrest are aware
> that the state criminal justice system provides an opportunity for full and
> fair litigation of fourth amendment suppression claims, the policy
> underlying the exclusionary rule will be served.  That a defendant later at
> trial might choose not to assert his fourth amendment claim could not
> remove the system's deterrence to police misconduct.

Id. at 1192-93; see also Smith v. Wainwright, 581 F.2d 1149 (5th Cir. 1978) (providing

that Stone requires only that the state provide an opportunity for full and fair adjudication

---

[36] In Bonner v. City of Prichard, the Eleventh Circuit adopted as binding precedent
all decisions of the former Fifth Circuit issued prior to October 1, 1981.  See 661 F.2d
1206, 1209 (11th Cir. 1981) (en banc).

155

of Fourth Amendment claims) (citing <u>Caver</u>).  In a more recent opinion, the Eleventh

Circuit reaffirmed that, in this circuit, <u>Stone</u> "bar[s] consideration of a Fourth

Amendment claim if the state has provided an opportunity for full and fair litigation of

the claim 'whether or not the defendant employs those processes.'"  <u>Huynh v. King</u>, 95

F.3d 1052, 1058 (11th Cir. 1996) (citing <u>Caver</u>, 577 F.2d at 1192) (footnote omitted).

<u>Stone</u>'s "full and fair litigation" language also was examined in <u>Tukes v. Dugger</u>, wherein

the Eleventh Circuit, quoting prior precedent, explained that

> "where there are facts in dispute, full and fair consideration requires
> consideration by the fact-finding court, and at least the availability of
> meaningful appellate review by a higher state court.  Where, however, the
> facts are undisputed, and there is nothing to be served by ordering a new
> evidentiary hearing, the full and fair consideration requirement is satisfied
> where the state appellate court, presented with an undisputed factual record,
> gives full consideration to defendant's Fourth Amendment claims."

911 F.2d 508, 514 (11th Cir. 1990) (quoting <u>Morgan v. Estelle</u>, 588 F.2d 934, 941 (5th Cir.

1979)).

Furthermore, a corollary principle, which emerged from <u>Stone</u>, is that error, if any,

in a state court's Fourth Amendment analysis or ruling does not provide a basis for

federal habeas review.  <u>See</u> <u>Gilmore v. Marks</u>, 799 F.2d 51, 57 (3d Cir. 1986) ("The

Courts of Appeals . . . have consistently held that an erroneous determination of a habeas

petitioner's Fourth Amendment claim does not overcome the <u>Stone  v. Powell</u> bar.").  In

other words, even if this court disagreed with the result of the state court on a Fourth

Amendment question, it has "no authority" to grant the writ of habeas corpus on that

basis.  Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (en banc).  A federal habeas petitioner, however, in some instances may escape the rule articulated in Stone, *supra*, on the basis of a denied opportunity, if he or she is prevented from litigating a Fourth Amendment claim "by reason of unconscionable breakdown in the underlying process." Id. (citing Frank v. Mangum, 237 U.S. 309 (1915)); see also Caver, 577 F.2d at 1192 (observing that in Gates, *supra*, the Second Circuit disagreed with the argument raised by the petitioner that "the mere presence of an opportunity, unavailed of by a defendant, is not sufficient to preclude federal habeas corpus consideration of fourth amendment suppression claims" and rejecting the same argument).

Here, turning to the litigation of Davis' Fourth Amendment claim in the state court proceedings, in the state trial court, Davis' trial counsel filed two motions which urged suppression of the undershorts, and the trial court thereafter held a pretrial hearing on the issue of the admissibility of the undershorts.  Davis' motions, although not detailed in their constitutional analyses, generally referenced the Fourth Amendment as a basis for suppression.  Although the trial court ruled against Davis, there is no allegation or argument by Davis that the state trial court denied him an opportunity for presentation of a Fourth Amendment suppression claim.  Not only was a corrective process available to Davis to challenge the admission of the undershorts on Fourth Amendment grounds, but it was employed by Davis when he filed his motions to suppress.  Thus, Davis does not argue, and for obvious and sound reason, that the state trial court failed to provide him

with an "opportunity" to move for the suppression of evidence based on a Fourth Amendment claim.

Additionally, the propriety of the admission at trial of Davis' undershorts was raised on direct appeal, and the decision of the trial court was affirmed.  Davis, however, complains that there was a breakdown in the appellate process on direct appeal, i.e., that he was denied "meaningful appellate review" (Doc. No. 92 at 26), because the Alabama Court of Criminal Appeals did not consider Davis' suppression claim in the context of the Fourth Amendment.  (Doc. No. 92 at 26.)  The court, however, finds that Davis' argument is unavailing because Davis did not present the issue concerning the suppression of the undershorts as a Fourth Amendment claim on direct appeal to the Alabama Court of Criminal Appeals, a fact implicitly conceded by Davis.  (See Doc. No. 95 at 19.)  In other words, the reason that the Alabama Court of Criminal Appeals did not reference Fourth Amendment principles in its analsyis was due to the fact that Davis did not raise a Fourth Amendment issue on direct appeal.

Courts consistently have concluded that a petitioner who, for whatever reason, chooses not to raise a Fourth Amendment issue on appeal has not been deprived of a full and fair opportunity to litigate the claim.  See, e.g., Turentine v. Miller, 80 F.3d 222, 224-25 (7th Cir. 1996) (federal collateral review of habeas-corpus petitioner's Fourth Amendment claim was foreclosed by Stone v. Powell because the petitioner failed to "clearly present[] his Fourth Amendment claim" on direct appeal; thus, petitioner could

not complain that the court of appeals, on direct review, failed to discuss the

constitutional requirements of Payton v. New York, 445 U.S. 573, 583-87 (1980));

Brunson v. Higgins, 708 F.2d 1353, 1361  (8th Cir. 1983) (although petitioner raised

Fourth Amendment issue in the trial court, he did not do so on direct appeal; his "failure

to raise the Fourth Amendment issue on appeal cannot prevent the application of the

Stone v. Powell doctrine"); United States ex rel. Barksdale v. Sielaff, 585 F.2d 288,

292-93 (7th Cir. 1978) (holding that, where the Fourth Amendment question was raised at

trial but not preserved on direct appeal in the state court, the defendant's failure to raise

the issue on appeal in the state courts did not suffice to avoid Stone); Dabbs v. Crosby,

No. 303CV953J12MCR, 2005 WL 2456220, *13 (M.D. Fla. 2005) ("Although the illegal

search and seizure claim was not presented as a federal constitutional claim in

Petitioner's direct appeal, Petitioner had the *opportunity* to advance the Fourth

Amendment claim on direct appeal"; finding that Stone barred review of Fourth

Amendment claim in federal habeas corpus proceeding).

Based on the foregoing, the court finds that the fact that the Alabama Court of

Criminal Appeals did not decide Davis' appeal on Fourth Amendment grounds is

insufficient to overcome the Stone bar because Davis did not frame his argument before

the Alabama Court of Criminal Appeals as a Fourth Amendment issue.  In order to

circumvent the Stone holding, Davis must demonstrate that he was denied the *opportunity*

to advance the Fourth Amendment claim before the Alabama Court of Criminal Appeals.

Yet, Davis has not advanced such a contention.  He had an opportunity to present his

Fourth Amendment issue, and that is all that Stone requires.  Caver, 577 F.2d at 1192; Gates, 568 F.2d at 840.

Davis, however, relies on Agee v. White, 809 F.2d 1487 (11th Cir. 1987), for his contention that Stone does not preclude review of a Fourth Amendment claim where the state appellate court, on direct appeal, fails to adequately address the claim.  (See Doc. No. 92 at 27.)  Agee is distinguishable.  In Agee, which was before the Eleventh Circuit on a federal habeas corpus petition, the petitioner had *raised* a Fourth Amendment claim on direct appeal before the Alabama Court of Criminal Appeals, arguing that a statement he gave was inadmissible "because of the residual taint from the initial, illegal arrest," but the Alabama Court of Criminal Appeals "ignored" the Fourth Amendment claim.  Id. at 1490.  Here, the Alabama Court of Criminal Appeals did not ignore a Fourth Amendment claim because one was not raised.  Davis, therefore, cannot now complain that the Alabama Court of Criminal Appeals did not explicitly discuss his claim in light of the Fourth Amendment or the Supreme Court of the United States' holding in Wong Son, *supra*.  The absence of any demonstration by Davis that the alleged failure of the Alabama Court of Criminal Appeals to employ a Fourth Amendment analysis to the suppression of the undershorts was the result of something other than his own neglect or choosing is fatal to his opposition to the application of Stone.

Davis, however, persists in his argument, asserting that on direct appeal he twice presented his Fourth Amendment issue to the Supreme Court of Alabama, once in his petition for certiorari to the Supreme Court of Alabama and again in his petition for

160

rehearing before that court.  The court carefully has considered this argument.[37]  Stone,

admittedly, did not specify whether a petitioner can forego an opportunity to litigate a

Fourth Amendment claim in a lower appellate tribunal in favor of attempting to seize that

opportunity in the higher appellate tribunal.  The court, however, has not found, and

Davis has not cited, any authority to the effect that a breakdown in the state appellate

process occurs when a petitioner, who foregoes the first appellate opportunity on direct

appeal to present a Fourth Amendment claim, is later denied a review on Fourth

Amendment grounds by a higher appellate tribunal.

Based on the facts of this case, the court simply is not persuaded that Davis was

denied an opportunity for a full and fair opportunity for review.[38]  Cf. McPhail v.

Warden, Attica Correctional Facility, 707 F.2d 67, 69-70 (2d Cir. 1983) (petitioner's

Fourth Amendment claim, which was not timely raised, was barred by Stone).  As

admitted by Davis, he bypassed mention of or reliance on the Fourth Amendment on

---

[37] It is noteworthy that Davis, at most, only indirectly presented a Fourth Amendment claim in his petition for writ of certiorari on direct appeal.  Davis argues, that, although he did not cite the Fourth Amendment in his discussion of this issue or cite any Supreme Court precedent, his use of the phrase "the fruit of the poisonous tree" constitutes "widely recognized language from Wong Sun v. United States, 371 U.S. 471, 488 (1963)."  (Doc. No. 95 at 20.)  Given its findings herein, the court need not and declines to address Davis' argument.

[38] The court notes that, even if the Supreme Court of Alabama erroneously decided on rehearing that the Alabama Court of Criminal Appeals already had adjudicated a Fourth Amendment claim, that fact would have no consequence as to the applicability of Stone.  See Christian v. McKaskle, 731 F.2d 1196, 1199 (5th Cir. 1984) (holding that Stone applies even though state habeas court erroneously held that petitioner's Fourth Amendment claim had been adjudicated on direct review).

direct appeal before the Alabama Court of Criminal Appeals.  He cannot now complain that there was a breakdown because the Supreme Court of Alabama then failed to analyze his suppression claim on the Fourth Amendment principles of <u>Wong Sun</u>.

In sum, the court finds that Davis has not demonstrated that the state court prevented him from litigating his Fourth Amendment claim.  Davis was afforded every full and fair opportunity to litigate and have adjudicated his Fourth Amendment claim; therefore, pursuant to <u>Stone</u>, the court finds that it is barred from considering this claim.[39]

---

[39] The court notes, that if the court was faced with the task of resolving the Fourth Amendment issues, 28 U.S.C. § 2254(d) would bar relief as well.  Although, on direct appeal, the Alabama Court of Criminal Appeals did not expressly discuss the Fourth Amendment, it devoted considerable attention to Davis' argument that the suppression of his undershorts constituted "the fruit" of an illegally-obtained statement.  <u>Davis</u>, 554 So.2d at 1101-02.  It held that Davis "voluntarily surrendered" his underwear and that, alternatively, there were ample facts known to law enforcement, outside of Davis' statements at the station house, to support the seizure, including physical evidence revealing that Mrs. Alford had been subjected to sodomy, Davis' statement in the patrol car that he had changed clothes before returning to the scene of the crime, and the fact that blood-spattered clothing had been recovered, but not underwear.  <u>Id.</u>  Moreover, as discussed in the preceding subsection of this opinion, the Alabama Court of Criminal Appeals expressly rejected Davis' contention that Davis' statement made at the crime scene and in the back seat of the patrol car violated <u>Miranda</u>.  The Court also considered whether Davis' arrest was legal, but found "no merit whatsoever" in that contention.  <u>Id.</u> at 1102.  Based on these findings of fact and conclusions of law made by the Alabama Court of Criminal Appeals, the court would find that Davis has not shown that the state court applied a rule that contradicted the governing law set forth in the opinions of the Supreme Court of the United States, that the result reached by the state court was at odds with any Supreme Court opinion, or that the state court's application of the clearly established law regarding this claim was objectively unreasonable.

## VI.  ORDER

Accordingly, for the reasons discussed herein, it is CONSIDERED and ORDERED that Davis' petition for writ of habeas corpus as to his death sentence be and the same is hereby CONDITIONALLY GRANTED.  The court shall issue a writ of habeas corpus unless, within 60 days from the date of this order, unless extended on further order of the court, the State of Alabama VACATES or SETS ASIDE Davis' sentence of death and imposes a sentence of life imprisonment without the possibility of parole.  The State is DIRECTED to notify the court *instanter* when the appropriate action correcting Davis' sentence has been taken, and at such time the court will enter a final judgment in this action.

It is further CONSIDERED and ORDERED that Davis' petition for writ of habeas corpus as to the remaining guilt-phase claims be and the same is hereby DENIED and that said claims are hereby DISMISSED with prejudice.

DONE this 7th day of July, 2006.

/s/ Ira DeMent_____
SENIOR UNITED STATES DISTRICT JUDGE

163